IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JAMES KIRKHAM, on behalf of himself and all others similarly situated, and<br><br>MATTHEW SESSOMS, on behalf of himself and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>TAXACT, INC.,<br><br>Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | Civil Action No. 2:23-CV-3303-WB<br><br>Jury Trial Demanded |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND STAY LITIGATION**


COHEN, PLACITELLA & ROTH, P.C.
James P. Goslee (#203043)
Michael Coren (#31037)
Eric S. Pasternack (#320127)
Jared M. Placitella (#321333)
2001 Market St., Suite 2900
Philadelphia, PA 19103
(215) 567-3500
jgoslee@cprlaw.com
mcoren@cprlaw.com
epasternack@cprlaw.com
jmplacitella@cprlaw.com

## TABLE OF CONTENTS


I. Introduction and Background ..... 1

II. Argument ..... 4

A. Neither Plaintiff Kirkham nor Plaintiff Sessoms agreed to arbitration..... 4

1. No agreement was formed because of TaxAct's failure to "explicitly" advise users that the act of clicking a checkbox will constitute assent to the "TaxAct Terms of Services and License Agreement."..... 6

2. TaxAct cannot satisfy the strict burden of proof required under Pennsylvania law to establish mutual assent to arbitration...... 10

3. Plaintiff Sessoms never clicked the "I agree" checkbox on TaxAct's "Create Account" or "E-File" webpages...... 11

4. Plaintiff Sessoms is not bound to arbitrate his claims because of his wife's use of TaxAct..... 13

a. Equitable estoppel cannot be used to compel arbitration because Plaintiff Sessoms did not "knowingly exploit" TaxAct's terms and conditions. .....13

b. Plaintiff Sessoms is not a third-party beneficiary of TaxAct's terms and conditions. 17

c. No agency relationship exists between Plaintiff Sessoms and his wife sufficient to bind him to arbitration. .....19

B. This Court can decide issues relating to arbitrability..... 22

C. Plaintiffs' claims under the Pennsylvania Wiretapping Act and 26 U.S.C. §§ 6103 and 7431(a)(2) exist independently of the "TaxAct Terms of Services and License Agreement" and fall outside the scope of its arbitration provision. ..... 23

D. The arbitration agreement is procedurally and substantively unconscionable. ..... 25

E. Because Plaintiff Sessoms is a non-signatory, the Federal Arbitration Act does not require that this litigation be stayed. ..... 29

III. Conclusion ..... 30

## TABLE OF AUTHORITIES

### Cases

*Abdurahaman v. Prospect CCM LLC*,
42 F.4th 156 (3d Cir. 2022) ........ 16

*American Bureau of Shipping v. Tencara Shipyard S.P.A.*,
170 F.3d 349 (2d. Cir. 1999)........ 15

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011)........ 28

*Bannett v. Hankin*,
331 F. Supp. 2d 354 (E.D. Pa. 2004) ........ 23

*Barrows v. Brinker Rest. Corp.*,
36 F.4th 45 (2d Cir. 2022) ........ 12

*Bel-Ray Co., Inc. v. Chemrite (Pty) Ltd.*,
181 F.3d 435 (3d Cir. 1999)........ 4

*Berman v. Freedom Fin. Network, LLC*,
30 F.4th 849 (9th Cir. 2022) ........ 6, 7, 8

*Blair v. Scott Specialty Gases*,
283 F.3d 595 (3d Cir. 2002)........ 5

*Bolus v. United Penn Bank*,
525 A.2d 1215 (Pa. Super. 1987)........ 19, 22

*Bouriez v. Carnegie Mellon Univ.*,
359 F.3d 292 (3d Cir. 2004)........ 13, 14, 16

*Burks v. Fed. Ins. Co.*,
883 A.2d 1086 (Pa. Super. 2005)........ 17

*Burns v. Philly Trampoline Parks, Delco, LLC*,
No. 3544 EDA 2016,
2017 WL 4948993 (Pa. Super. Oct. 31, 2017)........ 14, 20

*Century Indem. Co. v. Certain Underwriters at Lloyd's London*,
584 F.3d 513 (3d Cir. 2009)........ 4

*Checchia v. Solo Funds*,
No. 23-444,
2023 WL 3868369 (E.D. Pa. June, 7, 2023) .......... 9

*Chilutti v. Uber Tech., Inc.*,
300 A.3d 430 (Pa. Super. 2023) .......... 3, 5, 10, 11

*Clayton v. McCullough*,
670 A.2d 710 (Pa. Super. 1996) .......... 21

*Clymer v. Jetro Cash and Carry Enterprises, Inc.*,
334 F. Supp. 3d 683 (E.D. Pa. 2018) .......... 25

*Congdon v. Uber Techs., Inc.*,
226 F. Supp. 3d 983 (N.D. Cal. 2016) .......... 29, 30

*Coulter v. Experian Information Solutions, Inc.*,
No. 20-1814,
2021 WL 735726 (E.D. Pa. Feb. 25, 2021) .......... 8

*Cty. of Monmouth v. Rite Aid Corp.*,
__ F. Supp. 3d __,
2023 WL 2743552 (E.D. Pa. 2023) .......... 14, 15, 16

*Culliane v. Uber Techs., Inc.*,
893 F.3d 53 (1st Cir. 2018) .......... 7

*E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediaries, S.A.S.*,
269 F.3d 187 (3d Cir. 2001) .......... 13, 14, 17

*Edwards v. Hovensa, LLC*,
497 F.3d 355 (3d Cir. 2007) .......... 26

*Genesco, Inc. v. T. Kakiuchi & Co.*,
815 F.2d 840 (2d Cir. 1987) .......... 23

*Griswold v. Coventry First LLC*,
762 F.3d 264 (3d Cir. 2014) .......... 13, 14, 23

*Gross v. Genesis Healthcare, Inc.*,
No. 2022 EDA 2017,
2018 WL 2423306 (Pa. Super. May 30, 2018) .......... 20

*Harris v. Green Tree Fin. Corp.*,
183 F.3d 173 (3d Cir. 1999) .......... 25

*Haskins v. First Am. Title Ins. Co.*,
866 F. Supp. 2d 343 (D.N.J. 2012) .......... 13

*HealthplanCRM, LLC v. Avmed, Inc.*,
458 F. Supp. 3d 308 (W.D. Pa. 2020) .......... 9

*Jackson v. Amazon.com, Inc.*,
65 F.4th 1093 (9th Cir. 2023) .......... 23, 24, 25

*Jaludi v. Citigroup*,
933 F.3d 246 (3d Cir. 2019) .......... 4, 12

*James v. Global TelLink Corp.*,
852 F.3d 262 (3d Cir. 2017) .......... 6

*Katz v. Six Flags Great Adventure, LLC,*
No. CV-18116,
2018 WL 3831337 (D.N.J. Aug. 13, 2018) .......... 4

*Kirleis v. Dickie, McCamey & Chilcote, P.C.*,
560 F.3d 156 (3d Cir. 2009) .......... 5

*Kohlman v. Grane Healthcare Co.*,
279 A.3d 42 (Pa. Super. 2022) .......... 25

*Lelouis v. Western Directory Co.*,
230 F. Supp. 2d 1214 (D. Or. 2001) .......... 27

*MacClelland v. Cellico P'ship*,
609 F. Supp. 3d 1024 (N.D. Cal. 2022) .......... 26, 27

*MAG Portfolio Consult, GMBH v. Merlin Biomed Grp. LLC*,
268 F.3d 58 (2d Cir. 2001) .......... 15

*McCulligan v. Pennsylvania State Police*,
123 A.3d 1136 (Pa. Cmwlth. Ct. 2015) .......... 27

*Mcllwain v. Saber Healthcare Grp., Inc.*,
208 A.3d 478 (Pa. Super. 2019) .......... 19

*Meyer v. Uber Tech., Inc.*,
868 F.3d 66 (2d Cir. 2017) .......... 6, 8

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
473 U.S. 614 (1985) .......... 23

*Morgan v. Sundance, Inc.*,
596 U.S. __, 142 S.Ct. 1708 (2022) .... 10

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
460 U.S. 1 (1983) .... 29

*Mountain Prop., Inc. v. Taylor Hill Realty Corp.*,
767 A.2d 1096 (Pa. Super. 2001) .... 5

*Nagrampa v. Mailcoups, Inc.*,
469 F.3d 1257 (9th Cir. 2006) .... 28

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Stucco Sys., LLC*,
289 F. Supp. 3d 457 (S.D.N.Y. 2018) .... 23

*Nguyen v. Barnes & Noble Inc.*,
763 F.3d 1171 (9th Cir. 2014) .... 7

*Nicosia v. Amazon.com, Inc.*,
834 F.3d 220 (2d Cir. 2016) .... 6

*O'Hanlon v. Uber Tech., Inc.*,
990 F.3d 757 (3d Cir. 2021) .... 4, 13, 16

*Okten v. ARS National Services, Inc.*,
2023 WL 3249828 (D. NJ 2023) .... 4

*Parilla v. IAP Worldwide Servs., VI, Inc.*,
368 F.3d 269 (3d Cir. 2004) .... 25

*Peterson v. Kindred Healthcare, Inc.*,
155 A.3d 651 (Pa. Super. 2017) .... 21

*Porter v. Toll Bros., Inc.*,
217 A.3d 337 (Pa. Super. 2019) .... 14, 16

*Quilloin v. Tenet HealthSystem Phila., Inc.*,
673 F.3d 221 (3d Cir. 2012) .... 26

*Register.com, Inc. v. Verio, Inc.*,
356 F.3d 393 (2d Cir. 2004) .... 6

*Samsung Elecs. Am., Inc. v. Ramirez*,
777 F. App'x 243 (9th Cir. 2019) .... 9

*Santiago v. Philly Trampoline Park, LLC*,
291 A.3d 1213 (Pa. Super. 2023)........................................................................ 20, 21, 22

*Scarpitti v. Weborg*,
609 A.2d 147 (Pa. 1992)........................................................................................ 17

*Schnabel v. Trilegiant Corp.*,
697 F.3d 110 (2d Cir. 2012)...................................................................................... 6

*Schreiber v. Olan Mills*,
627 A.2d 806 (Pa. 1993)........................................................................................... 5

*Smay v. E.R. Stuebner, Inc.*,
864 A.2d 1266 (Pa. Super. Ct. 2004)......................................................................... 4

*Soliman v. Subway Franchisee Advert. Fund. Tr. Ltd.*,
442 F. Supp. 3d 519 (D. Conn. 2020)........................................................................ 9

*Specht v. Netscape Commc'ns Corp.*,
306 F.3d 17 (2d Cir. 2002)........................................................................................ 6

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016)................................................................................................... 4

*Starke v. SquareTrade, Inc.*,
913 F.3d 279 (2d Cir. 2019)....................................................................................... 8

*Thibodeau v. Comcast Corp.*,
912 A.2d 874 (Pa. Super. 2006)............................................................................... 28

*TransUnion v. Ramirez*,
141 S. Ct. 2190 (2021)............................................................................................... 4

*Trina Solar US, Inc. v. Jasmin Solar Pty Ltd.*,
954 F.3d 567 (2d Cir. 2020)................................................................................ 14, 15

*Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Jr. Univ.*,
489 U.S. 468 (1989)................................................................................................... 4

*Walton v. Johnson*,
66 A.3d 782 (Pa. Super. 2013)........................................................................ 19, 20, 21

*Washburn v. N. Health Facilities, Inc.*,
121 A.3d 1008 (Pa. Super. Ct. 2015)............................................................... 13, 18, 19

*Wert v. ManorCare of Carlisle PA, LLC*,
124 A.3d 1248 (Pa. 2016) ........ 26

**Statutes**

18 Pa. C.S. § 5701 ........ 1

18 Pa.C.S.A. § 5725(a)(1) ........ 26

26 U.S.C. § 6103 ........ 1

26 U.S.C. § 7431(a)(2) ........ 1

## I. Introduction and Background

As a Congressional Report revealed earlier this year,[1] Defendant TaxAct, Inc., embedded into its website and online tax preparation and filing applications computer code—"pixels"—that intercepts, discloses, and without the taxpayers' knowledge or consent, transmits taxpayers' confidential tax return information to third parties including Google and Meta. Having violated taxpayers' trust, TaxAct is liable under federal and Pennsylvania law for statutory liquidated damages as well as actual damages, punitive damages, and attorney's fees and costs.[2]

After Plaintiff James Kirkham sued TaxAct on behalf of a putative class of TaxAct's Pennsylvania website users, Plaintiff Matthew Sessoms joined this action. Unlike Plaintiff Kirkham, who used TaxAct's services to prepare and file his taxes, Plaintiff Sessoms did not personally use TaxAct. His wife, Krysta Sessoms, created an account that she used to prepare and file his taxes. While Plaintiff Sessoms did not personally use TaxAct to prepare and file his taxes, TaxAct's employment of pixels harmed him (and others like him) just the same.

Rather than offer a merits-based defense to Plaintiffs' claims, TaxAct asks this Court to compel Plaintiffs Kirkham and Sessoms to arbitration. TaxAct's motion should be denied. Neither Plaintiff Kirkham nor Plaintiff Sessoms agreed to arbitration. Goslee Decl., Exhibit A, 11/27/2023 Decl. of Plaintiff Sessoms, ¶ 17; Goslee Decl., Exhibit B, 10/12/2023 Decl. of Plaintiff Kirkham, ¶ 7. Nor did they knowingly and unambiguously agree to waive their constitutional right to a jury trial. *Id.* TaxAct does not even contend that Plaintiffs Kirkham and

[1]https://www.warren.senate.gov/imo/media/doc/Attacks%20on%20Tax %20Privacy%20 Report_7.12.2023.pdf (last accessed July 20, 2023).

[2] TaxAct violated 26 U.S.C. §§ 6103 and 7431(a)(2) as well as the Pennsylvania Wiretapping and Electronic Surveillance Control Act ("Pennsylvania Wiretap Act"), 18 Pa. C.S. § 5701, *et seq.*

Sessoms read the “Terms of Service and License Agreement.” It instead urges this Court to find that Plaintiffs Kirkham and Sessoms agreed to arbitration because TaxAct’s website featured a “clickwrap” agreement. But TaxAct’s website contained nothing of the sort. The defining characteristic of a “clickwrap” agreement is that it presents the user with the terms, in a scrollable pop-up window, and requires the user to affirmatively accept the terms. TaxAct’s website did not present the “Terms of Service and License Agreement” in a scrollable, pop-up window to Plaintiff Kirkham and it could not have to Plaintiff Sessoms as he never visited TaxAct’s website. Nor did it warn users that by clicking a checkbox, TaxAct would regard them as having agreed to the “Terms of Service and License Agreement.”

More accurately, TaxAct used a “browse-wrap” agreement, and a defective one at that. While a “clickwrap” agreement requires users to affirmatively click a button indicating their agreement to terms of use after viewing the agreement, a “browse-wrap” purports to obtain the same assent automatically, simply by use of the website. In the years since ”browse-wrap “agreements came into use, the law has developed clear standards for their use. For a company to bind a user to a “browse-wrap” agreement, its website must at a minimum feature an “explicit textual notice” that notifies the user of the legal significance of the action he or she must take to enter into an agreement. In other words, the notice must advise the user of what action would constitute assent. While TaxAct included an “I agree” checkboxes on its “Create Account” and “E-file” pages, those notices fall considerably short of satisfying the “explicit textual notice” requirement, which serves as a floor of what a website operator must do to obtain mutual assent to a “browse-wrap” agreement.

Pennsylvania law imposes a more demanding standard on website operators, holding them to a strict burden of proof that they obtained a consumer’s unambiguous manifestation of

assent to arbitration. *Chilutti v. Uber Tech., Inc.*, 300 A.3d 430, 449-50 (Pa. Super. 2023). TaxAct cannot satisfy this more demanding standard. For one thing, it failed to advise its users on the "Create Account" and "E-file" pages themselves that they would be waiving their right to a jury trial by agreeing to TaxAct's terms. For another, the waiver does not appear on the first page of the TaxAct Terms of Services and License Agreement in bold, capitalized text. Given these deficiencies, TaxAct cannot compel arbitration against anyone.

Certainly, TaxAct cannot compel arbitration against Plaintiff Sessoms as he never visited the TaxAct website, created a TaxAct account, used TaxAct to prepare and file his taxes, or clicked the "I agree" checkbox. Goslee Decl., Exhibit A, ¶¶ 4-17. In fact, because Plaintiff Sessoms never personally visited the TaxAct website, TaxAct never presented even so much as a notice of or link to the Arbitration Agreement to him. No argument could therefore be made that Plaintiff Sessoms is a signatory to the "TaxAct Terms of Services and License Agreement" subject to arbitration. There is moreover no basis under Pennsylvania law to impose an arbitration agreement against him as a non-signatory, particularly given that the claims asserted against TaxAct fall outside the scope of the Arbitration Agreement.

TaxAct's "Terms of Service and License Agreement" is also procedurally and substantively unconscionable: it is a contract of adhesion and includes terms that unreasonably favor TaxAct to the disadvantage of its users by limiting the remedies available to them and the time in which they may pursue their claims. Given the cumulative effect of these unconscionable practices and terms, the offending provisions cannot be severed.[3]

[3] Despite having removed this matter to federal court, TaxAct has questioned whether Article III's case and controversy requirement is satisfied in this matter given the statutory basis of both plaintiffs' substantive and the liquidated damages claims. Dkt. 14. *See TransUnion v.*

For these reasons, as more fully set out below, TaxAct's Motion to Compel Arbitration and Stay Litigation should be denied.

## II. Argument

### A. Neither Plaintiff Kirkham nor Plaintiff Sessoms agreed to arbitration.

"Arbitration is strictly a matter of contract." *Bel-Ray Co., Inc. v. Chemrite (Pty) Ltd.*, 181 F.3d 435, 444 (3d Cir. 1999). Only the "parties to an arbitration agreement are subject to arbitration" as a result. *O'Hanlon v. Uber Tech., Inc.*, 990 F.3d 757, 766 (3d Cir. 2021) (quoting *Smay v. E.R. Stuebner, Inc.*, 864 A.2d 1266, 1271 (Pa. Super. Ct. 2004)). This is because "the Federal Arbitration Act does not require parties to arbitrate when they have not agreed to do so[.]" *Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Jr. Univ.*, 489 U.S. 468, 474 (1989). After all, "the basis for contractual arbitration is consent, not coercion." *Century Indem. Co. v. Certain Underwriters at Lloyd's London*, 584 F.3d 513, 523 (3d Cir. 2009). Neither Plaintiffs Kirkham nor Sessoms have so agreed and are therefore not subject to arbitration.[4]

As TaxAct admits, Pennsylvania law governs the question of contract formation here. Dkt. 30-1, generally (applying Pennsylvania law). *See Jaludi v. Citigroup*, 933 F.3d 246, 255 (3d Cir. 2019). To form a contract under Pennsylvania law, there must be (1) a mutual manifestation of an intention to be bound, (2) terms sufficiently definite to be enforced, and (3) consideration.

---

*Ramirez*, 141 S. Ct. 2190 (2021); *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016). Having raised this threshold issue, it is incumbent on TaxAct to justify its removal of this Action to this Court. Absent a case or controversy, there is no subject matter jurisdiction and the only relief that can be granted here would be an order remanding this case to the Court of Common Pleas. *See Okten v. ARS National Services, Inc.*, 2023 WL 3249828 (D. NJ 2023); *Katz v. Six Flags Great Adventure, LLC,* No. CV-18116, 2018 WL 3831337, at *8-9 (D.N.J. Aug. 13, 2018).

[4] TaxAct's heavy reliance on a "presumption of arbitrability" is misplaced as the presumption does not apply to the "threshold question as to the existence of an agreement between the parties to arbitrate." *Id.* at 526-27.

*Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir. 2009) (citing *Blair v. Scott Specialty Gases*, 283 F.3d 595, 603 (3d Cir. 2002)). An "explicit agreement is essential to the formation of an enforceable contract." *Id.* at 163. "[T]here must be a meeting of the minds; the very essence of an agreement is that the parties mutually assent to the same thing." *Schreiber v. Olan Mills*, 627 A.2d 806, 808 (Pa. 1993) (cleaned up). "Whether particular conduct expresses an offer and acceptance must be determined on the basis of what a reasonable person in the position of the parties would be led to understand by such conduct under all of the surrounding circumstances." *Mountain Prop., Inc. v. Taylor Hill Realty Corp.*, 767 A.2d 1096, 1101 (Pa. Super. 2001). "When the evidence is in conflict as to whether the parties intended that a particular writing should constitute an enforceable contract, it is a question of fact whether a contract exists." *Yellow Run Coal Co. v. Alma-Elly-Yv Mines, Ltd.*, 285 Pa. Super. 84, 426 A.2d 1152, 1154 (1981).

TaxAct cannot establish mutual assent due to its failure to "explicitly advise" users that clicking the "I agree" checkbox on its website's "Create Account" and "E-file" pages will constitute assent to the "TaxAct Terms of Services and License Agreement." Nor can TaxAct satisfy Pennsylvania's more demanding standard, which requires a strict burden of proof establishing a party's unambiguous manifestation of assent to arbitration. *Chilutti*, 300 A.3d at 449-50. TaxAct cannot satisfy this more demanding standard. It cannot prove: (1) that it "explicitly state[d] on the registration website that the consumer is waiving a right to a jury trial when they agree to the company's 'terms and conditions, and the registration process cannot be completed until the consumer is fully informed of the waiver;" and (2) that in the waiver itself, the waiver "appear[s] at the top of the first page in bold, capitalized text." *See id*. at 450.

With TaxAct unable to satisfy the requirements of either standard, no contract was formed, and arbitration cannot be compelled.

**1. No agreement was formed because of TaxAct's failure to "explicitly" advise users that the act of clicking a checkbox will constitute assent to the "TaxAct Terms of Services and License Agreement."**

"While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004). To establish mutual assent, the party proposing a contract must provide "reasonably conspicuous notice" of the contract's existence and obtain an "unambiguous manifestation" of assent. *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 20-35 (2d Cir. 2002). This requires "both that the terms are being presented and that they can be adopted through the conduct that the offeror alleges constituted assent." *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 123 (2d Cir. 2012). This is a "fact-intensive inquiry." *Meyer v. Uber Tech., Inc.*, 868 F.3d 66, 76 (2d Cir. 2017).

Over the years, a body of case law has developed, which makes clear what e-commerce companies must do to obtain mutual assent. The "easiest method of ensuring terms are agreed to" is through the use of "clickwrap" agreements, which require users to "click on an acceptance after being presented with terms and conditions[.]" *James v. Global TelLink Corp.*, 852 F.3d 262, 267 (3d Cir. 2017). This is accomplished by presenting users "with specified contractual terms on a pop-up screen," which then requires users to "check a box explicitly stating 'I agree' in order to proceed." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022).

Even though courts have enforced "clickwrap" agreements, *Meyer*, 868 F.3d at 75, some companies, including TaxAct, forego this straightforward approach, ostensibly "to streamline consumer purchases[.]" *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 237 (2d Cir. 2016). Unlike

"clickwrap" agreements, "browse-wrap" agreements display "a notice of deemed acquiescence and a link" to the putative terms and conditions. *Culliane v. Uber Techs., Inc.*, 893 F.3d 53, 62 (1st Cir. 2018). "Courts are more reluctant to enforce browse-wrap agreements because consumers are frequently left unaware that contractual terms were even offered, much less that continued use of the website will be deemed to manifest acceptance of those terms." *Berman*, 30 F.4th at 856. And for good reason. "Because online providers have complete control over the design of their websites, the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers." *Id.* at 857.

As TaxAct does not contend that Plaintiffs had actual knowledge of the Arbitration Agreement, an enforceable contract can only be found here "based on an inquiry notice theory" if: (1) TaxAct's website provided "reasonably conspicuous notice of the terms to which the consumer will be bound"; and (2) the consumer took "some action, such as clicking a button or checking a box, that unambiguously manifest[ed] his or her asset to those terms." *Id.* at 856. "A user's click of a button can be construed as an unambiguous manifestation of assent only if the user is ***explicitly advised*** that the act of clicking will constitute assent to the terms and conditions of an agreement." *Id.* at 857. The presence of an "explicit textual notice" is "critical to the enforceability of any browse-wrap-type agreement." *Id.* (citing *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014)).

To meet this standard, "the notice must ***explicitly*** notify a user of the legal significance of the action she must take to enter into a contractual agreement." *Id.* at 858 (emphasis added). In *Berman*, the Ninth Circuit considered a notice, which read: "***I understand and agree to the Terms & Conditions***." *Id.* (emphasis added). This, notice according to the Ninth Circuit, "did not indicate to the user what action would constitute assent to those terms and conditions" or give an

"indication that it would bind plaintiffs to a set of terms and conditions." *Id.* The Ninth Circuit, as a result, found the agreement unenforceable. *Id.* Rather than leave it at that, the Ninth Circuit offered guidance on how the defective notice could be fixed. As it explained, this "notice defect could easily have been remedied by including language such as, '***By clicking the Continue >> button***, you agree to the Terms & Conditions.'" *Id.* (emphasis added).[5]

Like the notice in *Berman*, TaxAct's notice on its "Create Account" page states: "***I agree to the TaxAct Terms of Service & Terms of Use***[.]" Jaeger Decl., Exhibit F-1 (emphasis added). As that notice does not inform users that by clicking the checkbox, they are agreeing to be bound by the "TaxAct Terms of Services and License Agreement," the Arbitration Agreement is unenforceable. TaxAct similarly relies on the notice and checkbox on its "E-file" page to satisfy the mutual assent requirement. Dkt. 30-1, pg. 11. The notice on that page states: "***I agree to the terms and conditions***." Jaeger Decl., Exhibit H-1 (emphasis added). This notice, too, fails to explicitly advise users that by clicking the checkbox, they are agreeing to be bound by the "TaxAct Terms of Services and License Agreement." *See* Goslee Decl., Exhibit B, ¶ 7 (Plaintiff Kirkham: "Nor did it explain that by clicking the checkbox, that I was agreeing to the terms and conditions or arbitration, let alone the significance of the arbitration agreement).

TaxAct inexplicably claims that the facts here "are identical to those in" *Coulter v. Experian Information Solutions, Inc.*, No. 20-1814, 2021 WL 735726 (E.D. Pa. Feb. 25, 2021). In that case, "reasonable notice was provided when Defendant's website advised Plaintiff that

[5] In *Meyer*, the mobile app explicitly warned: "***By creating an Uber account***, you agree to the TERMS OF SERVICE & PRIVACY POLICY[.]" *Meyer*, 868 F.3d at 78-80 (emphasis added). By contrast, in *Starke v. SquareTrade, Inc.*, 913 F.3d 279 (2d Cir. 2019), the Second Circuit found that the email there, unlike in *Meyer*, "in no way signal[ed] to Starke that he should click on the link, and it does not advise him that he would be deemed to agree to the contract terms in the document to be found by clicking that link." *Id.* at 293.

‘***[b]y clicking the ‘Submit Secure Order’ button***, Plaintiff manifested his assent to the Terms of Use Agreement[.]” *Id.* at *5 (emphasis added). The notice at issue in *Coulter* thus explicitly advised users that the act of clicking will constitute assent to the Terms and Use Agreement. TaxAct’s reliance on *HealthplanCRM, LLC v. Avmed, Inc.*, 458 F. Supp. 3d 308 (W.D. Pa. 2020), is also misplaced as the notice on the log-in page there warned that “***[u]se of Cavulus constitutes acceptance of the End User License Agreement[.]”*** *Id.* at 332 (emphasis added).

TaxAct’s website also fell short of providing users with reasonably conspicuous notice of the “TaxAct Terms of Service and License Agreement.” To be sure, the notice on TaxAct’s “Create Account” page states: “I agree to the TaxAct ***Terms of Service & Terms of Use***[.]” Jaeger Decl., Exhibit F-1 (emphasis added). There is nothing indicating that the “Terms of Service & Terms of Use” refers to the “TaxAct Terms of Service and License Agreement” when clicking the “I agree” checkbox. *See Checchia v. Solo Funds*, No. 23-444, 2023 WL 3868369, *9 (E.D. Pa. June, 7, 2023).With TaxAct’s notice referring to the “Terms of Service & Terms of Use” and not the “TaxAct Terms of Service and License Agreement”—a mistake entirely of its own creation—a user cannot be expected to connect clicking the “I agree” checkbox with a differently titled document than the one identified in the notice.[6]

[6] *See, e.g.*, *Samsung Elecs. Am., Inc. v. Ramirez*, 777 F. App’x 243, 244 (9th Cir. 2019) (“the inaptly titled booklet containing the terms and conditions and the smartphone packaging’s vague reference to terms and conditions are insufficient to put a reasonable consumer (or a reasonably prudent smartphone user) on notice of the arbitration provision that Samsung seeks to enforce”); *Checchia*, 2023 WL 3868369, at *9 (“critically, there is nothing indicating that the ‘Terms of Service’ are in fact ‘SoLo’s Terms & Conditions’ to which the user is agreeing when clicking the ‘I agree’ checkbox.”); *Soliman v. Subway Franchisee Advert. Fund. Tr. Ltd.*, 442 F. Supp. 3d 519, 525 (D. Conn. 2020) (“[e]ven if a reasonable consumer would have become aware of the notice, it is doubtful she would have ‘connect[ed] the contractual terms to the services to which they apply’”) (quoting *Meyer*, 868 F.3d at 78).

The notice on the E-file Submission Page—"I agree to the terms and conditions"—likewise creates confusion over what TaxAct's users are purportedly agreeing to as it too fails to identify the "TaxAct Terms of Service and License Agreement." And making matters even more confusing for TaxAct's users is that on the "E-file" page, there are three paragraphs of terms and conditions above the "I agree" checkbox. The notices provided on the "Create Account" and "E-File" pages are defective, as a result.

**2. TaxAct cannot satisfy the strict burden of proof required under Pennsylvania law to establish mutual assent to arbitration.**

Because consumer arbitration agreements tend to conflict with the consumers' constitutional rights to a jury trial under both the U.S. and Pennsylvania Constitutions, Pennsylvania law requires a strict burden of proof to establish a party's unambiguous manifestation of assent to arbitration.[7] *Chilutti*, 300 A.3d at 449-50. This standard can be satisfied only by: "(1) explicitly stating on the registration website and application screens that the consumer is waiving a right to a jury trial when they agree to the company's 'terms and conditions,' and [establishing] the registration process cannot be completed until the consumer is fully informed of the waiver; and (2) when the agreements are available for viewing after a user has clicked on the hyperlink, the waiver should not be hidden in the 'terms and conditions' provision but should appear at the top of the first page in bold, capitalized text." *Id.* at 450.

TaxAct cannot satisfy either of these requirements.

[7] This burden of proof does not exact arbitration agreements to a more demanding standard than other sorts of agreements such confessions of judgment. *Chilutti*, 300 A.3d at 442. Applying the standard set forth in *Chilutti* to arbitration agreements therefore makes "arbitration agreements as enforceable as other contracts, but not more so." *Morgan v. Sundance, Inc.*, 596 U.S. __, 142 S.Ct. 1708, 1713 (2022).

First, TaxAct's "Create Account" and "E-file" pages do not "explicitly" state that the consumer is waiving his or her right to a jury trial by agreeing to the company's terms and conditions. Jaeger Decl., Exhibits F-1, H-1. Perhaps recognizing that it cannot this requirement, TaxAct claims that the "Terms expressly provide that 'you and TaxAct waive your rights to a jury trial and to have any dispute arising out of or related to these Terms or our Services resolved in court.'" Dkt. 30-1, pg. 18. It is of no moment though that this statement can be found on page 4 of the "TaxAct Terms of Service and License Agreement." As the Supreme Court has explained, it is the "registration website and application screens" that must contain this warning. *Chilutti*, 300 A.3d at 450.

Second, were a user to click the link and view the "TaxAct Terms of Service and License Agreement," they would not find the "waiver" "at the top of the first page in bold, capitalized text[.]"[8] Jaeger Decl., Exhibit G-1. The user would rather have to read through four pages of dense, legalese before getting to the arbitration provision. Exhibit G-4.

**3. Plaintiff Sessoms never clicked the "I agree" checkbox on TaxAct's "Create Account" or "E-File" webpages.**

In moving to compel arbitration, TaxAct claims that Plaintiff Sessoms is a party to the Arbitration Agreement. As it presumes, "the Terms (and the Arbitration Agreement within them) were repeatedly provided to Plaintiffs" and that Plaintiff Sessoms affirmatively checked a

---

[8] Indeed, to make this link and others, TaxAct relies on the Declaration of Mark Jaeger. In another proceeding, in which Mr. Jaeger signed a nearly identical declaration to the one here, he admitted that he did not confirm the accuracy of any hyperlinks, Goslee Decl., Exhibit D, T79:2-20, that he does not have personal knowledge of TaxAct's supposed practice requiring users to accept the terms and conditions, *id.*, T69:5-12, that he has not checked the "database to verify how things work," *id.*, T74:4-9, and that he did not independently review any of the code on TaxAct's website, *id.*, T82:16-19.

checkbox agreeing to the Terms when he created his account and did so again when he filed his taxes. Dkt. 30-1, pg. 11. But TaxAct offers no factual basis for its conjecture.

As Plaintiff Sessoms states in his Declaration, his wife, Krysta Sessoms, created the TaxAct user account, "blakesessoms." Goslee Decl., Exhibit A, ¶ 4. He also declared that when Ms. Sessoms created the user account, he was not "physically present," had not asked "her to specifically use TaxAct's services," and that while he gave his wife "permission to prepare [his] tax returns, [he] did not grant her authority to enter into any agreements on [his] behalf or to waive [his] right to a jury trial or to participate in a class action." *Id.*, ¶¶ 5, 6. He was also "not physically present" when his wife prepared and filed his 2020, 2021, 2022 tax returns. *Id.*, ¶ 8. As a matter of fact, Plaintiff Sessoms:

- "never created an account with TaxAct,"
- "never logged into TaxAct,"
- "never personally used TaxAct to prepare [or electronically file] a tax return,"
- "had never seen the account registration or tax preparation and electronic filing pages on TaxAct's website,"
- never "clicked a 'checkbox' on the TaxAct website acknowledging or agreeing to any terms and conditions," and
- had "never seen TaxAct's terms and conditions."

*Id.*, ¶¶ 9-15. Because Plaintiff Sessoms "never agreed to arbitration," *id.*, ¶ 18, there is a genuine dispute of material fact, which precludes the grant of TaxAct's motion to compel. *See Jaludi*, 933 F.3d at 251 n. 7; *see also Barrows v. Brinker Rest. Corp.*, 36 F.4th 45, 51 (2d Cir. 2022)

(reversing decision that "completely discounted the evidentiary value . . . of [the] sworn declaration" by the plaintiff's denial that he had electronically signed any arbitration agreement).

#### 4. Plaintiff Sessoms is not bound to arbitrate his claims because of his wife's use of TaxAct.

Faced with the reality that Plaintiff Sessoms never agreed to arbitration, TaxAct takes the remarkable position that he is nevertheless bound to arbitrate his claims because his wife used TaxAct. That is, TaxAct contends that Plaintiff Sessoms is somehow bound to an agreement he never saw, let alone assented to, because he either "knowingly exploited" its services, was a third party beneficiary, or is bound by his wife's alleged assent. None of these theories pass muster under Pennsylvania law.

##### a. Equitable estoppel cannot be used to compel arbitration because Plaintiff Sessoms did not "knowingly exploit" TaxAct's terms and conditions.

In "some situations," "equitable estoppel [may] bind non-signatories to an arbitration clause when the non-signatory ***knowingly exploits*** the agreement containing the arbitration clause despite having never signed the agreement." *O'Hanlon*, 990 F.3d at 766 (quoting *Washburn v. N. Health Facilities, Inc.*, 121 A.3d 1008, 1015 (Pa. Super. Ct. 2015)) (emphasis added). Those situations though are few as the Third Circuit "narrow[ly]" applies the equitable estoppel exception. *Griswold v. Coventry First LLC*, 762 F.3d 264, 274 (3d Cir. 2014).

Under the "knowingly exploit" theory of estoppel, *Haskins v. First Am. Title Ins. Co.*, 866 F. Supp. 2d 343, 350 (D.N.J. 2012), a person may "be equitably estopped from challenging an agreement that includes an arbitration clause when that person embraces the agreement ***and*** directly benefits from it," *Bouriez v. Carnegie Mellon Univ.*, 359 F.3d 292, 295 (3d Cir. 2004) (citing *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediaries, S.A.S.*, 269 F.3d 187, 194 (3d Cir. 2001)). This is not "an 'or' test."; the non-signatory must both

embrace the agreement "and" directly benefit from it. *Porter v. Toll Bros., Inc.*, 217 A.3d 337, 354 (Pa. Super. 2019) (Kunselman, J., concurring) (quoting *Bouriez*, 359 F.3d at 295).

As this Court has recognized, a non-signatory cannot "knowingly embrace" an arbitration agreement that he "is not alleged to have seen." *Cty. of Monmouth v. Rite Aid Corp.*, __ F. Supp. 3d __, __, 2023 WL 2743552, *7 (E.D. Pa. 2023). In *Monmouth*, this Court found that while the non-signatory may have received an "incidental benefit" from the Optum-Rite Aid Contract, "it was not a benefit that she '[sought] and obtain[ed].'" *Id.* (quoting *Griswold*, 762 F.3d at 272); *see also Burns v. Philly Trampoline Parks, Delco, LLC*, No. 3544 EDA 2016, 2017 WL 4948993, *5 (Pa. Super. Oct. 31, 2017) (rejecting estoppel argument because the non-signatory "did not know about the Agreement until after his alleged injury").

The record here is bereft of any evidence that Plaintiff Sessoms "knowingly" embraced the "TaxAct Terms of Service and License Agreement." TaxAct indeed offers no competent evidence to dispute that Plaintiff Sessoms: (1) "never created an account with TaxAct"; (2) "never logged into TaxAct"; (3) "never personally used TaxAct to prepare [or electronically file] a tax return"; (4) "had never seen the account registration or tax preparation and electronic filing pages on TaxAct's website," and (5) had "never seen TaxAct's terms and conditions" before the commencement of this litigation. *Id.*, ¶¶ 9-15.

Besides being unable to show that Plaintiff Sessoms "knowingly" embraced the agreement, TaxAct cannot establish that he "directly" benefited from it. *See Bouriez*, 359 F.3d at 295 (citing *E.I. DuPont*, 269 F.3d at 199-200). "The benefits of exploiting the agreement . . . must 'flow[] ***directly*** from the agreement,' rather than indirectly from 'the contractual relation of [the] parties to [the] agreement.'" *Trina Solar US, Inc. v. Jasmin Solar Pty Ltd.*, 954 F.3d 567, 572 (2d Cir. 2020) (quoting *MAG Portfolio Consult, GMBH v. Merlin Biomed Grp. LLC*, 268

F.3d 58, 61-63 (2d Cir. 2001)). For the benefits to flow "directly" from the contract, the "non-signatory beneficiary must actually invoke the contract to obtain its benefit[.]" *Id.*

Illustrating the distinction between direct and indirect benefits, the Second Circuit recognized in *Trina Solar* that the non-signatory "surely benefited from the contractual relationship" between its agent and the seller of the solar panels as the non-signatory "ultimately received" the solar panels. *Trina Solar*, 954 F.3d at 572. But that was not enough to estop the non-signatory from avoiding the arbitration clause in the agreement between the non-signatory's agent and the seller. As the Second Circuit explained, there was "no record evidence that [the non-signatory] ever invoked the Contract to demand delivery of the solar panels, and the Contract itself does not provide [the non-signatory] any direct benefit." *Id.* at 572-73.

In contrast, in *American Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349 (2d. Cir. 1999), the owners of a vessel hired an intermediary to obtain a "classification" for the vessel, which could be presented to an insurance carrier. *Id.* at 351. The "classification" obtained "incorporated by reference" an arbitration agreement between the intermediary and the issuer of the certificate. *Id.* The owners of the vessel then "knowingly" presented the "classification," which incorporated the arbitration agreement by reference, to an insurer and obtained "direct benefits" in the form of an insurance policy." *Id.* at 353.

TaxAct does not argue that Plaintiff Sessoms "directly" benefited from Ms. Sessom's use of TaxAct to prepare and file his taxes. Nor could it as there is no evidence that Plaintiff Sessoms "s[ought] and obtain[ed]" any benefits "directly from the agreement," much less that he invoked the agreement. *Cf. Trina Solar*, 954 F.3d at 572; *Cty. of Monmouth*, __ F. Supp. 3d at __, 2023 WL 2743552, *7. TaxAct rather argues that "Sessoms received the benefits" from his wife's use of TaxAct. Dkt. 30-1, pg. 14. The distinction between "direct" and "indirect" benefits matters

though. As both federal and Pennsylvania courts have stressed, estoppel is only appropriate where the non-signatory both embraced the agreement "and" directly benefited from it. *Porter*, 217 A.3d at 354 (Kunselman, J., concurring) (quoting *Bouriez*, 359 F.3d at 295).

Having overlooked this black letter law, TaxAct instead argues that "Sessoms' claims are intertwined with the obligation in the Terms." Dkt. 30-1, pg. 14. The Third Circuit has, however, rejected this "entwinement theory" of equitable estoppel where a signatory attempts to bind a non-signatory to an arbitration agreement. *O'Hanlon*, 990 F.3d at 767 n.7. TaxAct's argument also misses the mark as Plaintiffs' claims do not rely on TaxAct's terms and conditions, but upon the Pennsylvania Wiretap Act and the federal tax laws. TaxAct's argument is thus "inconsistent with the rule that "the plaintiff, not the defendant, controls the complaint," a principle the Third Circuit has repeatedly applied to the arbitration context." *Monmouth*, *supra*, 2023 WL 2743552 *5 (quoting *Abdurahaman v. Prospect CCM LLC*, 42 F.4th 156, 162 (3d Cir. 2022)). It is the "plaintiff's actual, not hypothetical, claims [which] control the estoppel analysis." *Id.* (citing *O'Hanlon*, 990 F.3d at 765-66 (declining invitation to recharacterize plaintiffs' claims as arising under Uber's Terms of Use as they entirely arose under the Americans with Disabilities Act)). When a plaintiff "chooses not to bring claims that would implicate an arbitration agreement" then, "a court may not substitute different claims in an effort to 'pull[] the entire dispute . . .into arbitration[.]" *Id.* at 6 (quoting *Abdurahman*, 42 F.4th at 161); *see also B.F. v. Amazon, Inc.*, 858 Fed. Appx. 218 (9th Cir. 2021) ("a non-signatory does not knowingly exploit the contract when they bring claims that 'do not arise out of the contract'").

Plaintiffs' claims here arise under federal and state law, and not the "TaxAct Terms of Service and License Agreement." Irrespective then of the "TaxAct Terms of Service and License Agreement," TaxAct would owe Plaintiffs the legal duty they claim TaxAct has violated. And

because TaxAct's duty under the federal and state privacy laws is independent of the agreement, Plaintiff Sessoms has not embraced the agreement in suing TaxAct. Plaintiff Sessoms has in no sense then "knowingly exploited" the agreement and equitable estoppel is therefore not appropriate here.

**b. Plaintiff Sessoms is not a third-party beneficiary of TaxAct's terms and conditions.**

TaxAct also cannot establish that Plaintiff Sessoms is a third-party beneficiary of the "TaxAct Terms of Service and License Agreement." As TaxAct posits: "a third-party beneficiary has been bound by contract terms ***where its claim arises out of*** the underlying contract to which it was an intended third-party beneficiary." Dkt. 30-1, pg. 15 (quoting *E.I. DuPont*, 269 F.3d at 194-95) (emphasis added). Again, Plaintiff Sessoms' claims do not arise out of the "TaxAct Terms of Service and License Agreement." They rather arise under federal and state law. Because those claims "do not relate to any 'third-party beneficiary' status created at the inception" of the agreement, TaxAct's third-party beneficiary argument lacks support. *See E.I. DuPont*, 269 F.3d at 197-98.

TaxAct's third-party beneficiary argument also fails because TaxAct cannot establish that "both parties to the contract express[ed] an intention to benefit the third party in the contract itself." *Scarpitti v. Weborg*, 609 A.2d 147, 150 (Pa. 1992). That "intention must have affirmatively appeared in the contract itself." *Burks v. Fed. Ins. Co.*, 883 A.2d 1086, 1088 (Pa. Super. 2005) (quoting *Scarpitti*, 609 A.2d at 49). Unless, that is, "the circumstances are so compelling that recognition of the beneficiary's right is appropriate to effectuate the intention of the parties, and the performance satisfies an obligation of the promisee to pay money to the beneficiary or the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." *Scarpatti*, 609 A.2d at 150-51.

Despite grasping for evidence that the parties to the "TaxAct Terms of Service and License Agreement" intended that Plaintiff Sessoms would be a third-party beneficiary, TaxAct has managed to identify just one provision in the agreement that concerns third-parties:

> You acknowledge and agree that you are solely responsible for all content, data, and information submitted by your user identification into the Service, including, without limitation, content, data, and information relating to third parties.

Jaeger Decl., Exhibit G-2. Far from establishing that Plaintiff Sessoms is an intended third-party beneficiary though, this provision only addresses the users' responsibilities. It says nothing about conferring benefits on any beneficiaries. The agreement is otherwise silent about third-parties.

The "TaxAct Terms of Service and License Agreement," to be sure, defines the agreement as "contract between TaxAct, Inc. ("TaxAct", "we", "us", or "our") and ***you*** ("you", "your", "user"), ***a visitor or user of*** TaxAct's websites, mobile applications, online and offline tax return preparation products, and related services[.]" Jaeger Decl. Exhibit G-1 (emphasis added). Elsewhere in its moving papers, TaxAct argues that Plaintiff Sessoms is a "user" as that term is defined in the above provision as well as in the Arbitration Agreement. To believe TaxAct then, that would make Plaintiff Sessoms a party to the agreement, in which case, he could not be a third-party beneficiary. *See Washburn*, 121 A.3d at 1016 ("Mr. Washburn could not be an intended third-party beneficiary of a contract to which he was ostensibly a party."). But because TaxAct failed to provide notice of the Arbitration Agreement to Plaintiff Sessoms and obtain his assent, he is not a party to the to the "TaxAct Terms of Service and License Agreement." That TaxAct failed to form a contract with Plaintiff Sessoms does not however make him a third-party beneficiary.

### c. No agency relationship exists between Plaintiff Sessoms and his wife sufficient to bind him to arbitration.

As Plaintiff Sessoms' causes of action against TaxAct do not arise out the "TaxAct Terms of Service and License Agreement," he cannot be compelled to arbitration under agency principles. *See DuPont*, 269 F.3d at 198-99 ("agency relationship must relate to the cause of action alleged in the complaint"). TaxAct also cannot satisfy its burden to establish that Plaintiff Sessoms should be bound to the arbitration agreement because of his wife's use of TaxAct's services. *See Washburn*, 121 A.3d at 1012 ("party asserting agency . . . has the burden of establishing an agency relationship"); *Bolus v. United Penn Bank*, 525 A.2d 1215, 1221 (Pa. Super. 1987) ("Whether an agency relationship exists is a question of fact for the jury."). TaxAct's agency argument should ultimately begin and end with the recognition that due to TaxAct's use of a defective "browse-wrap" agreement, Ms. Sessoms is not bound to arbitrate any claims that she has with TaxAct. And because Ms. Sessoms is not bound, her husband cannot be either under agency principles. Even if she had agreed to arbitration though (and she has not), TaxAct cannot establish that the requisite agency relationship existed between Plaintiff Sessoms and his wife to support its agency argument.

An agency relationship may be created only by express authority, implied authority, apparent authority, and authority by estoppel. *Washburn*, 121 A.3d at 1012 (citing *Walton v. Johnson*, 66 A.3d 782, 786 (Pa. Super. 2013)). "Express authority exists where the principal deliberately and specifically grants authority to the agent as to certain matters." *Washburn*, 121 A.3d at 1012 (quoting *Walton*, 66 A.3d at 786). Implied authority meanwhile "exists in situations where the agent's actions are proper, usual and necessary to carry out express agency." *McIlwain v. Saber Healthcare Grp., Inc.*, 208 A.3d 478, 486 (Pa. Super. 2019).

In arguing that there was an agency relationship between Plaintiff Sessoms and his wife, TaxAct notably offers no evidence that Plaintiff Sessoms "deliberately and specifically" granted authority to Ms. Sessoms to agree to arbitration on his behalf. *Cf. Burns*, 2017 WL 4948993, at *4. TaxAct instead claims that Plaintiff Sessoms permitted her to file his taxes. Dkt. 30-1, pg. 16. But in making that argument, TaxAct "focuses on the actions of the purported agent, not that of the non-signing principal, in asserting implied and apparent authority in this case." *Santiago v. Philly Trampoline Park, LLC*, 291 A.3d 1213, 1221 (Pa. Super. 2023). TaxAct also errs in arguing that an agency relationship should be found simply because Ms. Sessoms did something for Plaintiff Sessoms. *See Clayton*, 670 A.2d at 714 (agency relationship "cannot be assumed from the mere fact that one does an act for another").

Although Plaintiff Sessoms' authorized Ms. Sessoms to prepare and electronically file his taxes, "[a] deliberate and specific grant of authority as to 'certain matters' does not constitute a deliberate and specific grant of authority as to all matters." *Gross v. Genesis Healthcare, Inc.*, No. 2022 EDA 2017, 2018 WL 2423306, *5 (Pa. Super. May 30, 2018) (quoting *Walton*, 66 A.3d at 788). In other words, by granting Ms. Sessoms the specific and limited authority to file his taxes, he did not give her any authority beyond that. The authority given by Plaintiff Sessoms to his spouse then to prepare and file his taxes using whatever means chosen by her does not constitute an express or implied grant of authority to her to enter into any legal agreements, let alone authorize her "to waive his constitutional right to a jury trial." *Id.*

Nor can TaxAct establish that Ms. Sessoms had apparent authority, which requires that "the principal, by word or conduct, causes people with whom the alleged agent deals to believe that the principal has granted the agent authority to act." *Santiago*, 291 A.3d at 1222. TaxAct cites no evidence that Plaintiff Sessoms had any interaction directly with TaxAct, let alone that

he caused it by his word or deed to believe that Ms. Sessoms was his agent. TaxAct instead tries to manufacture apparent authority by relying on their familial relationship and the conduct of the purported agent, which the Superior Court has described as a "meritless argument." *Id.* S*ee also Clayton v. McCullough*, 670 A.2d 710, 714 (Pa. Super. 1996) ("Agency 'cannot be assumed from the mere fact that one does an act for another.'"); *Peterson v. Kindred Healthcare, Inc.*, 155 A.3d 651, 644 (Pa. Super. 2017) (observing that an agency relationship cannot "be inferred from mere relationship or family ties unattended by conditions, acts or conduct clearly implying an agency."). With no evidence of any verbal or nonverbal communication from Plaintiff Sessoms then that caused TaxAct to believe that he authorized Ms. Sessoms to agree to arbitrate any claims, TaxAct cannot maintain its apparent authority argument.

TaxAct's argument that "Sessoms does not allege that he terminated his use of the Services, or opted-out of the Arbitration Agreement," Dkt. 30-1, pg. 16, has it backwards. In *Walton*, the Superior Court rejected the argument made by TaxAct here. As the Superior court observed, even "assuming an agency relationship," the party seeking to compel arbitration "must show that [the non-signatory] knew or should have known that her mother had signed away her legal rights." *Walton*, 66 A.3d at 789. For that reason, the Superior Court recognized that the hospital had presented no evidence that the non-signatory "knew or should have known about the waiver after- the-fact or that her mother might have exceeded her authority in signing the Agreement," which the court attributed, at least in part, to the fact that the hospital never presented the agreement to the non-signatory to "ratify or execute." *Id.* Because there has been no showing here that Plaintiff Sessoms knew or should have known about the Arbitration Agreement, which is attributable to TaxAct's use of ineffective browse-wrap agreements,

Plaintiff Sessoms cannot be faulted for not complying with a provision of the Arbitration Agreement that neither he nor his wife knew anything about.

At bottom, TaxAct presumes the existence of an agency relationship; yet there is no evidence to support that contention. And that is another problem of its own creation. As the Superior Court has explained, "it is well-settled that a third party must exercise reasonable diligence to determine the authority of an apparent agent, and 'can [only] rely on the apparent authority of an agent when this is a reasonable interpretation of the manifestations of the principal." *Santaigo*, 291 A.3d at 1222 (quoting *Bolus*, 525 A.2d at 1222). TaxAct has presented no evidence that it has performed any due diligence to learn whether Plaintiff Sessoms "authorized his wife to bind him to arbitration" or that Plaintiff Sessoms "manifested such intent to" TaxAct. *See id.* If TaxAct "wishes to create enforceable agreements to arbitrate from the laundry list of people it seeks to preclude from filing claims against it in a court of law, then obtaining the assent of each of those persons, directly or through the recognized principles of agency is precisely what it must do." *Id*. TaxAct could have included a prompt on its website to determine whether someone other than the tax filer was the "user" and whether that person did so as an agent of the tax filer. But it did not. And having failed to exercise reasonable diligence, TaxAct cannot enforce the arbitration agreement.

**B. This Court can decide issues relating to arbitrability.**

Given that TaxAct cannot satisfy its burden under Pennsylvania law to establish that Plaintiffs assented to arbitration, it inextricably follows that it cannot prove they agreed to delegate any disputes over arbitrability to an arbitrator, as TaxAct contends. TaxAct also cannot establish that all disputes over arbitrability have been delegated to an arbitrator as to Plaintiff Sessoms specifically as he never used TaxAct's website and is consequently not a signatory to

the “TaxAct Terms of Services and License Agreement.” *See Nat’l Union Fire Ins. Co. of Pittsburgh, Pa. v. Stucco Sys., LLC*, 289 F. Supp. 3d 457, 465 (S.D.N.Y. 2018) (“[c]ourts have generally found that agreements that do not mention or reference a particular non-signatory do not clearly or unmistakably evidence an agreement by that non-signatory to have an arbitrator determine whether the agreement is arbitrable”).

### C. Plaintiffs’ claims under the Pennsylvania Wiretapping Act and 26 U.S.C. §§ 6103 and 7431(a)(2) exist independently of the “TaxAct Terms of Services and License Agreement” and fall outside the scope of its arbitration provision.

“The presumption in favor or arbitration does not extend . . . to non-signatories to an agreement; it applies only when both parties have consented to and are bound by the arbitration clause.” *Griswold*, 762 F.3d at 271. “When determining whether a given claim falls within the scope of an arbitration agreement, a court must ‘focus on the factual allegations in the complaint rather than the legal causes of action asserted.” *Bannett v. Hankin*, 331 F. Supp. 2d 354, 360 (E.D. Pa. 2004) (quoting *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 846 (2d Cir. 1987)). The allegations in the pleadings must “touch matters” covered by the arbitration provision. *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 624 n.13 (1985).

The Arbitration Agreement here provides:

> [Y]ou and TaxAct waive your rights to a jury trial and to have any disputes arising out of or related to ***these Terms or our Services*** resolved in court. Instead, all disputes arising out of or related to these ***Terms or our Services*** will be resolved through confidential binding arbitration[.]

Jaeger Decl., Exhibit G-4.

Examining a similar arbitration provision, the Ninth Circuit observed that “‘both phrases, ‘arising out of’ and ‘related to,’ mark a boundary by indicating some direct relationship.” *Jackson v. Amazon.com, Inc.*, 65 F.4th 1093, 1104 (9th Cir. 2023). The Ninth circuit then found

that the allegations in the complaint lacked a direct relationship with the arbitration provision, which read:

> Any dispute or claim, whether based on contract, common law, or statute, arising out of or relating in any way to this Agreement, including termination of this agreement, to your participation in the program or to your performance of services.

*Jackson*, 65 F.4th at 1104-05 (Graber, J., concurring in part and dissenting in part). As the Ninth Circuit observed, Amazon's theory was that its alleged monitoring of drivers' conversations "took place while the drivers were performing deliveries for Amazon under the agreement and participating in the Flex Program." The Ninth Circuit disagreed, explaining that the "alleged misconduct was not related to agreement" or to the drivers' "participation in the Flex program or the performance of services under that program." *Jackson*, 65 F.4th at 1104. The Ninth Circuit further explained that "controversy in this case is ultimately not about any characteristics or conduct of class members, but whether Amazon is indeed liable for wiretapping and invasion of privacy." *Id.* at 1103. And thus, the Ninth Circuit found that the dispute before it did "not touch on any matters related to the contract that would fall within the arbitration clause." *Id.* The "alleged misconduct" rather "existed independently of the contract and therefore fell outside of the arbitration provision." *Id.* at 1104.

As in *Jackson*, Plaintiffs claim that TaxAct is liable for wiretapping their communications and improperly using and disclosing their confidential tax return information in violation of federal and state law. There is no direct relationship between those claims and TaxAct's "Terms" or "Services," just as there wasn't one in *Jackson*. TaxAct's misconduct rather exists independently of the "Terms" and "Services" for none of the claims depend on the "Terms" or TaxAct's performance of the "Services." After all, TaxAct's "alleged misconduct

would be wrongful even if there had been no contract." *See Jackson*, 65 F.4th at 1103. This matter hence falls outside the scope of TaxAct's arbitration provision.

**D. The arbitration agreement is procedurally and substantively unconscionable.**

Under Pennsylvania law, "[p]rocedural and substantive unconscionability are assessed under a sliding-scale approach, with a lesser degree of substantive unconscionability required where the procedural unconscionability is very high." *Kohlman v. Grane Healthcare Co.*, 279 A.3d 42, 48 (Pa. Super. 2022). Procedural unconscionability "is generally found in contracts of adhesion." *Clymer v. Jetro Cash and Carry Enterprises, Inc.*, 334 F. Supp. 3d 683, 691 (E.D. Pa. 2018). "A contract of adhesion is one prepared by a party with excessive bargaining power and presented to the other party on a 'take it or leave it' basis." *Id.* (quoting *Parilla v. IAP Worldwide Servs., VI, Inc.*, 368 F.3d 269, 276 (3d Cir. 2004)). Substantive unconscionability meanwhile "refers to contractual terms that are unreasonably or grossly favorable to one side and to which the disfavored party does not assent." *Harris v. Green Tree Fin. Corp.*, 183 F.3d 173, 181 (3d Cir. 1999). "To establish substantive unconscionability, the plaintiff must show that the contractual terms are unreasonably favorable to the drafter[.]" *Clymer*, 334 F. Supp. 3d at 691.

There are several bases to find procedural and substantive unconscionability here. Indeed, the unconscionability of the Terms and License Agreement is readily apparent considering that several, material provisions in the Agreement fall below the "Consumer Arbitration Minimum Standards," as defined by TaxAct's chosen arbitrator, JAMS. Goslee Decl., Exhibit A.[9]

---

[9] In particular, the "Minimum Standards" requires that "[r]emedies that would otherwise be available to the consumer under applicable federal, state or local laws must remain available under the arbitration clause, unless the consumer retains the right to pursue the unavailable remedies in court." *Id.*, pg. 1. The "Minimum Standards" also require that the consumer "have the right to an in-person hearing in his or her hometown area" and that the "clause or procedures

First, the "Terms of Service and License Agreement" includes a provision limiting the remedies available to users: "The entire liability of TaxAct and the participating parties (jointly) for any reason shall be limited to the amount paid by you for the services and content." Jaeger Decl., Exhibit C-3. Plaintiff's federal and state-law claims have statutory liquidated damages provisions. For example, the Wiretap Act's statutory damages provision affords plaintiffs "[a]ctual damages, but not less than liquidated damages computed at the rate of $100 a day for each day of violation, or $1,000, whichever is higher" as well as punitive damages and attorney's fees and litigation costs. 18 Pa.C.S.A. § 5725(a)(1). By limiting TaxAct's liability to the amount paid for services, TaxAct would reduce its liability to between "$99.50" and "$0", which falls far short of what the Legislature though appropriate in passing the Pennsylvania Wiretap Act, for example, which provides statutory minimum damages of at least $1,000 plus punitive damages, attorney's fees and costs.[10] That renders the "Terms of Service and License Agreement" unconscionable. *See MacClelland v. Cellico P'ship*, 609 F. Supp. 3d 1024, 1037 (N.D. Cal. 2022) ("an arbitration agreement may not limit statutorily imposed remedies such as punitive damages and attorney fees"). *Cf. Quilloin v. Tenet HealthSystem Phila., Inc.*, 673 F.3d 221, 230 (3d Cir. 2012) (quoting *Edwards v. Hovensa, LLC*, 497 F.3d 355, 364 (3d Cir. 2007)) ("An arbitration agreement cannot be construed as substantively unconscionable where it 'does not alter or limit the rights and remedies available to [a] party in the arbitral forum'").

must not discourage the use of counsel." Because the Terms and License Agreement do not satisfy the "minimum standards of fairness," as defined by JAMS, the Agreement is unconscionable. JAMS also will not administer the arbitration as a result of TaxAct's failure to satisfy the "Minimum Standards." *Id.* The Agreement is therefore unenforceable multiple times over. *See Wert v. ManorCare of Carlisle PA, LLC*, 124 A.3d 1248, 1263 (Pa. 2016).

[10] "File your own," https://www.taxact.com/?version=10042023con&promo= HT100423DXCON (last accessed October 11, 2023).

Second, the Wiretap Act provides for a two-year statute of limitations, which begins to run only once the plaintiff learns of the unlawful wiretapping. *McCulligan v. Pennsylvania State Police*, 123 A.3d 1136, 1140-41 (Pa. Cmwlth. Ct. 2015). The "Terms of Service and License Agreement" thus impermissibly shortens the time in which users could bring claims to one year—a fully year less than what the Legislature chose to provide under the Pennsylvania Wiretap Act. *See Lelouis v. Western Directory Co.*, 230 F. Supp. 2d 1214, 1222 (D. Or. 2001) (finding one-year limitations period imposed by an arbitration provision to be unconscionable in view of the otherwise applicable statute of limitations for statutory claims); *MacClelland*, 609 F. Supp. 3d at 1035 ("Contractual agreements to shorten the statute of limitations period are generally disfavored because they derogate statutory intent"). The one-year statute of limitations provision in the "Terms of Service and License Agreement" therefore poses a potential trap for the unwary and is substantively unconscionable generally, and in particular here where users could not have known that TaxAct inserted pixels into the coding of its website, which would covertly intercept, disclose, and transmit tax return information and other personal identifiers to third-parties.

Third, TaxAct's "Terms of Service and License Agreement" includes a class action waiver. Under Pennsylvania law, "class action waivers are substantively unconscionable where 'class action litigation is the only effective remedy' such as when 'the high cost of arbitration compared within the minimum potential value of individual damages denie[s] every plaintiff a meaningful remedy."[11] *Quilloin*, 673 F.3d at 232 (quoting *Thibodeau v. Comcast Corp.*, 912

---

[11] As Plaintiff Kirkham did not agree to arbitration as discussed *supra* and the unconscionable provisions of the "Terms of Service and License Agreement" cannot be severed given their cumulative effect, the Federal Arbitration Act does not preclude this Court from

A.2d 874, 883-84 (Pa. Super. 2006)). That is the case here. Absent allowing this matter to proceed as a class action, individual plaintiffs will be denied an effective remedy.

Fourth, by TaxAct's own admission, it designed its website to steer users to accept the arbitration agreement knowing full well that most, if not all, users would not read the arbitration agreement. At the same time, it drafted the form agreement—a contract of adhesion—so that a user would have to read through 4 pages of legalese before seeing that they could opt out of the arbitration agreement by sending an email to arbitration@taxact.com within 30 days of when the user "first accepted the terms of this Section." Jaeger Decl., Exhibit G. And making it more difficult still for users, TaxAct requires the "opt-out notice" to include the user's "full name and ***clearly indicate*** [their] intent to opt out of binding arbitration." *Id.* The disparity here is striking. As drafted by TaxAct, a user could agree to arbitration despite having never viewed the arbitration agreement yet to opt out of the agreement, the user would have to read the agreement and "clearly indicate" their intent to opt out. This renders the "Terms of Service and License Agreement" both procedurally and substantively unconscionable.

Fifth, TaxAct has also self-servingly designated Texas as the location for all arbitrations. As Plaintiffs Kirkham and Sessoms explain in their declarations, that requirement places a significant burden on them given the inconvenience and expense of having to travel to Texas. *See* Goslee Decl., Exhibit A, ¶ 9. Because that burden is not mutually shared, it is unconscionable. *See Nagrampa v. Mailcoups, Inc.*, 469 F.3d 1257, 1289 (9th Cir. 2006).

Where there is a "multitude of unconscionable provisions in an agreement to arbitrate," severance of the offending provisions should not be allowed, and the agreement should not

---

finding that the class action waiver is unconscionable. *Cf. AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 352 (2011).

enforced. *Parilla v. IAP Worldwide Servs., VI, Inc.*, 368 F.3d 269, 289 (3d Cir. 2004); *Alexander v. Anthony Intern., L.P.*, 341 F.3d 256, 271 (3d Cir. 2023) (finding severance inappropriate where the agreement limited the time in which employees could bring claims and the amount and type of relief they could obtain). Because the "Terms of Service and License Agreement" is a contract of adhesion and includes "draconian terms" that unreasonably favor TaxAct to the disadvantage of its user by limiting the remedies available to them and the time in which they may pursue their claims, the cumulative effect precludes severing the offending provisions as it is "afflicted by so much fundamental and pervasive unfairness."

**E. Because Plaintiff Sessoms is a non-signatory, the Federal Arbitration Act does not require that this litigation be stayed.**

The FAA does not require that litigation be stayed where one of the parties is not a signatory to an arbitration agreement. *See Congdon v. Uber Techs., Inc.*, 226 F. Supp. 3d 983, 989-90 (N.D. Cal. 2016) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 20 n.23 (1983)); *see also Mendez v. Puerto Rican Intern. Co., Inc.*, 553 F.3d 709 (3d Cir. 2009) (observing Section 3 of the FAA does not apply "in situations involving a party who has not committed itself to arbitrate any issues before the court"). Section 3's mandatory stay therefore does not apply here. The decision to stay these proceedings is consequently one committed to this Court's discretion. *Moses*, 460 U.S. at 20 n.3. In exercising that discretion, "the court should weigh the competing interests that will be affected, including: the possible damage which may result from granting the stay, the hardship or inequity which a party may suffer in being required to go forward, and 'the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay.'" *Congdon*, 226 F. Supp. 3d at 990.

As a non-signatory, Plaintiff Sessoms is not subject to the FAA for he has not agreed to arbitration. He should therefore be allowed to proceed with this litigation as there is "no justification" for delay, particularly considering that while his claims may overlap with those who may be subject to Arbitration Agreement, if there are any such individuals, TaxAct included in its Arbitration Agreement a provision, which it contends allows only for individual arbitration. Plaintiff Sessoms' claims, as well as those of other putative class members, "will need to be litigated in this court" or state court. *See Congdon*, 226 F. Supp. 3d at 991. TaxAct "cannot have its cake and eat it, too." *See id.* It "cannot, on the one hand, argue that the parties intended individualized adjudication of each plaintiff's claims, and in the same breath, argue that certain individual's actions should be impacted by parallel litigation." *See id.*

TaxAct's request to stay this litigation should accordingly be denied.

## III. Conclusion

For all these reasons, TaxAct's motion to compel arbitration should be denied.

Respectfully submitted,

COHEN, PLACITELLA & ROTH, P.C.

By: /s/ James P. Goslee
James P. Goslee (#203043)
Michael Coren (#31037)
Eric S. Pasternack (#320127)
Jared M. Placitella (#321333)
2001 Market St., Suite 2900
Philadelphia, PA 19103
(215) 567-3500
jGoslee@cprlaw.com
mcoren@cprlaw.com
epasternack@cprlaw.com
jmplacitella@cprlaw.com

Dated: December 1, 2023