**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JAMES KIRKHAM and MATTHEW SESSOMS, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>TAXACT, INC.,<br><br>Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | Civil Action No.: 2:23-CV-3303-WB<br><br>**ECF CASE** |

**DEFENDANT TAXACT, INC.'S MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS**

Defendant TaxAct, Inc. ("TaxAct") moves this Court for the entry of an Order compelling Plaintiffs James Kirkham and Mathew Sessoms ("Plaintiffs") to submit all of the claims in their Amended Complaint against TaxAct to arbitration by JAMS as required by TaxAct's standard terms and conditions of service, which Plaintiffs accepted. If the Court compels arbitration, TaxAct further moves for the entry of an Order staying proceedings with respect to all of Plaintiffs' claims pending completion of the arbitration.

By filing this Motion, TaxAct does not waive any arguments or defenses to Plaintiffs' Amended Complaint, including its arguments under Rule 12 of the Federal Rules of Civil Procedure.

The reasons for this Motion are set forth in the accompanying Memorandum of Law, the Declaration of Mark Jaeger in Support of TaxAct's Motion to Compel Arbitration and Stay Claims, the exhibits to the Declaration, and any arguments of counsel. A proposed Order granting the relief requested in this Motion is attached.

Dated: February 16, 2024

Respectfully submitted,

/s/ *James W. Ducayet*
James W. Ducayet (*pro hac vice*)
jducayet@sidley.com
Ankur Shingal (*pro hac vice*)
ashingal@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Telephone: (312) 853 7000
Facsimile: (312) 853 7036

Tyson Y. Herrold (314262)
BAKER & HOSTETLER LLP
1735 Market Street, Suite 3300
Philadelphia, PA 19103
Telephone: (215) 564-3286
therrold@bakerlaw.com

*Attorneys for Defendant TaxAct, Inc.*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

JAMES KIRKHAM and MATTHEW SESSOMS, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

TAXACT, INC.,

Defendant.

Civil Action No.: 2:23-CV-3303-WB

**ECF CASE**

# DEFENDANT TAXACT, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS

# TABLE OF CONTENTS


INTRODUCTION ..... 1

FACTUAL BACKGROUND ..... 1

I. All TaxAct Customers Must Accept the Terms to Use TaxAct's Services. ..... 2

II. The Terms Include an Arbitration Agreement With an Opt-Out Provision. ..... 3

III. Multiple Records Demonstrate Both Plaintiffs' Acceptance of the Terms and Arbitration Agreement. ..... 4

A. Plaintiff Kirkham Accepted the Terms and Arbitration Agreement ..... 4

B. Plaintiff Sessoms Accepted the Terms and Arbitration Agreement ..... 6

ARGUMENT ..... 7

I. Based on the Delegation Clauses in the Terms, This Court's Review is Limited. ..... 8

II. Arbitration Must Be Compelled Because Plaintiffs Entered into a Delegation Clause-Containing Contract with TaxAct—and Agreed to the Terms—Every Tax Year from 2020 through 2022. ..... 10

A. Both Kirkham and Sessoms Formed Agreements to Arbitrate Their Claims. ..... 10

B. Sessoms Is Bound by the Terms Based on His Spouse's Use of TaxAct's Services on His Behalf. ..... 14

III. The Existence of the Arbitration and Delegation Clauses in the Applicable Terms Must End the Court's Inquiry and Require a Stay Pending Arbitration. ..... 18

IV. Alternatively, Even if There Were No Delegation Provision, Arbitration Would Still Be Appropriate. ..... 20

V. TaxAct Submits, for Preservation Purposes, That the Existence of the Arbitration Agreement and the Delegation Clause Requires a Stay of Discovery While Its Motion to Compel is Pending ..... 22

CONCLUSION ..... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACE Am. Ins. Co. v. Huntsman Corp.*,
255 F.R.D. 179 (S.D. Tex. 2010)....................16

*Am. Express Co. v. Italian Colors Rest.*,
570 U.S. 228 (2013)....................8

*Anfibio v. Optio Sols. LLC*,
No. 20-cv-11146-CCC-ESK, 2020 WL 8483808 (D.N.J. Dec. 30, 2020)....................23

*Arthur Anderson LLP v. Carlisle*,
556 U.S. 624 (2009)....................15

*AT&T Techs., Inc. v. Commn'cns Workers of Am.*,
475 U.S. 643 (1986)....................20

*Bridas S.A.P.I.C. v. Gov't of Turkmenistan*,
345 F.3d 347 (5th Cir. 2003)....................17

*Henry ex rel. BSC Ventures Holdings, Inc. Emp. Stock Ownership Plan v. Wilmington Tr. NA*,
72 F.4th 499 (3d Cir. 2023)....................19

*Carey v. 24 Hour Fitness, USA, Inc.*,
669 F.3d 202 (5th Cir. 2012)....................11

*Carrone v. UnitedHealth Grp. Inc.*,
No. CV 20-5138 (FLW), 2020 WL 4530032 (D.N.J. Aug. 6, 2020)....................19

*Chassen v. Fid. Nat'l Fin. Inc.*,
836 F.3d 291 (3d Cir. 2016)....................20

*CIGNA HealthCare of St. Louis, Inc. v. Kaiser*,
294 F.3d 849 (7th Cir. 2002)....................23

*Coinbase, Inc. v. Bielski*,
599 U.S. 736 (2023)....................23, 24

*Conglomerate Gas II, L.P. v. Gibb*,
2015 WL 6081919 (Tex. App. 2015)....................11

*Contec Corp. v. Remote Sol., Co.*,
398 F.3d 205 (2d Cir. 2005)....................9

*Coulter v. Experian Info. Sols., Inc.*,
No. 20-cv-1814, 2021 WL 735726 (E.D. Pa. Feb. 25, 2021)....................10

*Curtis v. Cintas Corp.*,
229 F. Supp. 3d 312 (E.D. Pa. 2017)....................10

*Dean Witter Reynolds, Inc. v. Byrd*,
470 U.S. 213 (1985)....................8

*Deardorff v. Cellular Sales of Knoxville, Inc.*,
No. 19-cv-2642-KSM, 2022 WL 407396 (E.D. Pa. Feb. 9, 2022)....................9, 10, 19

*DHI Grp., Inc. v. Kent*,
No. CV H-16-1670, 2017 WL 4837730 (S.D. Tex. Oct. 26, 2017)....................13

*Dobbs v. Health IQ Ins. Servs., Inc.*,
No. CV 21-5276, 2022 WL 2974713 (E.D. Pa. July 27, 2022)....................13

*Express Lien, Inc. v. Handle, Inc.*,
No. CV 19-10156, 2021 WL 2476853 (E.D. La. June 17, 2021)....................11

*Feldman v. Google, Inc.*,
513 F. Supp. 2d 229 (E.D. Pa. 2007)....................12

*FFR SE, LLC v. Sanborn*,
No. 14-5439, 2015 WL 3970923 (E.D. Pa. June 30, 2015)....................22

*In re Firstmerit Bank, N.A.*,
52 S.W.3d 749 (Tex. 2001)....................16

*Fleetwood Enters. Inc. v. Gaskamp*,
280 F.3d 1069 (5th Cir. 2002)....................16

*Griswold v. Coventry First LLC*,
762 F.3d 264 (3d Cir. 2014)....................22

*HealthplanCRM, LLC v. AvMed, Inc.*,
458 F. Supp. 3d 308 (W.D. Pa. 2020)....................9, 15

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
139 S. Ct. 524 (2019)....................9

*Intertec Contracting Turner Steiner Int'l, S.A.*, No. 98 Civ. 9116(CSH), 2001 WL
812224 (S.D.N.Y. July 18, 2001)....................23

*Jia v. Nerium Int'l LLC*,
3:17-CV-03057-S, 2018 WL 4491163 (N.D. Tex. Sept. 18, 2018)....................11

*In re Kellogg Brown & Root, Inc.*,
166 S.W.3d 732 (Tex. 2005) ....................16

*Kirleis v. Dickie, McCamey & Chilcote, P.C.*,
560 F.3d 156 (3d Cir. 2009) ....................10

*Klepper v. SLI, Inc.*,
45 F. App'x. 136 (3d Cir. 2002) ....................22, 23

*KPMG LLP v. Cocchi*,
565 U.S. 18 (2011) ....................8

*Lizalde v. Vista Quality Mkts.*,
746 F.3d 222 (5th Cir. 2014) ....................11

*MacDonald v. CashCall, Inc*,
883 F.3d 220 (3d Cir. 2018) ....................10

*Mahamedi IP L., LLP v. Paradice & Li, LLP*,
No. 5:16-CV-02805-EJD, 2017 WL 2727874 (N.D. Cal. Feb. 14, 2017) ....................23

*Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.*,
247 F.3d 44 (3d Cir. 2001) ....................20

*Medversant Techs., LLC, v. Leverage Health Solutions, LLC*,
114 F. Supp. 3d 290 (E.D. Pa. 2015) ....................20

*Meyer v. Uber Techs., Inc.*,
868 F.3d 66 (2d Cir. 2017) ....................12

*Mitsubishi Motors Corp. v. Soler-Plymouth, Inc.*,
473 U.S. 614 (1985) ....................8

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
460 U.S. 1 (1983) ....................8, 20

*Nationwide of Bryan, Inc. v. Dyer*,
969 S.W.2d 518 (Tex. App. 1998) ....................17

*In re Online Travel Co. (OTC) Hotel Booking Antitrust Litig.*,
953 F. Supp. 2d 713 (N.D. Tex. 2013) ....................11, 12, 13

*Patrick v. Running Warehouse, LLC*,
No. 22-56078, 2024 WL 542831 (9th Cir. Feb. 12, 2024) ....................13

*Phillips v. Neutron Holdings, Inc.*,
2019 WL 4861435 (N.D. Tex. 2019) ....................11

*In re Rangel*,
45 S.W.3d 783 (Tex. App. 2001)....................16

*RealPage, Inc. v. EPS, Inc.*,
560 F. Supp. 2d 539 (E.D. Tex. 2007)....................11

*Renfrew Ctrs., Inc. v. UNI/CARE Sys. Inc.*,
920 F. Supp. 2d 572 (E.D. Pa. 2013)....................22

*Rent-A-Center, W., Inc. v. Jackson*,
561 U.S. 63 (2010).................... *passim*

*Richardson v. Coverall N. Am., Inc.*,
811 F. App'x 100 (3d Cir. 2020)....................9

*Sea Spray Holdings, Ltd. v. Pali Fin. Grp., Inc.*,
269 F. Supp. 2d 356 (S.D.N.Y. 2003)....................20

*Singh v. Uber Techs. Inc.*,
939 F.3d 210 (3d Cir. 2019)....................9

*Skalde v. Lemieux Grp., L.P.*,
No. 3:20-cv-2039, 2021 WL 1812677 (M.D. Pa. May 6, 2021)....................23

*State Farm Life Ins. Co. v. Bryant*,
No. 3:18-CV-1628-L, 2021 WL 1222152 (N.D. Tex. Mar. 31, 2021)....................16

*Stevens v. Equifax Info. Servs., LLC*,
No. CV 21-4840, 2022 WL 4120282 (E.D. Pa. Sept. 9, 2022)....................15

*Stonewall Ins. Co. v. Modern Exploration Inc.*,
757 S.W.2d 432 (Tex. App 1988)....................17

*Suarez-Valdez v. Shearson Lehman/Am. Express, Inc.*,
858 F.2d 648 (11th Cir. 1988)....................23

*Sw. Airlines Co. v. BoardFirst, L.L.C.*,
No. 3:06–CV–0891–B, 2007 WL 4823761 (N.D. Tex. Sept. 12, 2007)....................13

*Sw. Health Plan, Inc. v. Sparkman*,
921 S.W.2d 355 (Tex. App. 1996)....................17

*Talman Home Fed. Sav. & Loan Ass'n of Illinois v. Am. Bankers Ins.*,
924 F.2d 1347 (5th Cir. 1991)....................16

*Trippe Mfg. Co. v. Niles Audio Corp.*,
401 F.3d 529 (3d Cir. 2005)....................20

*In re Weekley Homes, L.P.*,
180 S.W.3d 127 (Tex. 2005)....................16

*White v. Sunoco, Inc.*,
870 F.3d 257 (3d Cir. 2017)....................15

*Widespread Elec. Sales, LLC v. Upstate Breaker Wholesale Supply, Inc.*,
No. 3:20-CV-2541-K, 2021 WL 2651087 (N.D. Tex. June 28, 2021)....................13

*Williams v. State*,
2016 LEXIS 9373 (Tex. App. 2016) ....................11

*Wireless Protocol Innovations, Inc. v. TCT Mobile (US) Inc.*,
2023 WL 4626659 (E.D. Tex. 2023) ....................18

**Statutes**

9 U.S.C. § 3.................... *passim*

9 U.S.C. § 4....................1, 19, 20, 24

26 U.S.C. § 6103....................2, 21

26 U.S.C. § 7431(a)(2)....................2, 21

Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa. C.S. § 5701, *et seq.* ....................2, 21

**Other Authorities**

Fed. R. Civ. P. 12....................1

Fed. R. Civ. P. 16....................22

JAMS Rule 11(b) ....................19

JAMS Rule 8(b) ....................4, 9

Defendant TaxAct, Inc. ("TaxAct" or "Defendant"), through its undersigned attorneys, respectfully moves to compel arbitration pursuant to Federal Arbitration Act ("FAA"), 9 U.S.C. § 4 and/or stay proceedings pending arbitration pursuant to 9 U.S.C. § 3.

## INTRODUCTION

This is a putative class action against TaxAct, a tax preparation software company that provides services to individual taxpayers and businesses. Plaintiffs James Kirkham and Matthew Sessoms (together "Plaintiffs") assert that TaxAct improperly disclosed their confidential tax return information and seek relief under a variety of statutory causes of action.

Plaintiffs cannot litigate these claims in this Court. When Plaintiffs used TaxAct's tax preparation products and services, they agreed to do so pursuant to TaxAct's standard terms and conditions of service (the "Terms"). These Terms, which are discussed in detail below, require that the disputes at issue be resolved by confidential binding arbitration, which is to be conducted on an individual (and not class-wide) basis. These Terms further incorporate a delegation provision, mandating that the arbitrator decide various threshold issues, including whether a dispute falls within the scope of an arbitration provision. As such, this Court should compel Plaintiffs to arbitrate their claims and should stay all proceedings pursuant to Section 3 of the FAA until that arbitration has been completed.

The Court denied TaxAct's prior motion to compel arbitration and stay proceedings (Dkt. No. 30) without prejudice. Dkt. No. 52, TaxAct now moves again to compel arbitration and stay proceedings applying Texas contract law.

## FACTUAL BACKGROUND

Plaintiffs are TaxAct customers who allege that TaxAct shared "sensitive taxpayer data with Meta Platforms, Inc. ('Meta') and Google LLC and its affiliates ('Google'), as well as other third-parties, without the taxpayers' knowing and voluntary consent." Am. Class Action Compl.

¶ 1 (Oct. 17, 2023), ECF No. 27 ("Am. Compl.") (emphasis omitted). Plaintiffs assert claims under federal law for alleged violations of 26 U.S.C. §§ 6103 and 7431(a)(2), and also assert state law claims under the Pennsylvania Wiretapping and Electronic Surveillance Control Act ("Pennsylvania Wiretap Act"), 18 Pa. C.S. § 5701, *et seq.* Am. Compl. ¶ 5. Plaintiffs purport to bring this action on behalf of themselves and: (1) a putative class of Pennsylvania residents who used TaxAct "during the time that Meta Pixel or Google Analytics coding was present and active on TaxAct's website and/or its other online mobile and desktop applications up and until November 23, 2022…."; and (2) a putative class of joint filers whose spouses used TaxAct's website "to prepare and/or file a joint tax return" during the same time. *Id.* ¶¶ 66-67.

## I. All TaxAct Customers Must Accept the Terms to Use TaxAct's Services.

Every visitor to or user of TaxAct's websites, mobile applications, online and offline tax return preparation products, and filing services (collectively, the "Services") is subject to the TaxAct Terms of Service and License Agreement (the "Terms")—a set of contractual terms and conditions of service—that are publicly available on TaxAct's website at https://www.taxact.com/legal-notice. *See* Decl. of Mark Jaeger in Supp. of Def. TaxAct, Inc.'s Mem. in Supp. of Mot. to Compel Arbitration & Stay Proceedings ("Jaeger Decl.") ¶¶ 3, 8, Ex. G. The operative Terms at the time of this dispute went into effect on November 17, 2020 and were in place on TaxAct's website until December 22, 2023. *Id.* ¶ 9. A hyperlink to the Terms has been listed at the footer of every page on TaxAct's website. *Id.* ¶¶ 8, 9. The Terms provide: "You may not use the Services until you have read and agreed to this Agreement. By using the Services, you indicate your unconditional acceptance of this Agreement. If you do not accept this Agreement, you must terminate your use of the Services." *Id.*, Ex. G at G-1. The Terms also provide: "This Agreement, TaxAct's Privacy Policy, and any terms associated with any particular offer for use of the Services set forth TaxAct's and the Participating Parties' entire

liability and your exclusive remedy with respect to the Services, comprise a complete statement of the agreement between you and TaxAct regarding the subject matter thereof, and supersede any prior understandings with regards to such subject matter." *Id.*, Ex. G at G-3. As detailed below, TaxAct users are required to affirmatively consent to the Terms when they create a TaxAct account and also again prior to the users' being able to file their tax returns. *Infra* § III; Jaeger Decl., ¶¶ 3, 6, 17.

## II. The Terms Include an Arbitration Agreement With an Opt-Out Provision.

The Terms include a section titled "Dispute Resolution; Binding Arbitration" (the "Arbitration Agreement") that contains detailed information regarding binding arbitration, including the following language in bold font:

> **You and TaxAct agree that any dispute arising out of or related to these Terms or our Services is personal to you and TaxAct and that any dispute will be resolved solely through individual arbitration and will not be brought as a class arbitration, class action or any other type of representative proceeding.**

Jaeger Decl. ¶ 11 & Ex. G at G-4. The Terms provide that THE VALIDITY AND PERFORMANCE OF THIS AGREEMENT SHALL BE GOVERNED BY TEXAS LAW (WITHOUT REFERENCE TO CHOICE OF LAW PRINCIPLES), AND APPLICABLE FEDERAL LAW," and select an arbitral forum of Dallas County, Texas. *Id.*, Ex. G at G-4. Consistent with the contractual election of arbitration, the Arbitration Agreement clearly and conspicuously states "you and TaxAct *waive your rights to a jury trial* and to have any dispute arising out of or related to these Terms or our Services resolved in court." *Id.*, Ex. G at G-4 (emphasis added). This language follows a bolded warning which states: "**Please read the following section carefully because it requires you to arbitrate certain disputes and claims with TaxAct and limits the manner in which you can seek relief from us.**" *Id.*, Ex. G at G-4.

Additionally, the Arbitration Agreement requires that disputes with TaxAct be resolved through individual arbitration in accordance with the Streamlined Arbitration Rules & Procedures of the Judicial Arbitration and Mediation Services ("JAMS Rules"). Jaeger Decl. ¶ 12. The Arbitration Agreement further (and in underlining) provides that the JAMS Rules are "hereby incorporated by reference." *Id.*, Ex. G at G-4. The JAMS Rules have a delegation provision, *i.e.*, a provision mandating that the arbitrator decide various threshold issues—such as whether a dispute falls within the scope of an arbitration provision—that courts ordinarily would decide:

> Jurisdictional and arbitrability disputes, including disputes over the formation, existence, *validity, interpretation or scope of the agreement* under which Arbitration is sought, and who are proper Parties to the Arbitration, *shall be submitted to and ruled on by the Arbitrator*. The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter.

*Id.*, Ex. N at N-7 (JAMS Rule 8(b)) (emphases added).

The Arbitration Agreement also includes an opt-out provision, which has clear instructions on how to opt out: "You have the right to opt out of binding arbitration within thirty (30) days of the date you first accepted the terms of this Section by sending an email to arbitration@taxact.com." Jaeger Decl. ¶ 13, Ex. G at G-4. Opting out of arbitration does not result in a penalty. *Id.* ¶ 14.

## III. Multiple Records Demonstrate Both Plaintiffs' Acceptance of the Terms and Arbitration Agreement.

### A. Plaintiff Kirkham Accepted the Terms and Arbitration Agreement

TaxAct's internal records confirm that Kirkham created his TaxAct account on December 22, 2020. Jaeger Decl. ¶ 4(a) & Ex. A. Kirkham filed a completed tax return through

TaxAct for tax year ("TY") [1] 2020 on February 12, 2021. *Id.* ¶ 5(b) & Ex. A. Kirkham also started but did not complete, and never electronically filed ("e-filed") nor printed to file through postal mail, a tax return via TaxAct in TY 2021. *Id*.

TaxAct requires individuals who create an account on the TaxAct website to acknowledge acceptance of the Terms to create an account. Jaeger Decl. ¶ 3. For TY 2020, when Kirkham created his account, Am. Compl. ¶ 9, this acknowledgment included requiring customer assent via a checkbox to a provision reading: "I agree to the TaxAct Terms of Service & Terms of Use [hyperlinked], and have read and acknowledge the Privacy Statement [hyperlinked]." Jaeger Decl. ¶ 6 & Ex. F.

Additionally, users are required to affirmatively check a checkbox to create a record of their acknowledgment of their acceptance of the Terms in order to e-file or paper file their tax returns. *Id.* ¶ 17. E-filing and paper filing pages during TY 2020—the only year Kirkham e-filed or printed a completed tax return through TaxAct—included a required checkbox that reads: "I agree to the terms and conditions [hyperlinked]."*Id.* ¶ 17 & Ex. H. Users must check the checkbox acknowledging their acceptance of the Terms in order to continue to the filing step. *Id.* ¶ 17 & Ex. I (describing the user experience in the Services, which requires that a user affirmatively check a checkbox before e-filing or printing a completed tax return and also reflecting the back-end code to the same for TY 2020). The hyperlink in the acknowledgement of the Terms immediately makes available the Terms containing the Arbitration Agreement, which requires a waiver of rights to a jury trial and instead requires binding arbitration, as noted above.

---

[1] Many of the dates included in this brief and supporting declaration and exhibits refer to "tax year" (or "TY"). Because TaxAct is a tax return preparation software company, many of its internal records are keyed to tax years. Generally, an individual will file tax returns for a given tax year in the following calendar year (e.g., TY 2020 returns are generally filed in calendar year 2021).

Accordingly, when Kirkham created his TaxAct account on December 22, 2020, he affirmatively checked the checkbox that reads: "I agree to the TaxAct Terms of Service & Terms of Use [hyperlinked], and have read and acknowledge the Privacy Statement [hyperlinked]." *Id.* ¶ 6. And when Kirkham electronically filed ("e-filed") his state and federal tax returns for TY 2020 on February 12, 2021, he again checked a checkbox, which read "I agree to the terms and conditions [hyperlinked]." *Id.* ¶¶ 17-18 & Ex. J.

Kirkham never opted out of the arbitration provisions. *Id.* ¶ 15.

### B. Plaintiff Sessoms Accepted the Terms and Arbitration Agreement

The Amended Complaint alleges that "Plaintiff Sessoms' spouse used TaxAct's online preparation and filing services to prepare and file joint tax returns with Plaintiff Sessoms from 2017 to 2022." Am. Compl. ¶ 15. The Amended Complaint further states that "Plaintiff Sessoms did not access or use TaxAct's website[,]" and "Plaintiff Sessoms did not see, understand, or agree to be bound by an arbitration agreement or any terms or conditions on TaxAct's website." *Id*. ¶¶ 16-17.

As an initial matter, these factual allegations are contradicted by TaxAct's internal records. In fact, Sessoms created his TaxAct account on February 22, 2021. Jaeger Decl. ¶ 5(a) & Ex. B. Using his own TaxAct account, Sessoms individually e-filed a completed tax return through TaxAct for TY 2020 on March 17, 2021. *Id.* Sessoms again individually e-filed a completed tax return for TY 2021 on March 7, 2022. *Id*. Then, using his own account, Sessoms started, but did not complete, and never e-filed nor printed to file through postal mail, a tax return via TaxAct for TY 2022. *Id.* However, an individual return for another individual was e-filed on Sessoms' account for TY 2022 first on March 24, 2023 and then again on April 14, 2023. *Id.* ¶ 5(b)-(c) & Ex. B. Finally, on February 8, 2023, Sessoms' spouse filed on her TaxAct account a joint tax return for herself and Sessoms for TY 2022. *Id.* ¶ 5(f)-(g) & Exs. D-E. TaxAct

has no record of Sessoms filing a return prior to TY 2020 and has no record of him being a joint filer on someone else's return prior to TY 2020.

In any event, when Sessoms created his account on February 22, 2021, he expressly accepted the Terms by affirmatively checking a required checkbox to assent to a provision that read: "I agree to the TaxAct Terms of Service & Terms of Use [hyperlinked], and have read and acknowledge the Privacy Statement [hyperlinked]." Jaeger Decl. ¶¶ 5(a), 6 & Ex. F. Sessoms again acknowledged his acceptance of the Terms when he e-filed his tax returns for TY 2020 on March 17, 2021 and for TY 2021 on March 7, 2022, by affirmatively checking checkboxes to again assent to a provision that read "I agree to the terms and conditions [hyperlinked]." *Id.* ¶¶ 5(a), 17, 19 & Ex. K. In addition, because a TaxAct user is responsible for activities conducted on the TaxAct website under their account, Sessoms also acknowledged his acceptance of the Terms the first time an individual tax return was e-filed using his TaxAct account for TY 2022 on March 24, 2023. *Id.* ¶¶ 5(a)-(c), 10, Ex. G.

Sessoms never opted out of the arbitration provisions. *Id.* ¶ 15.

When Sessoms' spouse filed a joint tax return for herself and for Plaintiff Sessoms for TY 2022 on February 8, 2023, she too checked the checkbox to assent to a provision that read "I agree to the terms and conditions [hyperlinked]." *Id.* ¶¶ 5(f), 10 & Ex. L. Sessoms' spouse also never opted out of the arbitration provisions. *Id.* ¶ 15. As explained below, Sessoms is bound both by his own assent and by his spouse's consent to the Terms.

## ARGUMENT

The Federal Arbitration Act ("FAA") requires that, when an issue is "referable to arbitration under an agreement in writing for such arbitration," the court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3. "[The FAA] leaves no place for the exercise of

discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985). The FAA "reflects an 'emphatic federal policy in favor of arbitral dispute resolution.'" *KPMG LLP v. Cocchi*, 565 U.S. 18, 21 (2011) (per curiam) (quoting *Mitsubishi Motors Corp. v. Soler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985)). This policy requires courts to "'rigorously enforce' arbitration agreements according to their terms," *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013), and to resolve "any doubts concerning the scope of arbitrable issues . . . in favor of arbitration," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983). Parties may "agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy," and "the FAA operates on this additional arbitration agreement just as it does on any other." *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68-70 (2010); *see id.* at 67-69 (arbitrability questions can be delegated to the arbitrator so long as the delegation is clear).

In light of these settled legal standards, and for all of the reasons set forth below, the Court should enforce the parties' arbitration agreement and stay proceedings against TaxAct.

## I. Based on the Delegation Clauses in the Terms, This Court's Review is Limited.

Plaintiff Kirkham entered into a contract with TaxAct—the Terms—when he created his account on December 22, 2020, each time he visited the TaxAct website to use the Services, and also when he e-filed his TY 2021 tax return on February 12, 2021. Jaeger Decl. ¶¶ 4(a), 18. Plaintiff Sessoms entered into a contract with TaxAct when he created his account on February 22, 2021, each time he visited the TaxAct website to use the Services, and also when tax returns were e-filed using his account in TY 2020, TY 2021, and TY 2022 on March 17, 2021, March 7, 2022, and March 24, 2023, respectively. *Id.* ¶¶ 5(a), 19. In addition, Plaintiff Sessoms' wife entered into a contract (again) when she e-filed a joint tax return for TY 2022 on

February 8, 2023 on behalf of herself and Plaintiff Sessoms. *Id.* ¶¶ 5(f), 20. The Terms contain the Arbitration Agreement, which expressly incorporates the JAMS Rules. In turn, the JAMS Rules have a delegation clause. *Id.* ¶¶ 11-12.

The Third Circuit has held that incorporation of an arbitral body's rules containing a delegation clause "constitutes clear and unmistakable evidence that the [contracting] parties agreed to delegate arbitrability." *Richardson v. Coverall N. Am., Inc.*, 811 F. App'x 100, 103-04 (3d Cir. 2020) (concluding that delegation was "clear and unmistakable" where the parties incorporated by reference the AAA Rules).[2] Here, the JAMS Rules clearly delegate all "disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought" to the arbitrator. JAMS Rule 8(b); *see Deardorff*, 2022 WL 407396, at *9; *accord Contec Corp. v. Remote Sol., Co.*, 398 F.3d 205, 208 (2d Cir. 2005) ("[W]hen, as here, parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator.").

Under controlling authority, the existence of a delegation provision substantially narrows the scope of this Court's review. *See, e.g.*, *Rent-A-Center*, 561 U.S. at 71-72; *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019) ("[I]f a valid agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue."); *Singh v. Uber Techs. Inc.*, 939 F.3d 210, 215 (3d Cir. 2019) ("Where such a

[2] *See Deardorff v. Cellular Sales of Knoxville, Inc.*, No. 19-cv-2642-KSM, 2022 WL 407396, at *8 (E.D. Pa. Feb. 9, 2022) ("parties may 'clearly and unmistakably' delegate arbitrability issues to an arbitrator by incorporating by reference the American Arbitration Association ('AAA') or the Judicial Arbitration and Mediations Services [sic] ('JAMS') rules") (citations omitted); *HealthplanCRM, LLC v. AvMed, Inc.*, 458 F. Supp. 3d 308, 322-23 (W.D. Pa. 2020) (noting that many courts have found the incorporation by reference of AAA arbitration rules to constitute "clear and unmistakable" delegation).

[delegation] clause is included, courts cannot decide threshold questions of arbitrability 'unless a party challenge[s] the delegation clause [specifically] and the court concludes that the delegation clause is not enforceable.'") (quoting *MacDonald v. CashCall, Inc*, 883 F.3d 220, 226 (3d Cir. 2018)).

Thus, given the enforceable delegation clause discussed above, this Court's inquiry is limited to the issue of whether a contract was formed containing an arbitration agreement. In other words, based on the delegation provision, Court may not determine whether any aspects of the Arbitration Agreements are unenforceable as to any particular Plaintiff (including arguments regarding unconscionability[3], which Plaintiffs raised in prior briefing), let alone to determine what scope of claims are subject to arbitration. Those matters, by virtue of the delegation provision, are for the arbitrator alone to decide.

## II. Arbitration Must Be Compelled Because Plaintiffs Entered into a Delegation Clause-Containing Contract with TaxAct—and Agreed to the Terms—Every Tax Year from 2020 through 2022.

### A. Both Kirkham and Sessoms Formed Agreements to Arbitrate Their Claims.

As noted, while nearly all issues regarding the Arbitration Agreement must be delegated to the arbitrator, the question of formation can be addressed by the Court. *See Deardorff*, 2022 WL 407396, at *6. To assess whether an agreement to arbitrate was formed, "courts look to ordinary state law principles of contract formation." *Coulter v. Experian Info. Sols., Inc.*, No. 20-cv-1814, 2021 WL 735726, at *5 (E.D. Pa. Feb. 25, 2021) (citing *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir. 2009)); *Curtis v. Cintas Corp.*, 229 F. Supp. 3d 312,

[3] For example, the Supreme Court has repeatedly admonished that courts cannot entertain arguments about the unconscionability of the arbitration agreement as a whole, because the party opposing arbitration must "challenge[] the delegation provision specifically" for any court to decide the issue. *See, e.g.*, *Rent-A-Center*, 561 U.S. at 71-72 (the arbitrator is to decide unconscionability challenges that apply "to the contract as a whole" and not to the "delegation provision specifically").

316 (E.D. Pa. 2017); *accord Lizalde v. Vista Quality Mkts.*, 746 F.3d 222, 225 (5th Cir. 2014) (citing *Carey v. 24 Hour Fitness, USA, Inc.*, 669 F.3d 202, 205 (5th Cir. 2012)).

Texas courts have held that "in determining whether parties reached a meeting of the minds, objective manifestations of intent to be bound are relevant but unexpressed subjective intentions are not." *Conglomerate Gas II, L.P. v. Gibb*, 2015 WL 6081919 at *7 (Tex. App. 2015) ("Indeed, contract-formation cases commonly recite that the determination of a meeting of the minds, and this offer and acceptance, is based on the objective standards of what the parties said and did and not on their subjective state of mind.") (citations omitted); *see also Williams v. State*, 2016 LEXIS 9373, at *4-5 (Tex. App. 2016).

"Clickwrap agreements" like the one at issue here—where a user's click indicates assent to the terms of use before the user is able to proceed on a website—are "routinely enforce[d]" by the courts as binding contracts. *Phillips v. Neutron Holdings, Inc.,* 2019 WL 4861435, at *4 (N.D. Tex. 2019); *see also Jia v. Nerium Int'l LLC*, 3:17-CV-03057-S, 2018 WL 4491163, at *3 (N.D. Tex. Sept. 18, 2018) ("It is well established under Texas law that assent through an affirmative 'click' is sufficient to bind the parties."); *see also Express Lien, Inc. v. Handle, Inc.*, No. CV 19-10156, 2021 WL 2476853, at *4 (E.D. La. June 17, 2021) ("In the case of 'clickwrap' agreements … courts within the Fifth Circuit have consistently held that, where parties knew or should have known about the existence of a website's terms, the parties may be bound even if they have not read them."). In evaluating clickwrap agreements, Texas courts have identified "the central issue is whether or not the users were 'conspicuously presented with the agreement prior to entering into a contract.'" *In re Online Travel Co. (OTC) Hotel Booking Antitrust Litig.*, 953 F. Supp. 2d 713, 719 (N.D. Tex. 2013) (citing *RealPage, Inc. v. EPS, Inc.*, 560 F. Supp. 2d 539, 545 (E.D. Tex. 2007)). That requirement is clearly met here.

The Terms, which contain the Arbitration Agreement, were repeatedly provided to Plaintiffs. The Terms are publicly available on the TaxAct website, and a hyperlink to the Terms is listed at the footer of every page on the TaxAct website and software. Importantly, the acknowledgement notice containing the checkbox hyperlinks to the Terms. Upon clicking on the hyperlink, the Terms (which conspicuously include the Arbitration Agreement) are immediately made available. The Terms themselves provide that Plaintiffs agreed to the Terms by using the Services. Jaeger Decl. ¶ 6, Ex. G at G-1.

As noted above, in order for Plaintiffs to have created a TaxAct account, they were required to affirmatively check a checkbox agreeing to the Terms, which they both did during TY 2020. *Id.* ¶¶ 6-7. Kirkham once again checked a checkbox agreeing to the Terms when he e-filed his state and federal tax returns for TY 2020. *Id.* ¶ 18. Plaintiff Sessoms also again checked a checkbox when he individually filed his tax returns for TY 2020 and TY 2021 and again in TY 2022 as a joint filer. *Id.* ¶¶ 19-21. These facts are nearly identical to those in *In re Online Travel Co.*, where the court found that plaintiffs "assent[ed] to the user agreement by clicking on a button that said 'Agree and Complete Reservation[,]'" which was located in close proximity to the hyperlinked terms, which in turn included the arbitration agreement. 953 F. Supp. 2d at 719 ("In the case at bar, it was impossible to complete a transaction on the Travelocity website in the absence of affirmative assent to the User Agreement….[which created] a valid clickwrap agreement.").[4]

[4] Courts outside of Texas and the Fifth Circuit have held the same. *See Feldman v. Google, Inc.*, 513 F. Supp. 2d 229, 236 (E.D. Pa. 2007) (courts evaluate clickwrap agreements through "traditional principles of contract law and focus on whether the plaintiff[ ] had reasonable notice of and manifested assent to the clickwrap agreement."); *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 76 (2d Cir. 2017) (a court may determine that a web-based agreement to arbitrate exists where notice of the agreement was "reasonably conspicuous and manifestation of assent unambiguous as a matter of law" (citation omitted)).

Even if the Court were to classify TaxAct's method of implementing its Terms as a browsewrap agreement—despite federal courts concluding that procedures such as TaxAct's qualify as a clickwrap agreement[5]—this distinction would not help Plaintiffs here. Texas courts routinely uphold the formation of browsewrap agreements where a party had actual or constructive knowledge of the contract. *See DHI Grp., Inc. v. Kent,* No. CV H-16-1670, 2017 WL 4837730, at *2-4 (S.D. Tex. Oct. 26, 2017) (holding that the parties entered into a valid browsewrap agreement and stating "[b]ecause there is no affirmative step to acknowledge assent to the agreement, it is necessary to show the user had actual or constructive knowledge of the terms and conditions to prove a valid contract exists between the user and the owner of the website"); *Sw. Airlines Co. v. BoardFirst, L.L.C.*, No. 3:06–CV–0891–B, 2007 WL 4823761, at *5, 7 (N.D. Tex. Sept. 12, 2007) (holding that the defendant was bound to a browsewrap agreement and explaining that a browsewrap contract is binding when a website user has "actual or constructive knowledge of a site's terms and conditions prior to using the site.'"); *Widespread Elec. Sales, LLC v. Upstate Breaker Wholesale Supply, Inc.*, No. 3:20-CV-2541-K, 2021 WL 2651087, at *6 (N.D. Tex. June 28, 2021) ("While an allegation regarding the 'conspicuousness of the [browsewrap] agreement' may go to show actual or constructive knowledge, it is simply one way of alleging the required knowledge element.") (citation omitted). Indeed, the Ninth Circuit recently held that a browsewrap agreement created a valid contract where a website provided "reasonably conspicuous notice of the Terms," as is the case here. *See e.g., Patrick v. Running Warehouse, LLC*, No. 22-56078, 2024 WL 542831, *4 (9th Cir. Feb. 12, 2024) (The

---

[5] *See, e.g.*, *In re Online Travel Co.*, 953 F. Supp. 2d at 719; *accord Dobbs v. Health IQ Ins. Servs., Inc.*, No. CV 21-5276, 2022 WL 2974713, at *4 (E.D. Pa. July 27, 2022) (holding that the parties entered into a clickwrap agreement when the "Plaintiff received notice of the hyperlinked Terms of Use, including the agreement to arbitrate potential claims, and manifested assent by clicking the 'SUBMIT' button.").

agreement at issue was "directly below key information such as the purchase total, and directly below the button [the customer] tapped to complete his purchase. The notice is on an uncluttered page and is not hidden or obscured. The notice is clear and legible, and the hyperlinked phrase 'terms of use' is colored bright green—contrasted against the surrounding white background and adjacent black text.").

Here, Plaintiffs had knowledge of the terms, as they are conspicuous on TaxAct's website and were repeatedly provided to Plaintiffs. The Terms are publicly available on the TaxAct website, and a hyperlink to the Terms is listed at the footer of every page on the TaxAct website and software. Importantly, the acknowledgement notice containing the checkbox hyperlinks to the Terms. Upon clicking on the blue-colored hyperlink, the Terms (which clearly include the Arbitration Agreement) are immediately made available. The Terms themselves provide that Plaintiffs agreed to the Terms by using the Services. Jaeger Decl. ¶ 6, Ex. G at G-1.

Therefore, a valid agreement to arbitrate exists between the parties here, and the delegation provision, as discussed, requires that the arbitrator—and *not* this Court—decide whether Plaintiffs' claims are arbitrable, *i.e.*, whether they fall within the scope of the arbitration agreement.

**B. Sessoms Is Bound by the Terms Based on His Spouse's Use of TaxAct's Services on His Behalf.**

In addition to being bound by the Terms through his own use of TaxAct's Services, Sessoms is also bound to the Terms through his spouse's use of the Services. When Sessoms' spouse filed a joint tax return for herself and for Sessoms for TY 2022 on February 8, 2023, she checked the checkbox that read "I agree to the terms and conditions [hyperlinked]." Jaeger Decl., ¶¶ 20-21. Sessoms claims that he himself did not access the Services and that he did not have any understanding of the Terms. As noted, these mere allegations are irreconcilable with the

evidence set forth in this motion and accompanying documents, and therefore insufficient to defeat a motion to compel arbitration without concrete facts and evidence to support the contrary mere (and factually incorrect) allegations in the Complaint regarding Plaintiffs' use of TaxAct. *See Stevens v. Equifax Info. Servs., LLC*, No. CV 21-4840, 2022 WL 4120282, at *3 (E.D. Pa. Sept. 9, 2022), *appeal dismissed sub nom. Stevens v. Transunion LLC*, No. 22-2906, 2023 WL 7123788 (3d Cir. Sept. 1, 2023). TaxAct's internal records show that Sessoms had to consent to the Terms when he created an account in TY 2020, and that he consented to the Terms when he individually filed his taxes through that account for TY 2020 and TY 2021. Jaeger Decl. ¶¶ 6 & 19, Exs. F & K.

Even if the Court were to set aside his prior agreement to the Terms in TY 2020 and 2021, Sessoms' allegations do not permit him to escape his contractual obligations with TaxAct for TY 2022. While Sessom's spouse filed joint tax returns on his behalf for TY 2022, there is no doubt that Sessoms received the benefits of the Services, most notably, the filing of his tax returns for that tax year. His receipt of all of the fruits of the contract between his spouse and TaxAct means that he is also bound by the Terms for TY 2022 under three separate legal principles, arising out of Texas common law principles of contract and agency law: equitable estoppel, third-party beneficiary theory, and agency.[6]

<u>Equitable Estoppel.</u> Equitable estoppel binds a non-signatory to an arbitration clause "when a nonsignatory 'knowingly exploits the agreement containing the arbitration clause.'"

---

[6] Where a written arbitration provision is made enforceable against a third party under state contract law, the FAAs terms are fulfilled. *Arthur Anderson LLP v. Carlisle*, 556 U.S. 624, 630-31 (2009). An arbitration clause can be "enforced by or against nonparties through assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel." *HealthplanCRM, LLC v. AvMed, Inc.*, 458 F. Supp. 3d 308, 327 (W.D. Pa. 2020) (citing *White v. Sunoco, Inc.*, 870 F.3d 257, 262 (3d Cir. 2017)).

*ACE Am. Ins. Co. v. Huntsman Corp.*, 255 F.R.D. 179, 201 (S.D. Tex. 2010) (citation omitted). Texas law recognizes two versions of equitable estoppel, one of which is "direct benefits estoppel." *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 738, 741 (Tex. 2005). Under direct benefits estoppel, "a non-signatory plaintiff seeking the benefits of a contract is estopped from simultaneously attempting to avoid the contract's burdens, such as the obligation to arbitrate disputes." *Id.* at 739; *see also In re Firstmerit Bank*, *N.A.*, 52 S.W.3d 749, 755 (Tex. 2001); *In re Weekley Homes, L.P.*, 180 S.W.3d 127, 135 (Tex. 2005). Here, Sessoms' claims are interlaced with the obligation in the Terms—his spouse could not even access the Services, much less use them, without acknowledging her acceptance of the Terms—and Sessoms received the benefits of his spouse using TaxAct's Services to file their joint tax return. Jaeger Decl. ¶¶ 5(g), 20-21 & Ex. M (describing that Plaintiff Sessom's spouse filed their tax return as a married and jointly-filed return and that she was required to input a date of birth for both her and Plaintiff Sessoms and enter a self-created PIN for each of them to e-file the joint return). As such, Sessoms is equitably estopped from repudiating the Arbitration Agreement after accepting the "benefits flowing directly from his spouse's and TaxAct's performance of the Terms..

Third-party beneficiary. Sessoms is also bound to arbitrate as a third-party beneficiary of the Terms "common law principles of contract and agency law." *Fleetwood Enters. Inc. v. Gaskamp*, 280 F.3d 1069 (5th Cir. 2002). "[A] third-party beneficiary is someone who was not privy to a contract, but for whose benefit a contract was made and for whom the contracting parties intended to benefit." *State Farm Life Ins. Co. v. Bryant*, No. 3:18-CV-1628-L, 2021 WL 1222152, at *4 (N.D. Tex. Mar. 31, 2021) (citing *Talman Home Fed. Sav. & Loan Ass'n of Illinois v. Am. Bankers Ins.*, 924 F.2d 1347, 1350 (5th Cir. 1991)). Texas courts routinely enforce arbitration agreements against non-signatory, third-party beneficiaries. *See In re Rangel*, 45

S.W.3d 783, 787 (Tex. App. 2001) (holding that wife of signatory to an arbitration agreement was a third-party beneficiary of contract and thus was bound by its terms); *Nationwide of Bryan, Inc. v. Dyer*, 969 S.W.2d 518, 520 (Tex. App. 1998) (holding that a home buyer's wife was bound by terms of sales contract, including arbitration provision, even though she never signed contract because she was "a third-party beneficiary from which she derives her standing to sue on the contract"); *Sw. Health Plan, Inc. v. Sparkman,* 921 S.W.2d 355, 358 (Tex.App. 1996, no writ) (when insurance contract contained arbitration provision, third-party beneficiary to contract was compelled to arbitrate though beneficiary never signed contract); *see also Stonewall Ins. Co. v. Modern Exploration Inc.*, 757 S.W.2d 432, 434–35 (Tex.App 1988, no writ) (third-party beneficiary "steps into shoes" of contracting party and is subject to all provisions of contract).

Sessoms benefited from his spouse's consent to the Terms. Acceptance of the Terms was necessary to use TaxAct's offerings, one of which is a tax return for married spouses filing jointly—clearly allowing for a third-party non-filer to receive the benefit of the filer's tax return services. The Terms also anticipate that users would use TaxAct's services on behalf of others, outlining a user's responsibilities for third-party data entered into TaxAct's Services. For instance, the Terms provide: "You acknowledge and agree that you are solely responsible for all content, data, and information submitted by your user identification into the Service, including, without limitation, content, data, and information relating to third parties." Jaeger Decl., Ex. G at G-2. As such, the Terms unequivocally contemplated a benefit to third parties such as Sessoms, who did indeed benefit from the contractual relationship between his spouse and TaxAct.

Agency. Sessoms is also bound by his spouse's acceptance of the Terms under agency law. Under the agency theory in the arbitration context, a non-signatory to an arbitration agreement can be compelled to arbitrate. *Bridas S.A.P.I.C. v. Gov't of Turkmenistan,* 345 F.3d

347, 356 (5th Cir. 2003) (recognizing that federal courts permit non-signatories to be bound to arbitration agreements through agency law). Under Texas law, an agency relationship "arises when a principal manifests assent to an agent that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents to the act." *Wireless Protocol Innovations, Inc. v. TCT Mobile (US) Inc.*, 2023 WL 4626659, at *9 (E.D. Tex. 2023). Here, Sessoms' permitting his spouse to file his taxes using TaxAct's Services, including by allowing her to input his information into the tax return form, established an agency relationship with his spouse. Sessoms' spouse would not have been able to successfully file joint federal and state tax returns without Sessoms' approval and him providing his certain tax return information ("TRI"), such as his adjusted gross income, as well as his self-created PIN.

In addition to clearly accepting the Terms—individually and though his spouse—Sessoms does not allege that he terminated his use of the Services, or opted-out of the Arbitration Agreement, as he was expressly permitted to do during the relevant period, nor is there any evidence of such termination, opt-out, or objection to the Terms.

## III. The Existence of the Arbitration and Delegation Clauses in the Applicable Terms Must End the Court's Inquiry and Require a Stay Pending Arbitration.

The only remaining question before the Court is whether the applicable Terms included an arbitration clause containing a delegation provision. Because the Terms do, all remaining questions—including the scope of the arbitration provisions—fall within the arbitrator's purview.

Plaintiffs' primary argument to date has been to claim that the *entire* Arbitration Agreement is unconscionable. *See* Pls.' Opp'n to Mot. Compel at 10-17 (Oct. 13, 2023), ECF No. 24 ("MTC Opp'n"). However, it is well-established that unconscionability, like any other validity arguments, is reserved for the arbitrator due to the delegation clause. *See, e.g.*, *Rent-A-*

*Center*, 561 U.S. at 71-72 (attack must be specific to the delegation clause, not other provisions of the arbitration agreement, for court to decide it); *Carrone v. UnitedHealth Grp. Inc.*, No. CV 20-5138 (FLW), 2020 WL 4530032, at *3 (D.N.J. Aug. 6, 2020) (collecting cases), *aff'd sub nom. Carrone v. UnitedHealth Grp. Inc*, No. 20-2742, 2021 WL 3520809 (3d Cir. Aug. 11, 2021). Plaintiffs may also attempt to argue that parts of their Amended Complaint are not captured by the delegation clause or are not subject to arbitration. But even if that were so (and it is not), such questions would go to the scope of the Arbitration Agreements, and well-settled law reserves those questions for the arbitrator in the first instance. *See Rent-A-Center*, 561 U.S. at 71-73; *see also* JAMS Rule 11(b).

The Arbitration Agreement requires that "all disputes arising out of or relating to these Terms or our Services will be resolved through confidential binding arbitration held in Dallas County, Texas. . . ." Jaeger Decl., Ex. G at G-4. According to recent Third Circuit precedent, "9 U.S.C. § 4 does not permit a district court to enter an order compelling arbitration outside the district where it sits." *Henry ex rel. BSC Ventures Holdings, Inc. Emp. Stock Ownership Plan v. Wilmington Tr. NA*, 72 F.4th 499, 504 n.5 (3d Cir. 2023), *cert. denied sub nom. Wilmington Trust, N.A. v. Marlow,* No. 23-122, 2023 WL 6797729 (Oct. 16, 2023). Regardless of whether the Court can compel arbitration in Dallas County, Texas, this Court is nevertheless required to stay these proceedings pursuant to 9 U.S.C. § 3, which provides that the Court "*shall* on application of one of the parties *stay the trial of the action* until such arbitration has been had in accordance with the terms of the agreement." *Id.* (emphasis added). *See Deardorff* , 2022 WL 407396, at *13–14 (holding that because "this Court cannot compel Chapman to arbitrate in North Carolina—the forum that the parties chose in the DCA[,] . . . [t]he Court will stay this

action, pending the arbitrator's decision on threshold issues of arbitrability (i.e., whether the arbitration provision is valid, whether the class action provision is valid, etc.)").[7]

## IV. Alternatively, Even if There Were No Delegation Provision, Arbitration Would Still Be Appropriate.

Even if there were no delegation provision in the Arbitration Agreement, the Court would still need to stay this case in favor of arbitration because Plaintiffs' claims plainly fall within the scope of the Agreement. To require arbitration, the court must determine that (1) a valid agreement to arbitrate exists—which as shown above, it does—and (2) the plaintiff's claims fall within the scope of the arbitration agreement. *Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F.3d 44, 54-55 (3d Cir. 2001). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24-25; .*Chassen v. Fid. Nat'l Fin. Inc.*, 836 F.3d 291, 295 (3d Cir. 2016); *Medversant Techs., LLC, v. Leverage Health Solutions, LLC*, 114 F. Supp. 3d 290, 295 (E.D. Pa. 2015). Indeed, a motion to compel arbitration "should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Trippe Mfg. Co. v. Niles Audio Corp.*, 401 F.3d 529, 532 (3d Cir. 2005) (quoting *AT&T Techs., Inc. v. Commn'cns Workers of Am.*, 475 U.S. 643, 650 (1986)). The "presumption of arbitrability is particularly applicable where the arbitration clause is broad." *Medversant*, 114 F. Supp. 3d at 295 (cleaned up) (quoting *AT&T*, 475 U.S. at 650).

[7] *See also Sea Spray Holdings, Ltd. v. Pali Fin. Grp., Inc.*, 269 F. Supp. 2d 356, 363 (S.D.N.Y. 2003) ("Where a federal court lacks authority pursuant to 9 U.S.C. § 4 to compel arbitration outside its district, the court may still determine that the dispute nonetheless remains 'referable to arbitration' elsewhere, if a forum is designated, and must then order a stay pursuant to § 3 instead, thereby leaving the parties free to pursue their contractual rights and remedies in the appropriate venue.") (cleaned up).

The Arbitration Agreement here is broad and clearly encompasses Plaintiffs' claims. Pursuant to the Arbitration Agreement, Plaintiffs agreed that, except for small claims individual actions or disputes regarding the alleged unlawful use of intellectual property, "all disputes arising out of or relating to these Terms or our Services will be resolved through confidential binding arbitration" and that "**any dispute will be resolved solely through individual arbitration and will not be brought as a class arbitration, class action or any other type of representative proceeding.**" Jaeger Decl., Ex. G at G-4.

All of Plaintiffs' claims arise out of or relate to the Terms. The Amended Complaint alleges that TaxAct's alleged practice of sharing confidential tax return information was unlawful under the Pennsylvania Wiretap Act, 18 Pa. C.S. § 5701*, et seq.* and 26 U.S.C. §§ 6103 and 7431(a)(2). Am. Compl. ¶ 5. These allegations spring from Plaintiffs' use of TaxAct's Services, which Plaintiffs could not have used until they first unconditionally accepted the Terms. *See* Jaeger Decl., Ex. G at G-1.[8] For instance, Plaintiffs could not even have inputted their tax return information that they claim TaxAct sent to third parties unless they first agreed to the Terms—meaning that their claims are clearly dependent on their use of the Services and assent to the Terms. Put differently, Plaintiffs' claims could not exist but for them (1) agreeing to the Terms, and (2) using the Services.

As such, because Plaintiffs' claims are not captured in the narrow exceptions described above, the factual underpinnings of each of Plaintiffs' claims squarely fall within the scope of the Arbitration Agreement, which governs "*all disputes*" arising out of or related to the Terms.

---

[8] The Terms provide: "You may not use the Services until you have read and agreed to this Agreement. By using the Services, you indicate your unconditional acceptance of this Agreement. If you do not accept this Agreement, you must terminate your use of the Services." *Id.*

Courts in the Third Circuit have found that provisions employing phrases “arising under,” “arising out of” (as is present in the Arbitration Agreement), and similar language should be broadly construed. *Griswold v. Coventry First LLC*, 762 F.3d 264, 271 n.5 (3d Cir. 2014); *FFR SE, LLC v. Sanborn*, No. 14-5439, 2015 WL 3970923, at *11 (E.D. Pa. June 30, 2015) (explaining provisions with the phrases “arising under” and “arising out of” are typically given broad construction) (citations omitted); *Renfrew Ctrs., Inc. v. UNI/CARE Sys. Inc.*, 920 F. Supp. 2d 572, 574 (E.D. Pa. 2013). As such, Plaintiffs’ claims certainly arise out of or relate to the Terms, which contain the Arbitration Agreement. The claims against TaxAct are, therefore, subject to mandatory arbitration.

## V. TaxAct Submits, for Preservation Purposes, That the Existence of the Arbitration Agreement and the Delegation Clause Requires a Stay of Discovery While Its Motion to Compel is Pending

TaxAct acknowledges that the Court ordered, over TaxAct’s objection, that discovery is open during the Rule 16 Conference on September 14, 2023. TaxAct has complied fully with the Court’s order, and served its initial disclosures the next day.

However, to preserve this issue, TaxAct submits that discovery should be stayed while the motion to compel is pending. As discussed, § 3 requires that the court “*shall* on application of one of the parties *stay the trial of the action* until such arbitration has been had in accordance with the terms of the agreement.” (emphasis added). The Third Circuit has held that allowing discovery to go forward while a motion to compel arbitration is pending is reversible error. In *Klepper v. SLI, Inc.*, the Court vacated an order directing the parties to proceed with discovery, reasoning that requiring “parties to submit to full discovery under the Federal Rules of Civil Procedure may unnecessarily subject them ‘to the very complexities, inconveniences and expenses of litigation that they determined to avoid.’” 45 F. App’x. 136, 139 (3d Cir. 2002). To be sure, as the Court pointed out, *Klepper* was decided prior to 2007, when the Federal Rules of

Appellate Procedure were amended to permit the citation of unreported decisions. But *Klepper* merely articulated the clear consensus of the circuits on this point, *see id.* (citing *Suarez-Valdez v. Shearson Lehman/Am. Express, Inc.*, 858 F.2d 648, 649 (11th Cir. 1988)); *see also*, *e.g.*, *CIGNA HealthCare of St. Louis, Inc. v. Kaiser*, 294 F.3d 849, 855 (7th Cir. 2002) ("refusal to stay discovery . . . until the issue of arbitrability is resolved puts the cart before the horse"); *accord Mahamedi IP L., LLP v. Paradice & Li, LLP*, No. 5:16-CV-02805-EJD, 2017 WL 2727874, at *1 (N.D. Cal. Feb. 14, 2017) ("If the Court ultimately determines that the dispute should be arbitrated, 'responsibility for the conduct of discovery lies with the arbitrators'—and if not, [the plaintiff] will suffer no prejudice from a temporary stay.") (citation omitted); *Intertec Contracting Turner Steiner Int'l, S.A.*, No. 98 Civ. 9116(CSH), 2001 WL 812224, at *7 (S.D.N.Y. July 18, 2001) ("As is the general practice of district courts, a stay of discovery was imposed in this case while the motion to compel arbitration was pending before the Court."). Thus, district courts within this Circuit often stay discovery while a motion to arbitrate is pending. *Accord Skalde v. Lemieux Grp., L.P.*, No. 3:20-cv-2039, 2021 WL 1812677, at *1-3 (M.D. Pa. May 6, 2021) (staying discovery pending the resolution of motion to dismiss or compel arbitration); *Anfibio v. Optio Sols. LLC*, No. 20-cv-11146-CCC-ESK, 2020 WL 8483808, at *2 (D.N.J. Dec. 30, 2020) (staying discovery pending the resolution of the defendant's motion to dismiss and compel arbitration).

This outcome is also consistent with the Supreme Court's decision last Term in *Coinbase, Inc. v. Bielski,* 599 U.S. 736 (2023). In *Coinbase*, the Supreme Court held that allowing the merits of a case to move forward— including discovery—while the question of arbitration on appeal is pending "represents the 'worst possible outcome' for parties and the courts: litigating a dispute in the district court only for the court of appeals to 'reverse and order the dispute

arbitrated.'" 599 U.S. at 743 (citation omitted). The rationale underlying the Supreme Court's concern applies equally to allowing unbounded merits discovery when a motion to arbitrate is pending before the district court.[9]

## CONCLUSION

For the reasons set forth above, the Court should order that Plaintiffs' claims against TaxAct be addressed through individual arbitration pursuant to 9 U.S.C. § 4 and/or stay proceedings pending arbitration pursuant to 9 U.S.C. § 3.

Dated: February 16, 2024

Respectfully submitted,

/s/ *James W. Ducayet*

James W. Ducayet (*pro hac vice*)
jducayet@sidley.com
Ankur Shingal (*pro hac vice*)
ashingal@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Telephone: (312) 853 7000
Facsimile: (312) 853 7036

Tyson Y. Herrold (314262)
BAKER & HOSTETLER LLP
1735 Market Street, Suite 3300
Philadelphia, PA 19103
Telephone: (215) 564-3286
therrold@bakerlaw.com

*Attorneys for Defendant TaxAct, Inc.*

[9] In their response to TaxAct's initial motion to compel arbitration, Dkt. No. 24 at 22, Plaintiffs assert that "TaxAct . . . questioned whether Article III's case and controversy requirement is satisfied." MTC Opp'n at 22. Plaintiffs did not provide any citation for their claim that TaxAct raised an Article III issue in its prior motion. This is because TaxAct raised no such issue in that motion, and does not raise any such issue now.

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JAMES KIRKHAM and MATTHEW SESSOMS, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>TAXACT, INC.,<br><br>Defendant. | Civil Action No.: 3-CV-3303-WB<br><br>**ECF CASE**<br><br>**ORAL ARGUMENT REQUESTED** |

**[PROPOSED] ORDER**

And now, on this _____ day of _____________, 2024, upon consideration of Defendant TaxAct, Inc.'s Motion to Compel Arbitration and Stay Proceedings Pursuant to 9 U.S.C. § 3, and any opposition filed by Plaintiffs, it is ORDERED that:

1. The Motion is GRANTED;

2. If Plaintiffs wish to pursue their dispute against TaxAct, Inc., they are ordered to submit all of the claims alleged in the Amended Complaint against TaxAct, Inc. to arbitration by JAMS under its JAMS Streamlined Arbitration Rules & Procedures as required by the TaxAct Terms of Service and License Agreement, which is attached to the Declaration of Mark Jaeger in support of the Motion to Compel Arbitration and Stay Proceedings; and

3. The claims against TaxAct, Inc. are stayed pending completion of this arbitration.

_________________________________
WENDY BEETLESTONE
U.S. DISTRICT COURT JUDGE

**CERTIFICATE OF SERVICE**

I, James W. Ducayet, certify that on this 16th day of February 2024, I caused the foregoing Motion to Compel Arbitration and Stay Proceedings Pursuant to 9 U.S.C. § 3, including accompanying Memorandum of Law and Declaration of Mark Jaeger, to be filed on the Court's ECF system where it is available for viewing and downloading.

*/s/ James W. Ducayet*
James W. Ducayet