IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JAMES KIRKHAM, on behalf of himself and all others similarly situated, and<br><br>MATTHEW SESSOMS, on behalf of himself and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>TAXACT, INC.,<br><br>Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | Civil Action No. 2:23-CV-3303-WB<br><br>Jury Trial Demanded |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S THIRD MOTION TO COMPEL ARBITRATION AND STAY LITIGATION**


COHEN, PLACITELLA & ROTH, P.C.
James P. Goslee (#203043)
Michael Coren (#31037)
Eric S. Pasternack (#320127)
Jared M. Placitella (#321333)
2001 Market St., Suite 2900
Philadelphia, PA 19103
(215) 567-3500
jgoslee@cprlaw.com
mcoren@cprlaw.com
epasternack@cprlaw.com
jmplacitella@cprlaw.com

**TABLE OF CONTENTS**


I. Introduction and Background ........................................................ 1

II. Argument ........................................................ 3

A. TaxAct waived any right it may have to compel arbitration. ........................................ 3

B. Neither Plaintiff Kirkham nor Plaintiff Sessoms agreed to arbitration........................... 4

1. The arbitration agreement is illusory and lacks consideration....................................... 5

2. TaxAct failed to obtain mutual assent to the Terms of Service. .................................... 7

C. Plaintiff Sessoms is not a signatory to TaxAct's Terms of Service............................. 12

1. Plaintiff Sessoms never visited TaxAct's website nor used its services....................... 12

2. Plaintiff Sessoms is not bound to arbitrate his claims because of his wife's use of TaxAct........................................................ 14

a. Equitable estoppel cannot be used to compel arbitration because Plaintiff Sessoms did not "knowingly exploit" TaxAct's Terms of Service. ................................................14

b. Plaintiff Sessoms is not a third-party beneficiary. ....................................................17

c. No agency relationship exists between Plaintiff Sessoms and his wife sufficient to bind him to arbitration. ........................................................19

D. This Court can decide issues relating to arbitrability.................................................. 24

E. Plaintiffs' claims fall outside the scope of TaxAct's arbitration provision. ................. 24

F. The Federal Arbitration Act does not require that this litigation be stayed................. 26

III. Conclusion ........................................................ 28

## Table of Authorities

### Cases

*Abdurahaman v. Prospect CCM LLC*,
42 F.4th 156 (3d Cir. 2022) ........................................ 17

*ACE Am. Ins. Co. v. Hustsman Corp.*,
255 F.R.D. 179 (S.D. Tex. 2010) ........................................ 14

*Albertson's Holdings, LLC v. Kay*,
514 S.W.3d 878 (Tex. App. 2017) ........................................ 19, 20

*Arnold v. Homeaway, Inc.*,
890 F.3d 546 (5th Cir. 2018) ........................................ 4

*B.F. v. Amazon, Inc.*,
858 Fed. Appx. 218 (9th Cir. 2021) ........................................ 17

*Baptist Mem. Hosp. Sys. v. Sampson*,
969 S.W.2d 945 (Tex. 1998) ........................................ 22

*Barrows v. Brinker Rest. Corp.*,
36 F.4th 45 (2d Cir. 2022) ........................................ 13

*Berman v. Freedom Fin. Network, LLC*,
30 F.4th 849 (9th Cir. 2022) ........................................ 8, 9

*Bishop v. GNC Franchising LLC*,
403 F. Supp. 2d 411 (W.D. Pa. 2005) ........................................ 3

*Bridas S.A.P.I.C. v. Gov't of Turkmenistan*,
345 F.3d 347 (5th Cir. 2003) ........................................ 14, 20

*Carey v. 24 Hour Fitness, USA, Inc.*,
669 F.3d 202 (5th Cir. 2012) ........................................ 5

*Checchia v. Solo Funds*,
No. 23-444, 2023 WL 3868369 (E.D. Pa. June, 7, 2023) ........................................ 11

*Chilutti v. Uber Tech., Inc.*,
300 A.3d 430 (Pa. Super. 2023) ........................................ 12

*Chubb Lloyds Ins. v. Buster & Cogdell Builders, LLC*,
668 S.W.3d 145 (Tex. App. 2023) ........................................ 12

*Chun Ping Turng v. Gauranteed Rate, Inc.*,
371 F. Supp. 3d 610 (N.D. Cal. 2019) ........................................................................ 4

*Coatney v. Ancestry.com DNA, LLC*,
__ F.4th __,
2024 WL 629858 (7th Cir. 2024) ........................................................................ 16

*Congdon v. Uber Techs., Inc.*,
226 F. Supp. 3d 983 (N.D. Cal. 2016) ........................................................................ 26, 27

*Corpus Christi Bank & Tr. v. Smith*,
525 S.W.2d 501 (Tex. 1975) ........................................................................ 19

*Coulter v. Experian Info. Solutions, Inc.*,
No. 20-1814,
2021 WL 735726 (E.D. Pa. Feb. 25, 2021) ........................................................................ 10

*Crump v. MetaSource Acquisitions, LLC*,
373 F. Supp. 3d 540 (E.D. Pa. 2019) ........................................................................ 5

*Cty. of Monmouth v. Rite Aid Corp.*,
667 F. Supp. 3d 152 (E.D. Pa. 2023) ........................................................................ 15, 17

*Culliane v. Uber Techs., Inc.*,
893 F.3d 53 (1st Cir. 2018) ........................................................................ 8

*Dow v. Keller Williams Realty, Inc.*,
624 F. Supp. 3d 556 (N.D. Tex. 2022) ........................................................................ 14

*E. Texas Med. Ctr. Reg. Healthcare Sys. v. Slack*,
916 F.Supp. 2d 719 (E.D. Tex. 2013) ........................................................................ 26

*E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediaries S.A.S.*,
269 F.3d 187 (3d Cir. 2001) ........................................................................ 14

*Exxon Mobil Corp. v. Rincones*,
520 S.W.3d 572 (Tex. 2017) ........................................................................ 21

*Feldman v. Google, Inc.*,
513 F. Supp. 2d 229 (E.D. Pa. 2007) ........................................................................ 10

*First Bank v. Brumitt*,
519 S.W.3d 95 (Tex. 2017) ........................................................................ 17, 19

*First Valley Bank of Los Fresnos v. Martin*,
144 S.W.3d 466 (Tex.2004) ........................................................................ 22

*Fleetwood Enterprises v. Gaskamp*,
280 F.3d 1069 (5th Cir. 2002) .......... 18, 19, 24

*Gaines v. Kelly*,
235 S.W.3d 179 (Tex. 2007).......... 22, 23

*Gross v. Genesis Healthcare, Inc.*,
No. 2022 EDA 2017,
2018 WL 2423306 (Pa. Super. May 30, 2018).......... 22

*Harland Clarke Holdings Corp. v. Milken*,
997 F. Supp. 2d 561 (W.D. Tex. 2014).......... 19

*Harris v. Blockbuster, Inc.*,
622 F. Supp. 2d 396 (N.D. Tex. 2009) .......... 6, 7

*HealthplanCRM, LLC v. Avmed, Inc.*,
458 F. Supp. 3d 308 (W.D. Pa. 2020).......... 10

*Hester Int'l v. Fed. Republic of Nigeria*,
879 F.2d 170 (5th Cir. 1989) .......... 20

*Hotels.com, L.P. v. Canales*,
195 S.W.3d 147 (Tex. App. 2006).......... 10

*Huckaba v. Ref-Chem, L.P.*,
892 F.3d 686 (5th Cir. 2018) .......... 5

*IMA, Inc. v. Columbia Hosp. Med. City at Dallas*, 1 F.4th 385
(5th Cir. 2021).......... 15

*In re Conseco Fin. Serv. Corp.*,
19 S.W.3d 562 (Tex. App. 2000).......... 18

*In re Kellogg Brown & Root, Inc.*,
166 S.W.3d 732 (Tex. 2005).......... 17

*In re Merrill Lynch Tr. Co.*,
235 S.W.3d 185 (Tex. 2007).......... 14

*In re Online Travel Co.*,
953 F.Supp.2d 713 (N.D. Tex. 2013) .......... 9

*In re Weekley Homes LP*,
180 S.W.3d 127 (Tex. 2005).......... 14, 15, 16

*Jackson v. Amazon.com, Inc.*,
65 F.4th 1093 (9th Cir. 2023) ........................................ 25, 26

*Jackson v. Royal Caribbean Cruises, Ltd.*,
389 F. Supp. 3d 431 (N.D. Tex. 2019) ........................................ 13

*Jaludi v. Citigroup*,
933 F.3d 246 (3d Cir. 2019)........................................ 13

*James v. Global TelLink Corp.*,
852 F.3d 262 (3d Cir. 2017)........................................ 8

*Jody James Farms, JV v. Altman Grp.*,
547 S.W.3d 624 (Tex. 2018)........................................ passim

*Jones v. Halliburton Co.*,
593 F.3d 228 (5th Cir. 2009) ........................................ 25

*Karl Rove & Co. v. Thornburgh*,
39 F.3d 1273 (5th Cir. 1994) ........................................ 8

*Kirleis v. Dickie, McCamey & Chilcote, P.C.*,
560 F.3d 156 (3d Cir. 2009)........................................ 5

*Lloyd's Register N. Am., Inc.*,
780 F.3d 283 (5th Cir. 2015) ........................................ 15

*McKimmy v. OpenSea*,
No. 22-545,
2023 WL 6370907 (S.D. Tex. Mar. 23, 2023)........................................ 10

*Meyer v. Uber Tech., Inc.*,
868 F.3d 66 (2d Cir. 2017)........................................ 8, 10, 11

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
473 U.S. 614 (1985)........................................ 25

*Morgan v. Sundance, Inc.*,
596 U.S. 411 (2022)........................................ 3

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
460 U.S. 1 (1983)........................................ 26, 27

*NationsBank, N.A. v. Dilling*,
922 S.W.2d 950 (Tex. 1996)........................................ 22

*Nationwide of Bryan, Inc. v. Dyer*,
96 S.W.2d 518 (Tex. App. 1998)........................................................................ 18

*Nelson v. Watch House Int'l, LLC*,
815 F.3d 190 (5th Cir. 2016) ........................................................................... 5, 6

*Nguyen v. Barnes & Noble Inc.*,
763 F.3d 1171 (9th Cir. 2014) ............................................................................. 9

*Nicosia v. Amazon.com, Inc.*,
834 F.3d 220 (2d Cir. 2016)................................................................................. 8

*Noble Drilling Servs., Inc. v. Certex USA, Inc.*,
620 F.3d 469 (5th Cir. 2010) ............................................................................. 15

*Ouadani v. TF Final Mile LLC*,
876 F.3d 31 (1st Cir. 2017)................................................................................ 15

*Pennzoil Expl. & Prod. Co. v. Ramco Energy Ltd.*,
139 F.3d 1061 (5th Cir. 1998) ..................................................................... 24, 25

*Peterson v. Kindred Healthcare, Inc.*,
155 A.3d 651 (Pa. Super. 2017)......................................................................... 20

*Phillips v. Neutron Holdings, Inc.*,
No. 18-3382,
2019 WL 4861435 (N.D. Tex. Oct. 2, 2019)...................................................... 10

*Popa v. Harriet Carter Gifts, Inc.*,
52 F.4th 121 (3d Cir. 2022) ................................................................................. 1

*Register.com, Inc. v. Verio, Inc.*,
356 F.3d 393 (2d Cir. 2004)................................................................................. 5

*Rourke v. Garza*,
530 S.W.2d 794 (Tex. 1975)............................................................................... 22

*Royston, Rayzor, Vickery & Williams, LLP v. Lopez*,
467 S.W.3d 494 (Tex. 2015)................................................................................. 5

*Samsung Elecs. Am., Inc. v. Ramirez*,
777 F. App'x 243 (9th Cir. 2019) ...................................................................... 11

*SCF Consulting, LLC v. Barrack, Rodos & Bacine*,
175 A.3d 273 (Pa. 2017)...................................................................................... 5

*Schnabel v. Trilegiant Corp.*,
697 F.3d 110 (2d Cir. 2012) ........ 7

*Soliman v. Subway Franchisee Advert. Fund. Tr. Ltd.*,
442 F. Supp. 3d 519 (D. Conn. 2020) ........ 12

*Specht v. Netscape Commc'ns Corp.*,
306 F.3d 17 (2d Cir. 2002) ........ 7

*Starke v. SquareTrade, Inc.*,
913 F.3d 279 (2d Cir. 2019) ........ 11

*Stolt-Nielsen S.A. v. AnimalFees Int'l Corp.*,
559 U.S. 662 (2010) ........ 4

*Three Valleys Mun. Water Dist. V. E.F. Hutton & Co.*,
925 F.2d 1136 (9th Cir. 1991) ........ 13

*Vollmering v. Assaggio Honolulu, LLC*,
No. 22-00002,
2022 WL 6246881 (S.D. Tex. Sept. 17, 2022) ........ 4

*Walton v. Johnson*,
66 A.3d 782 (Pa. Super. 2013) ........ 22

*Westmoreland v. Sadoux*,
299 F.3d 462 (5th Cir. 2002) ........ 14

*Zinante v. Drive Elec., LLC*,
582 Fed. Appx. 368 (5th Cir. 2014) ........ 18

**Statutes**

18 Pa. C.S. § 5701 ........ 17

18 Pa. C.S.A. § 5725(a)(1) ........ 1

26 U.S.C. § 6103 ........ 17

26 U.S.C. § 7431(a)(2) ........ 17

Tex. Fam. Code. § 3201(c) ........ 19

## I. Introduction and Background

TaxAct, Inc.'s ("TaxAct") Third Motion to Compel Arbitration (ECF No. 55) should be denied. To begin with, TaxAct cannot move to compel arbitration here while it simultaneously invokes the judicial process in *Smith-Washington v. TaxAct, Inc.*, No. 23-00830 ("California Action"), to settle the claims of the putative Class Members here there.[1]

TaxAct's Motion should also be denied because TaxAct's Terms of Service and License Agreement ("Terms of Service") lacks consideration—a necessary element for a contract to be found. The Terms of Service, including its arbitration provision, are illusory given that the agreement's "Modifications" provision allows TaxAct to modify the Terms of Service retroactively and without advance notice. Under Texas law, if a party to an agreement has the unilateral ability to retroactively modify the arbitration agreement without notice, the agreement is illusory. TaxAct not only can do that but has done so. In the final days of 2023, TaxAct modified the arbitration provision in its Terms of Service retroactively, which necessitated this Court's intervention (ECF No. 50).

[1] On February 26, 2024, the plaintiffs in the California Action moved for preliminary approval of a proposed national class action settlement with TaxAct. No. 23-830, ECF No. 121. The proposed settlement includes a $14.95 million common fund as well as an in-kind coupon for complimentary use of TaxAct's "Xpert Assist" service, which is an add-on service TaxAct provides. *Id.* at pg. 7. According to the plaintiffs in the California Action, assuming a 5% claims rate, the average authorized claimants' net share will be $18.65. *Id.* The amounts received by Pennsylvanians may be even less as the proposed Plan of Allocation awards members of the "Nationwide Class" 3 allocation points while it awards members of the "California Subclass" 6 allocation points. It similarly gives members of the "Nationwide Married Filing Joint Class" 1 allocation point while granting the members of the "California Married Filing Jointly Subclass" 2 allocation points. *Id.* at pg. 8. To put this in perspective, as Plaintiffs noted in their Motion to Appoint Interim Class Counsel, Pennsylvania Wiretap Act's liquidated damages provision, which is to be strictly construed in favor of privacy protections, affords the putative Class Members $100 a day for each day or violation or $1,000, whichever is higher. 18 Pa. C.S.A. § 5725(a)(1); *Popa v. Harriet Carter Gifts, Inc.*, 52 F.4th 121, 129 (3d Cir. 2022).

Nor can TaxAct satisfy the mutual assent requirement for contract formation. Neither Plaintiff Kirkham nor Plaintiff Sessoms agreed to arbitration. Goslee Decl., Exhibit A, 11/27/2023 Decl. of Plaintiff Sessoms, ¶ 17; Goslee Decl., Exhibit B, 10/12/2023 Decl. of Plaintiff Kirkham, ¶ 7. TaxAct does not even contend that Plaintiffs Kirkham and Sessoms read the Terms of Service. It instead urges this Court to find that Plaintiffs Kirkham and Sessoms agreed to arbitration because TaxAct's website featured a "clickwrap" agreement. But TaxAct's website contained nothing of the sort. The defining characteristic of a "clickwrap" agreement is that it presents the user with the terms, in a scrollable pop-up window, and requires the user to affirmatively accept the terms. TaxAct more accurately used a "browse-wrap" agreement.

While a "clickwrap" agreement requires users to affirmatively click a button conveying their agreement to terms of use after viewing the agreement, a "browse-wrap" purports to obtain the same assent automatically, simply by use of the website. In the years since browse-wrap agreements came into use, the law has developed clear standards for their use. For a company to bind a user to a "browse-wrap" agreement, its website must at a minimum feature an "explicit textual notice" that notifies the user of the legal significance of the action he or she must take to enter into an agreement. In other words, the notice must advise the user of what action would constitute assent. While TaxAct used "I agree" checkboxes on its website, those notices fall considerably short of satisfying the "explicit textual notice" requirement.

TaxAct's failure to obtain mutual assent is even more pronounced when it comes to Plaintiff Sessoms and those like him who never personally used TaxAct's services. Plaintiff Sessoms never visited the TaxAct website, created a TaxAct account, or personally used TaxAct to prepare and file his taxes. Nor did he click an "I agree" checkbox. Goslee Decl., Exhibit A, ¶¶ 4-17. No argument can therefore be made that Plaintiff Sessoms is a party to TaxAct's Terms of

Service. TaxAct therefore argues that Plaintiff Sessoms should be compelled to arbitration because his wife used TaxAct to prepare and file his tax returns. There is, however, no basis under Texas (or for that matter, Pennsylvania or federal) law to subject Plaintiff Sessoms to arbitration as a non-signatory considering: (1) that neither TaxAct's Terms of Service nor its website give any indication that TaxAct intended that its services benefit any third parties; (2) Plaintiff Sessoms' claims arise under federal and state law thereby making any benefit he received indirect and incidental, at most, and (3) a marital relationship does not, in itself, make one spouse the agent of the other.

For these reasons, as addressed below, TaxAct's Motion to Compel Arbitration and Stay Litigation should be denied.

## II. Argument

### A. TaxAct waived any right it may have to compel arbitration.

Under federal law, TaxAct waived its right to arbitration (to the extent it has such a right, which Plaintiffs dispute.)[2] Waiver occurs when a party has "intentional[ly] relinquish[ed] or abandon[ed] . . . a known right." *Morgan v. Sundance, Inc.*, 596 U.S. 411, 417 (2022). Following *Morgan*, the test is "whether the party has substantially invoked the judicial process." *Vollmering*

[2] Plaintiffs acknowledge that on February 12, 2024, this Court denied TaxAct's Second Motion to Compel Arbitration without prejudice because "Pennsylvania contract law . . . is not relevant to TaxAct's Motion" because TaxAct's Terms of Service state that "[t]he validity and performance of this agreement shall be governed by Texas law . . . and applicable federal law." ECF No. 52. Plaintiffs will therefore primarily address Texas and federal law herein. But to avoid waiver, Plaintiffs will briefly address the choice of law issue and include citations to Pennsylvania law where appropriate to show that arbitration cannot be compelled here under either federal, Texas, or Pennsylvania law. Under Pennsylvania law, the forum state here, "courts generally honor the intent of the contracting parties and enforce choice of law provisions in the contracts executed by them." *Bishop v. GNC Franchising LLC*, 403 F. Supp. 2d 411, 415 (W.D. Pa. 2005). The choice-of-law provision in the Terms of Service does not however apply here because, as a threshold matter, no contract was formed between TaxAct and the Plaintiffs.

*v. Assaggio Honolulu, LLC*, No. 22-00002, 2022 WL 6246881, *12 (S.D. Tex. Sept. 17, 2022).[3] By agreeing to the preliminary approval of a settlement before a Federal court, TaxAct has substantially invoked the judicial process and relinquished any right that it may have to arbitration against the members of the putative nationwide class there. Because TaxAct seeks preliminary approval of a settlement in the California Action of a national class, which encompasses the putative Class Members here, this is not a case in which the claim is made that a defendant has waived arbitration because of the defendant's conduct in litigating a different case involving different parties. *Cf. Chun Ping Turng v. Gauranteed Rate, Inc.*, 371 F. Supp. 3d 610, 620 (N.D. Cal. 2019) (cataloging cases rejecting waiver argument where the party's inconsistent actions were in separate cases involving other parties). To the contrary, TaxAct has repeatedly and consistently argued before this Court that the members of the putative Classes here are members of the putative Class in the California Action. See ECF Nos. 45, 53, 54, 57, 61, 64. And having done that, TaxAct has relinquished the right to compel the putative Class Members to arbitration here.

**B. Neither Plaintiff Kirkham nor Plaintiff Sessoms agreed to arbitration.**

The "first, and perhaps most obvious, question" when a party seeks to compel arbitration is "whether there is a contract between the parties at all." *Arnold v. Homeaway, Inc.*, 890 F.3d 546, 550 (5th Cir. 2018). This is because a "party may not be compelled" to submit to arbitration "unless there is a contractual basis for concluding that the party agreed to do so." *Stolt-Nielsen S.A. v. AnimalFees Int'l Corp.*, 559 U.S. 662, 684 (2010). Under Texas law, a binding contract

[3] The district court recognized in *Vollmering* that the requirement under Texas law that there be "prejudice" for waiver to be found is inconsistent with the Supreme Court's decision in *Morgan*, which rejected the "prejudice" requirement as the FAA makes "arbitration agreements as enforceable as other contracts, but not more so." *Vollmering*, 2022 WL at *12 (citing *Morgan*, 142 S.Ct. at 1713).

requires: (1) an offer; (2) an acceptance in strict compliance with the terms of the offer; (3) mutual assent; (4) each party's consent to the terms; and (5) execution and delivery of the contract with intent that it be mutual and binding. *Huckaba v. Ref-Chem, L.P.*, 892 F.3d 686, 689 (5th Cir. 2018).[4] "While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004). When a company like TaxAct proposes a take-it-or-leave-it arbitration agreement to a user online and later seeks to enforce that agreement, it bears the burden of satisfying each requirement for contract formation. *Jody James Farms, JV v. Altman Grp.*, 547 S.W.3d 624, 633 (Tex. 2018). To do that, TaxAct must establish that it secured mutual assent from its users to arbitration and that consideration supports the agreement. It cannot satisfy either requirement.

**1. The arbitration agreement is illusory and lacks consideration.**

An arbitration agreement is illusory under Texas law "if one party can 'avoid the promise to arbitrate by amending the provision or terminating it altogether." *Nelson v. Watch House Int'l, LLC*, 815 F.3d 190, 193 (5th Cir. 2016) (quoting *Carey v. 24 Hour Fitness, USA, Inc.*, 669 F.3d 202, 205 (5th Cir. 2012)).[5] "[A]n arbitration provision that is part of a larger underlying contract may be supported by the consideration supporting the underlying contract." *Royston, Rayzor, Vickery & Williams, LLP v. Lopez*, 467 S.W.3d 494, 505 (Tex. 2015). But an arbitration

[4] Pennsylvania law requires a mutual manifestation of an intention to be bound to terms definite enough to be enforced, and consideration. *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir. 2009).

[5] A contract cannot be enforced under Pennsylvania law if "'the promise is entirely optional with the promisor.'" *Crump v. MetaSource Acquisitions, LLC*, 373 F. Supp. 3d 540, 545-46 (E.D. Pa. 2019) (quoting *SCF Consulting, LLC v. Barrack, Rodos & Bacine*, 175 A.3d 273, 278 (Pa. 2017) (Dougherty, J., concurring)). If one party reserves the right to modify an agreement retroactively, the agreement is illusory. *Id.* at 545.

provision that is part of a larger contract "remains illusory if the contract permits one party to legitimately avoid its promise to arbitration, such as by unilaterally amending or terminating the arbitration provision and completely escaping arbitration." *Nelson*, 815 F.3d at 193. An arbitration agreement is not illusory however if the power to terminate or modify it "(1) extends only to prospective claims, (2) applies equally to both" parties and (3) requires advance notice before the modification or termination is effective. *Id.* at 194 (citing *In re Halliburton Co.*, 80 S.W.3d 566, 569-70 (Tex. 2002)).

In *Nelson*, the Fifth Circuit found an arbitration agreement illusory because it allowed one party "to make unilateral changes" that would be "immediately effective upon notice to employees." *Id.* at 196. Even though the arbitration agreement in *Nelson* did not expressly state that the agreement could be modified retroactively, the Fifth Circuit found it illusory because it "unquestionably" lacked an advance notice requirement. *Id.* at 195-96. Meanwhile, in *Harris v. Blockbuster, Inc.*, the district court found an arbitration provision that was part of a larger contract illusory even though it did not clearly state that the agreement could be modified retroactively. 622 F. Supp. 2d 396, 399 (N.D. Tex. 2009). As the district court explained, it was enough that there was "nothing to suggest that once published, the amendment would be inapplicable to disputes arising, or arising out of events occurring, before such publication[.]" *Id.*

The Terms of Service here similarly afford TaxAct "the right, at any time, to change the terms of this Agreement." Jaeger Decl., Exhibit G-2. While the "Modifications" provision requires that TaxAct provide notice, it does not require advance notice. *Id.* Nor does it limit any amendments or modifications to prospective claims. To be sure, the "Modifications" provision states that "TaxAct's posting a notice or updating the terms of this Agreement for the then current tax year will not amend or modify the terms for any prior tax year ***unless*** the terms

expressly indicate prior year terms are also amended or modified." *Id.* (emphasis added). TaxAct thus has a unilateral right to amend the Terms of Service retroactively without advance notice subject only to the requirement that the updated terms of service expressly state that they apply retroactively, which again, TaxAct can unilaterally determine.

TaxAct's ability to unilaterally amend the Terms of Service, including the arbitration provision, retroactively without advance notice is not a hypothetical concern. *Cf. Harris*, 622 F. Supp. 2d at 399 (finding arbitration agreement illusory "where there was no attempt to apply a contract modification to prior events"). When TaxAct updated its Terms of Service on December 22, 2023, it modified the arbitration provision retroactively. *See* https://www.taxact.com/legal-notice (last accessed February 27, 2024). Plaintiffs as a result filed a Motion for a Protective Order, which this Court granted, in part. ECF No. 50. While an arbitration agreement can be found illusory under Texas law even when there has been no attempt at retroactive modification, *Harris*, 622 F. Supp. 2d at 400, TaxAct's attempt to retroactively modify its Terms of Service confirms that the arbitration agreement is illusory and thus lacks consideration.

**2. TaxAct failed to obtain mutual assent to the Terms of Service.**

Because of its design choices in creating its website, TaxAct cannot demonstrate that it secured Plaintiffs' mutual assent to the Terms of Service. To establish mutual assent, the party proposing a contract must provide "reasonably conspicuous notice" of the contract's existence and obtain an "unambiguous manifestation" of assent. *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 20-35 (2d Cir. 2002). This requires "both that the terms are being presented and that they can be adopted through the conduct that the offeror alleges constituted assent." *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 123 (2d Cir. 2012).

Since the internet's advent, a body of case law has developed on what e-commerce companies must do to obtain mutual assent. The "easiest method of ensuring terms are agreed to" is by using "clickwrap" agreements, which require users to "click on an acceptance after being presented with terms and conditions[.]" *James v. Global TelLink Corp.*, 852 F.3d 262, 267 (3d Cir. 2017). This is accomplished by presenting users "with specified contractual terms on a pop-up screen," which requires users to "check a box explicitly stating 'I agree' in order to proceed." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022).

Even though courts will enforce "clickwrap" agreements, *Meyer v. Uber Tech., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017), some companies, including TaxAct, choose to forgo this straightforward approach, ostensibly "to streamline consumer purchases[.]" *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 237 (2d Cir. 2016). Unlike "clickwrap" agreements, "browse-wrap" agreements display "a notice of deemed acquiescence and a link" to the agreement. *Culliane v. Uber Techs., Inc.*, 893 F.3d 53, 62 (1st Cir. 2018). "Courts are more reluctant to enforce browse-wrap agreements because consumers are frequently left unaware that contractual terms were even offered, much less that continued use of the website will be deemed to manifest acceptance of those terms." *Berman v. Freedom Find. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022). And for good reason. "Because online providers have complete control over the design of their websites, the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers." *Id.* at 857.

"To manifest tacit assent to a contract through conduct, one must "[intend] to engage in the conduct and know or have reason to know that the other party may infer from his conduct that he assents." *Karl Rove & Co. v. Thornburgh*, 39 F.3d 1273, 1291 (5th Cir. 1994) (cleaned up). Because TaxAct does not contend that Plaintiffs had actual knowledge of the arbitration

agreement, an enforceable contract can only be found here "based on an inquiry notice theory" if (1) TaxAct's website provided "reasonably conspicuous notice of the terms to which the consumer will be bound" and (2) the consumer took "some action, such as clicking a button or checking a box, that unambiguously manifest[ed] his or her asset to those terms." *Berman*, 30 F.4th at 856. "A user's click of a button can be construed as an unambiguous manifestation of assent only if the user is ***explicitly advised*** that the act of clicking will constitute assent to the terms and conditions of an agreement." *Id.* at 857 (emphasis added). The presence of an "explicit textual notice" is "***critical*** to the enforceability of any browse-wrap-type agreement." *Id.* (citing *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014)) (emphasis added).

To meet this standard, "the notice must ***explicitly*** notify a user of the legal significance of the action she must take to enter into a contractual agreement." *Id.* at 858 (emphasis added). In *Berman*, the Ninth Circuit considered a notice: "***I understand and agree to the Terms & Conditions***." *Id.* (emphasis added). This notice, according to the Ninth Circuit, "did not indicate to the user what action would constitute assent to those terms and conditions" or give an "indication that it would bind plaintiffs to a set of terms and conditions." *Id.* As a result, the Ninth Circuit found the agreement unenforceable. *Id.* But rather than leave it at that, the Ninth Circuit offered guidance on how the defective notice could be fixed. As it explained, this "notice defect could easily have been remedied by including language such as, '***By clicking the Continue >> button***, you agree to the Terms & Conditions.'" *Id.* (emphasis added).

Courts in Texas have likewise found that an explicit textual notice specifying what action would constitute assent is necessary for there to be a valid agreement. *See In re Online Travel Co.*, 953 F.Supp.2d 713, 718 (N.D. Tex. 2013) (finding user assented by clicking the "Accept" button where above the button, there was a "notice explaining that, ***by clicking the button, the***

***user agrees*** to the policies set forth in the User Agreement") (emphasis added); *McKimmy v. OpenSea*, No. 22-545, 2023 WL 6370907, *2 (S.D. Tex. Mar. 23, 2023) ("There is reasonable notice when a user is required to click a 'Continue' button and a ***statement is displayed directly above the button that informs users that by clocking 'Continue,'*** they are agreeing to the website's terms") (emphasis added); *Phillips v. Neutron Holdings, Inc.*, No. 18-3382, 2019 WL 4861435, *1 (N.D. Tex. Oct. 2, 2019) (finding user assented to the User Agreement by clicking a button, which underneath contained a notice that "***[b]y signing up, I confirm*** that I am at least 18 years old, and that I have read and agreed to Lime's User Agreement & Terms of Service") (emphasis added); *Hotels.com, L.P. v. Canales*, 195 S.W.3d 147, 156 (Tex. App. 2006) ("although the website does not require the consumer to actually open and view the User Agreement, the consumer must click 'I agree to the Terms and Conditions' which specifically state '***by proceeding with this reservation, you agree to all Terms and Conditions'***") (emphasis added).

Courts outside Texas have also followed this approach. *Compare Meyer*, 868 F.3d at 76 (the mobile app explicitly warned: "***By creating an Uber account***, you agree to the TERMS OF SERVICE & PRIVACY POLICY[.]") (emphasis added); *Coulter v. Experian Info. Solutions, Inc.*, No. 20-1814, 2021 WL 735726, *5 (E.D. Pa. Feb. 25, 2021) ("reasonable notice was provided when Defendant's website advised Plaintiff that '***[b]y clicking the 'Submit Secure Order' button***, Plaintiff manifested his assent to the Terms of Use Agreement[.]") (emphasis added); *HealthplanCRM, LLC v. Avmed, Inc.*, 458 F. Supp. 3d 308, 315 (W.D. Pa. 2020) (notice on the log-in page there warned that "***[u]se of Cavulus constitutes acceptance of the End User License Agreement[.]"***) (emphasis added); *Feldman v. Google, Inc.*, 513 F. Supp. 2d 229, 233 (E.D. Pa. 2007) (observing that at the top of the page, there was a notice that "***[i]f you agree with***

***these terms, indicate your assent below***" and that below a scrollable window of the terms, there was a box and the words, "Yes, I agree to the above terms and conditions.") (emphasis added); *with Starke v. SquareTrade, Inc.*, 913 F.3d 279, 293 (2d Cir. 2019) (finding the email there, unlike in *Meyer*, "in no way signal[ed] to Starke that he should click on the link, and it does not advise him that he would be deemed to agree to the contract terms in the document to be found by clicking that link.").

TaxAct cannot establish mutual assent due to its failure to "explicitly advise" users that clicking the "I agree" checkbox on its website's "Create Account" and "E-file" pages will constitute assent to the "TaxAct Terms of Services and License Agreement." TaxAct's website also fell short of providing users with reasonably conspicuous notice of the "TaxAct Terms of Service and License Agreement." To be sure, the notice on TaxAct's "Create Account" page states: "I agree to the TaxAct ***Terms of Service & Terms of Use***[.]" Jaeger Decl., Exhibit F-1 (emphasis added). There is nothing indicating that the "Terms of Service & Terms of Use" refers to the "TaxAct Terms of Service and License Agreement" when clicking the "I agree" checkbox. *See Checchia v. Solo Funds*, No. 23-444, 2023 WL 3868369, *9 (E.D. Pa. June, 7, 2023). With TaxAct's notice referring to the "Terms of Service & Terms of Use" and not the "TaxAct Terms of Service and License Agreement"—a mistake entirely of its own creation—a user cannot be expected to connect clicking the "I agree" checkbox with a differently titled document than the one identified in the notice.[6] The inclusion of a link to the "TaxAct Terms of Service and License

---

[6] *See, e.g.*, *Samsung Elecs. Am., Inc. v. Ramirez*, 777 F. App'x 243, 244 (9th Cir. 2019) ("the inaptly titled booklet containing the terms and conditions and the smartphone packaging's vague reference to terms and conditions are insufficient to put a reasonable consumer (or a reasonably prudent smartphone user) on notice of the arbitration provision that Samsung seeks to enforce"); *Checchia*, 2023 WL 3868369, at *9 ("critically, there is nothing indicating that the 'Terms of Service' are in fact 'SoLo's Terms & Conditions' to which the user is agreeing when clicking the

Agreement" does not cure TaxAct's error in misidentifying the Terms of Service as mutual assent requires that the parties "agree to the same thing, in the same sense, and at the same time." *Chubb Lloyds Ins. v. Buster & Cogdell Builders, LLC*, 668 S.W.3d 145, 152 (Tex. App. 2023).

In addition, TaxAct's "E-file Submission" page, which states "I agree to the terms and conditions,"—likewise creates confusion over what TaxAct's users are purportedly agreeing to as it too fails to identify the "TaxAct Terms of Service and License Agreement." Jaeger Decl., Exhibit H-1. Making matters even more confusing still is that on the website's "E-file" page, there are three paragraphs of terms above the "I agree" checkbox. The notices provided on the "Create Account" and "E-File" pages are defective, as a result.

For these reasons, TaxAct cannot satisfy the mutual assent requirement.[7]

### C. Plaintiff Sessoms is not a signatory to TaxAct's Terms of Service.

#### 1. Plaintiff Sessoms never visited TaxAct's website nor used its services.

In moving to compel arbitration, TaxAct claims that Plaintiff Sessoms is a party to the Arbitration Agreement. It claims that "TaxAct's internal records show that Sessoms had to consent to the Terms when he created an account in TY 2020, and that he consented to the Terms when he individually filed his taxes through that account for TY 2020 and TY 2021." ECF No.

---

'I agree' checkbox."); *Soliman v. Subway Franchisee Advert. Fund. Tr. Ltd.*, 442 F. Supp. 3d 519, 525 (D. Conn. 2020) ("[e]ven if a reasonable consumer would have become aware of the notice, it is doubtful she would have 'connect[ed] the contractual terms to the services to which they apply'") (quoting *Meyer*, 868 F.3d at 78).

[7] Pennsylvania law imposes a more demanding standard on website operators, holding them to a strict burden of proof that they obtained a consumer's unambiguous manifestation of assent to arbitration. *Chilutti v. Uber Tech., Inc.*, 300 A.3d 430, 449-50 (Pa. Super. 2023). TaxAct cannot satisfy this more demanding standard. For one thing, it failed to advise its users on the "Create Account" and "E-file" pages themselves that they would be waiving their right to a jury trial by agreeing to TaxAct's terms. For another, the waiver does not appear on the first page of the TaxAct Terms of Services and License Agreement in bold, capitalized text. Given these deficiencies, TaxAct cannot compel arbitration against anyone.

55, pg. 14-15. But TaxAct offers no evidence that it was Plaintiff Sessoms that created the account TaxAct references or that he personally filed his taxes. It instead relies solely on inference, which this Court need not credit. *Cf. Jackson v. Royal Caribbean Cruises, Ltd.*, 389 F. Supp. 3d 431, 444 n.6 (N.D. Tex. 2019) (noting that the party opposing arbitration should receive "the benefit of all reasonable doubts and inferences that may arise") (quoting *Three Valleys Mun. Water Dist. V. E.F. Hutton & Co.*, 925 F.2d 1136, 1141 (9th Cir. 1991)).

As Plaintiff Sessoms states in his Declaration, his wife, Krysta Sessoms, created the TaxAct user account titled "blakesessoms." Goslee Decl., Exhibit A, ¶ 4. As he explains, when Ms. Sessoms created the user account, he was not "physically present," had not asked "her to specifically use TaxAct's services," and that while he gave his wife "permission to prepare [his] tax returns, [he] did not grant her authority to enter into any agreements on [his] behalf or to waive [his] right to a jury trial or to participate in a class action." *Id.*, ¶¶ 5, 6. Nor was Plaintiff Sessoms "physically present" when his wife prepared and filed his 2020, 2021, 2022 tax returns. *Id.*, ¶ 8. As a matter of fact, Plaintiff Sessoms: "never created an account with TaxAct," "never logged into TaxAct," "never personally used TaxAct to prepare [or electronically file] a tax return," "had never seen the account registration or tax preparation and electronic filing pages on TaxAct's website," never "clicked a 'checkbox' on the TaxAct website acknowledging or agreeing to any terms and conditions," and had "never seen TaxAct's terms and conditions." *Id.*, ¶¶ 9-15. Because Plaintiff Sessoms "never agreed to arbitration," *id.*, ¶ 18, there is a genuine dispute of material fact, which precludes the grant of TaxAct's motion to compel. *See Jackson*, 389 F. Supp. 3d at 444-45; *see also Jaludi v. Citigroup*, 933 F.3d 246, 251 n. 7 (3d Cir. 2019); *see also Barrows v. Brinker Rest. Corp.*, 36 F.4th 45, 51 (2d Cir. 2022) (reversing decision that

"completely discounted the evidentiary value . . . of [the] sworn declaration" by the plaintiff's denial that he had electronically signed any arbitration agreement).

**2. Plaintiff Sessoms is not bound to arbitrate his claims because of his wife's use of TaxAct.**

Lacking evidence that Plaintiff Sessoms personally created a TaxAct account or personally used TaxAct, TaxAct suggests that he is bound by the Terms of Service because of his wife's use of TaxAct's services. Arbitration agreements however only apply to non-signatories in "rare circumstances." *Westmoreland v. Sadoux*, 299 F.3d 462, 465 (5th Cir. 2002). In Texas, "the general rule is that '[i]f the parties have not agreed to arbitration, no trial court has the discretion to make them go[.]'" *Dow v. Keller Williams Realty, Inc.*, 625 F. Supp. 3d 556, 569 (N.D. Tex. 2022) (quoting *In re Merrill Lynch Tr. Co.*, 235 S.W.3d 185, 193-94 (Tex. 2007)). None of the limited exceptions to this general rule apply here.

**a. Equitable estoppel cannot be used to compel arbitration because Plaintiff Sessoms did not "knowingly exploit" TaxAct's Terms of Service.**

Arbitration cannot be compelled here under a direct benefits theory of equitable estoppel as that theory only applies "when a nonsignatory 'knowingly exploits the agreement containing the arbitration clause.'" ECF No. 55, pgs. 15-16 (quoting *ACE Am. Ins. Co. v. Hustsman Corp.*, 255 F.R.D. 179, 201 (S.D. Tex. 2010)). According to the Supreme Court of Texas, for equitable estoppel to apply, the nonparty must "consistently and knowingly insist[] that others treat it as a party" to the contract containing the arbitration clause. *In re Weekley Homes LP*, 180 S.W.3d 127, 135 (Tex. 2005). Other courts, including the Third and Fifth Circuits, have likewise recognized that direct benefits estoppel requires that the non-signatory have "knowingly exploit[ed] the agreement containing the arbitration clause." *See Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 361-62 (5th Cir. 2003) (quoting *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediaries S.A.S.*, 269 F.3d 187, 199 (3d Cir. 2001)).

A party invoking the direct benefits theory of equitable estoppel must therefore establish that the non-signatory had "actual knowledge of the contract containing the arbitration clause." *Noble Drilling Servs., Inc. v. Certex USA, Inc.*, 620 F.3d 469, 473 (5th Cir. 2010); *see also IMA, Inc. v. Columbia Hosp. Med. City at Dallas*, 1 F.4th 385, 393 (5th Cir. 2021) ("A non-signatory must have specific knowledge of the relevant agreement—a non-signatory's generalized sense that two contracting parties have a course of dealing will not satisfy this requirement."); *Lloyd's Register N. Am., Inc.*, 780 F.3d 283, 291 (5th Cir. 2015) ("To invoke direct-benefits estoppel under this theory, LRNA first mush show that Pear Seas knowingly exploited the contract during the contract's existence[,]" meaning that "Pearl Seas must have known about the existence of the contract and its terms, and acted to exploit the contract."); *id.* at 292 ("If a non-signatory receives a copy of a heretofore-unknown contract for the first time when it sues a signatory, that mid-litigation revelation likely is not enough for knowing exploitation of the contract under this version of direct-benefits estoppel); *Ouadani v. TF Final Mile LLC*, 876 F.3d 31, 38 (1st Cir. 2017) (holding that non-signatory driver is not bound to arbitration agreement where there was no evidence he was aware of its existence). A non-signatory quite simply cannot "knowingly embrace" an arbitration agreement that he "is not alleged to have seen." *Cty. of Monmouth v. Rite Aid Corp.*, 667 F. Supp. 3d 152, 162 (E.D. Pa. 2023).

While TaxAct acknowledges this "knowledge" requirement, ECF No. 55, pgs. 15-16, it does not claim that Plaintiff Sessoms had "actual" and "specific" knowledge of the Terms of Service at the time his wife created an account and prepared his taxes. *Cf. IMA*, 1 F.4th at 393; *see also Weekley Homes*, 180 S.W.3d at 132-33 ("The analysis here focuses on the nonparty's conduct during the performance of the contract."). Without evidence establishing that Plaintiff Sessoms had "actual" and "specific" knowledge, TaxAct's estoppel argument fails.

TaxAct's reliance on equitable estoppel is also misplaced because it cannot establish that Plaintiff Sessoms "directly" benefited from the Terms of Service. *See Coatney v. Ancestry.com DNA, LLC*, __ F.4th __, 2024 WL 629858, *8-11 (7th Cir. 2024).[8] A non-signatory may only "be compelled to arbitrate 'if it seeks, through the claim, to derive a direct benefit from the contract containing the arbitration provision.'" *Weekley Homes*, 180 S.W.3d at 131. "Whether a claim seeks a direct benefit from a contract containing an arbitration clause turns on the substance of the claim, not artful pleading." *Id.* at 131-32. Equity is thus said to prevent a person from avoiding arbitration when "a claim depends on the contract's existence and cannot stand independently—that is, the allegedly liability arises solely from the contract or must be determined by reference to it[.]" *Jody James Farms*, 547 S.W.3d at 637 (internal citations omitted). But "when the substance of the claim arises from general obligations imposed by state law, including statutes, torts and other common law duties, or federal law, direct-benefits estoppel is not implicated[.]" *Id.* (internal citations omitted); *see also Fleetwood Enterprises v. Gaskamp*, 280 F.3d 1069, 1075 (5th Cir. 2002) (a "non-signatory can only be bound by the terms of an arbitration provision in an agreement if the non-signatory is asserting claims that require reliance on the terms of the written agreement containing the arbitration provision.").

[8] In *Coatney*, defendant Ancestry.com ("Ancestry") sold DNA test kits to the guardians of the child-plaintiffs. *Id.* at *1. To use Ancestry's services, "[r]egistered users" must first have agreed to arbitration. *Id.* While only adults could purchase and activate the DNA test kits under Ancestry's Terms & Conditions, minors aged thirteen to eighteen could however still receive Ancestry's DNA service. *Id.* For minors to use the service, a parent or legal guardian had to activate a DNA test kit and send in the minor's saliva sample "using an account for the child that the parent or guardian manages." *Id.* Like TaxAct here, Ancestry argued that the plaintiffs are bound to arbitration under an estoppel theory. In rejecting that argument, the Seventh Circuit explained that "there are no allegations that [the children] have accessed Ancestry's analysis of their DNA" and that plaintiffs did "not seek to enforce the Terms Against Ancestry" but were rather asserting claims under the Illinois Genetic Information Privacy Act. *Id.* at *9, *11.

Plaintiff Sessoms' claims stand independently of the Terms of Service as they arise under federal and state law. *See* 26 U.S.C. §§ 6103 and 7431(a)(2); 18 Pa. C.S. § 5701, *et seq*. Because TaxAct's liability is therefore "extra-contractual," direct-benefits estoppel does not apply here. Indeed, TaxAct argues that because Plaintiff Sessoms' wife could not have accessed TaxAct's services without agreeing to the Terms of Service, Plaintiff Sessoms "received the benefits of his spouse using TaxAct's Services to file their joint tax returns." ECF No. 55, pg. 16. Estoppel is however "not implicated even if the claim refers to or relates to the contract or would not have arisen 'but for' the contract's existence." *Jody James Farms*, 547 S.W.3d at 637; *see also In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 741 (Tex. 2005) ("although a non-signatory's claim may relate to a contract containing an arbitration provision, that relationship does not, in itself, bind the non-signatory to the arbitration provision").[9]

**b. Plaintiff Sessoms is not a third-party beneficiary.**

Plaintiff Sessoms is not a third-party beneficiary of TaxAct's Terms of Service. An arbitration agreement may be enforced only against a third-party non-signatory if "the parties to the contract intended to secure a benefit to that third party and entered into the contract directly for the third party's benefit." *Jody James Farms*, 547 S.W.3d at 635. "To determine whether the contracting parties intended to directly benefit a third party and entered into a contract for that purpose, courts must look solely to the contract's language, construed as a whole." *First Bank v. Brumitt*, 519 S.W.3d 95, 102 (Tex. 2017). Because the parties "are presumed to be contracting

---

[9] *See also Monmouth*, 2023 WL 2743552 *5 (quoting *Abdurahaman v. Prospect CCM LLC*, 42 F.4th 156, 162 (3d Cir. 2022)) (noting that when a plaintiff "chooses not to bring claims that would implicate an arbitration agreement" then, "a court may not substitute different claims in an effort to 'pull[] the entire dispute . . .into arbitration[.]"); *B.F. v. Amazon, Inc.*, 858 Fed. Appx. 218, 220 (9th Cir. 2021) ("a non-signatory does not knowingly exploit the contract when they bring claims that 'do not arise out of the contract'").

for themselves only," courts in Texas "will not create a third-party beneficiary contract by implication[.]" *Fleetwood Enterprises v. Gaskamp*, 280 F.3d 1069, 1075 (5th Cir. 2002). "[T]he intent to make someone a third-party beneficiary must be clearly written or evidenced in the contract." *Id.* at 1076. Texas law moreover "does not confer third-party beneficiary status automatically upon one spouse when the other spouse enters a sales contract." *Zinante v. Drive Elec., LLC*, 582 Fed. Appx. 368, 371 (5th Cir. 2014) (comparing *In re Conseco Fin. Serv. Corp.*, 19 S.W.3d 562, 571 (Tex. App. 2000) with *Nationwide of Bryan, Inc. v. Dyer*, 96 S.W.2d 518, 521 (Tex. App. 1998)).[10]

TaxAct cites just one provision in the Terms of Service that concerns third-parties:

> You acknowledge and agree that ***you are solely responsible*** for all content, data, and information submitted by your user identification into the Service, including, without limitation, content, data, and information relating to third parties.

Jaeger Decl., Exhibit G-2 (emphasis added).

Far from establishing that Plaintiff Sessoms is an intended third-party beneficiary, this provision only addresses the users' responsibilities. It says nothing about conferring benefits on any beneficiaries.[11] This provision, therefore, is neither "sufficiently clear" nor 'unequivocal" in

[10] In *Conseco*, the court found that that the non-signatory's wifes claims were not subject to arbitration because they arose under the Texas Debt Collection Act and the Deceptive Trade Practices Act. While in *Nationwide*, the court came to the opposite conclusion because the non-signatory wife's standing to sue was derived from the contract containing the arbitration clause.

[11] In rejecting Ancestry's third-party beneficiary argument in *Coatney*, the Seventh Circuit noted that Ancestry's terms did "not say plaintiffs' guardians agreed to them 'on behalf of' their children" and that the "Terms exclude third-party beneficiaries," which indicates "that the signatories intended to bind themselves, but not others, to arbitration." *Coatney*, 2024 WL 629858, at *7. Ancestry argued that the children should still be considered third-party beneficiaries because "Ancestry sequenced and analyzed [their] DNA to generate insights about Plaintiffs' genetic history[.]" *Id.* at *6. The Seventh Circuit rejected that argument too, noting that "nothing in the DNA Processing Consent says the Terms are for plaintiffs' direct benefit." *Id.* at *7.

demonstrating the "necessary intent to directly benefit" any third-parties for Plaintiff Sessoms to be regarded as a third-party beneficiary. *See Brumitt*, 519 S.W.3d at 103; *see also Fleetwood Enters.*, 280 F.3d 1069, 1076 (5th Cir. 2002) (noting that "contract does not mention the Gaskamp children at all and [that] there is no indication in the contract that it is designed to benefit anyone other than the Gaskamp parents, who purchased the home"). After all, "general beneficence does not create third-party rights." *Jody James Farms*, 547 S.W.3d at 635. Any downstream benefit that Plaintiff Sessoms received "is, at best, indirect and incidental," which is not enough to bind him to the arbitration agreement. *Id.* at 636; *see also Lincoln Fin. Advisors v. Ards*, No. 18-437, 2019 WL 6907074 (Tex. Ct. App. Dec. 19, 2019) ("It is not enough that the third party would benefit from the parties' performance.") (citing *Brumitt*, 519 S.W.3d at 102).

TaxAct's third-party beneficiary argument also cannot succeed because the Terms of Service contain no indication that TaxAct "intended to grant [Plaintiff Sessoms] the right to be a "claimant" in the event of a breach." *Brumitt*, 519 S.W.3d at 102 (*quoting Corpus Christi Bank & Tr. v. Smith*, 525 S.W.2d 501, 505 (Tex. 1975)); *see also Harland Clarke Holdings Corp. v. Milken*, 997 F. Supp. 2d 561, 577 (W.D. Tex. 2014) (noting that the purchase agreement contained multiple terms entitling third-parties to indemnification "with full rights of enforcement as though such Person was a signatory to this Agreement.").

Plaintiff Sessoms is not a third-party beneficiary for all these reasons.

**c. No agency relationship exists between Plaintiff Sessoms and his wife sufficient to bind him to arbitration.**

A marital relationship "does not, in itself, make one spouse the agent of the other spouse." *Albertson's Holdings, LLC v. Kay*, 514 S.W.3d 878, 884 (Tex. App. 2017). The Texas Legislature indeed saw to it that one cannot infer agency status merely because of the marital relationship. Tex. Fam. Code. § 3201(c). There is thus no presumption that one spouse is an

agent for the other under Texas law. *Albertson's*, 514 S.W.3d at 884.[12] And so, "[a]n agency relationship can arise only at the will and by the act of the principal, and its existence is always a fact to be proved by tracing it to some act of the alleged principal." *Id.*

"An agency relationship may be demonstrated by 'written or spoken words or conduct, by the principal, communicated either to the agent (actual authority) or to the third party (apparent authority).'" *Bridas*, 345 F.3d at 357 (quoting *Hester Int'l v. Fed. Republic of Nigeria*, 879 F.2d 170, 181 (5th Cir. 1989)). Recognizing that "he who would bind the principal is bound to ascertain, not only the fact of agency, but the nature and extent of the authority," the Fifth Circuit has refused to recognize an agency relationship where there was no indication in the agreement that one of the parties to it did so on behalf of the Government of Turkmenistan. *Id.* at 358 (internal citations omitted). As the Fifth Circuit explained, had the other party to the agreement "felt that Turkmenneft was signing the agreement not for itself but on behalf of the Government, it had the obligation to make that fact ***clear on the face of the agreement***[,]" which "could have been accomplished in a myriad of ways. *Id.* (emphasis added).

The same is true here. TaxAct had a duty to determine, not only the fact of agency but also its nature and extent. Yet it did not. As a sophisticated corporation responsible for helping hundreds of thousands of people file their tax returns each year that is represented by counsel and long familiar with the use of arbitration agreements, TaxAct had an obligation to make it "clear on the face of the agreement" that Ms. Sessoms was acting as an agent for her husband if that is truly what TaxAct intended. *See id.* Yet again, TaxAct did not. To be sure, TaxAct drafted the

[12] An agency relationship cannot "be inferred from mere relationship or family ties unattended by conditions, acts or conduct clearly implying an agency" under Pennsylvania law either. *Peterson v. Kindred Healthcare, Inc.*, 155 A.3d 651, 644 (Pa. Super. 2017).

form agreement to make it between "TaxAct, Inc. ("TaxAct, "we", "us", or "our") and ***you ("you", "your" or "user")***, a visitor or user of TaxAct's Services." Jaeger Decl., Exhibit G-1 (emphasis added). The Terms of Service further provide: "Subject to ***your*** continued compliance with this Agreement, including payment of any applicable fees, you are hereby granted a limited, nonexclusive, nontransferable, non-sublicensable, revocable license to access and use the Services for your personal purposes." *Id.* (emphasis added). These provisions are inconsistent with, and disprove, TaxAct's argument that Ms. Sessoms agreed to the Terms of Service on behalf of her husband, Plaintiff Sessoms. The design of TaxAct's website is similarly inconsistent with the notion that Ms. Sessoms was acting as an agent for her husband as it reads: "I agree to the TaxAct Terms of Service & Terms of Use . . . ." Jaeger Decl., Exhibit F-1.

Because neither the Terms of Service nor TaxAct's website contain a clear indication of an agency relationship, TaxAct sidesteps the issue and instead contends that by permitting his wife to prepare and file his tax returns, Plaintiff Sessoms established an agency relationship with his spouse.[13] TaxAct notably fails to claim, much less offer evidence, that Plaintiff Sessoms exercised the requisite "control" over how his wife would prepare and file his taxes to establish an agency. *Cf. Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 589 (Tex. 2017). Nor could it. As Plaintiff Sessoms stated in his Declaration, he was not present with Ms. Sessoms when she created the TaxAct account that she alone used to access the website. Goslee Decl., Exhibit A, ¶ 5. He also declared that while he "understood that she was preparing [his] tax return, [he] did not ask her to specifically use TaxAct's services and, in fact, [he] had no preference or concern to what service she used—whether that be TaxAct or one of its competitors or even it was an online

[13] "Agency cannot be assumed from the mere fact that one does an act for another." *Clayton v. McCullough*, 670 A.2d 710, 714 (Pa. Super. 1996).

service." *Id.* He added that although he "gave Krysta permission to prepare [his] tax returns, [he] did not grant her authority to enter into any agreements on [his] behalf or waive [his] right to a jury trial or to participate in a class action." *Id.*, ¶ 6.[14] Nothing in the record here demonstrates that Ms. Sessoms had actual authority to specifically enter into an agreement with TaxAct on Plaintiff Sessoms' behalf.

Nor can TaxAct establish apparent authority. That concept is "based on estoppel" and arises 'either from a principal knowingly permitting an agent to hold [herself] out as having authority or by a principal's actions which lack such ordinary care as to clothe an agent with the indica of authority[.]'" *Gaines v. Kelly*, 235 S.W.3d 179, 182 (Tex. 2007) (quoting *Baptist Mem. Hosp. Sys. v. Sampson*, 969 S.W.2d 945, 948 (Tex. 1998)). The "principal's full knowledge of all material facts is essential to establish a claim of apparent authority based on estoppel." *Id.* (quoting *Rourke v. Garza*, 530 S.W.2d 794, 803 (Tex. 1975)). Only the conduct of the principal is relevant to making that determination. *Id.* (quoting *NationsBank, N.A. v. Dilling*, 922 S.W.2d 950, 953 (Tex. 1996)). Apparent authority "must be based on the acts of the principal" and "is limited to the scope of responsibility that is apparently authorized." *Id.* at 184 (quoting *First Valley Bank of Los Fresnos v. Martin*, 144 S.W.3d 466, 471 (Tex.2004)).

In *Gaines*, the supposed principal used the person claimed to be an agent "as an intermediary to deliver loan documents and facilitate the transaction." 235 S.W.3d at 184. As the Texas Supreme Court explained though, the evidence that the supposed agent "brought the parties together, delivered the paperwork, and assisted in its completion is not evidence that [the

[14] "[A] deliberate and specific grant of authority as to 'certain matters' does not constitute a deliberate and specific grant of authority as to all matters." *Gross v. Genesis Healthcare, Inc.*, No. 2022 EDA 2017, 2018 WL 2423306, *5 (Pa. Super. May 30, 2018) (quoting *Walton v. Johnson*, 66 A.3d 782, 788 (Pa. Super. 2013)).

supposed principal] authorized or acquiesced in [the claimed agent's] representation that the loan was a 'done deal.'" *Id.*at 182 In addition to noting that there was no evidence that the supposed principal was aware of the documents, the Supreme Court noted that there was no evidence that the claimed agent was authorized to sign them. *Id.* While the supposed principal failed to affirmatively deny an agency relationship when the attorney for the other party informed him that the documents had been returned to the claimed agent and that was consistent with there being an agency relationship, the Supreme Court found that this was "not conduct by which a person might reasonably infer that Thompson also possessed the authority to negotiate the terms of those documents." *Id.* The Supreme Court thus found that even if Thompson were regarded as an agent for the purposes delivering the loan documents, the "scope" of that agency relationship did not extend to negotiating the documents. *Id.*

There is no evidence of conduct here that indicates that Plaintiff Sessoms authorized Mrs. Sessoms to enter into an arbitration agreement with TaxAct, let alone that he had full knowledge of all material facts of this agreement. Whether Ms. Sessoms were regarded as an agent for the purposes of preparing and filing his taxes is of no moment here. This matter is not about whether Ms. Sessoms properly and accurately provided information and filed Plaintiff Sessoms' tax returns. It is rather about TaxAct's unlawful use and disclosure of Plaintiff Sessoms' confidential tax return information. The question is thus not whether Ms. Sessoms was authorized to prepare and file his taxes, but whether Plaintiff Sessoms authorized her to enter into an agreement with TaxAct to waive his right to a jury trial and his class action rights in favor of arbitration. The authorization to do the former is not authorization to do the latter. There is no evidence—and TaxAct indeed points to none—that Plaintiff Sessoms authorized Ms. Sessoms to enter into an agreement with TaxAct, let alone that he "knowingly" did so. The lack of such evidence is fatal

to TaxAct's agency argument. Because apparent authority is based on estoppel, TaxAct's agency argument fails for another reason: his claims do not "require reliance on the terms of" TaxAct's Terms of Service. *See Fleetwood Enters.*, 280 F.3d at 1075.

**D. This Court can decide issues relating to arbitrability.**

Given that TaxAct cannot satisfy its burden to establish that Plaintiffs assented to arbitration, it inextricably follows that it cannot prove they agreed to delegate any disputes over arbitrability to an arbitrator, as TaxAct contends. *See Jody James Farms*, 547 S.W.3d at 631-32. There are two other reasons why any issues here relating to arbitrability are for the Court to decide and not an arbitrator. First, TaxAct argues that because the Terms of Service incorporate the JAMS Rules, the delegation clause in the JAMS Rules controls. The Texas Supreme Court however rejected that argument in *Jody James Farms*, reasoning that the mere incorporation of the AAA rules does not show a clear intent to arbitrate arbitrability. *Id.* at 632. Second, the Texas Supreme Court has also found that "an agreement silent about arbitrating claims against non-signatories does not unmistakably mandate arbitration of arbitrability in such cases." *Id.* Therefore, neither Plaintiff Kirkham nor Plaintiff Sessoms can be compelled to arbitrate issues relating to arbitrability under Texas law.

**E. Plaintiffs' claims fall outside the scope of TaxAct's arbitration provision.**

TaxAct's use and disclosure of taxpayers' confidential tax return information is beyond the reach of its arbitration agreement. While TaxAct characterizes its arbitration clause as broad, "even broad clauses have their limits." *Pennzoil Expl. & Prod. Co. v. Ramco Energy Ltd.*, 139 F.3d 1061, 1067 n.8 (5th Cir. 1998). While "a dispute need only 'touch matters covered by' the arbitration agreement to be arbitrable,'" the Fifth Circuit has "defined an arbitrable dispute under a broad clause as one 'having a significant relationship to the contract.'" *Jones v. Halliburton*

*Co.*, 593 F.3d 228, 235 (5th Cir. 2009) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 624 n. 13 (1985); *Pennzoil*, 139 F.3d at 1067).

The Arbitration Agreement here provides:

> [Y]ou and TaxAct waive your rights to a jury trial and to have any disputes arising out of or related to ***these Terms or our Services*** resolved in court. Instead, all disputes arising out of or related to these ***Terms or our Services*** will be resolved through confidential binding arbitration[.]

Jaeger Decl., Exhibit G-4. TaxAct argues that "[a]ll of Plaintiffs' claims arise out of or relate to the Terms" because Plaintiffs could not have otherwise used TaxAct's services. TaxAct in effect asks this Court to read this provision so broadly as to encompass any claim against TaxAct. That is not the language of the agreement though. *See Jones*, 583 F.3d at 241. TaxAct's Terms of Service do not require that all disputes between TaxAct and "you" be submitted to arbitration. It rather only requires that those "arising out of or related to these Terms or our Services." That is much different. *See, e.g.*, *Jody James Farms*, 547 S.W.3d at 637.

Examining a similar arbitration provision, the Ninth Circuit has observed that "'both phrases, 'arising out of' and 'related to,' mark a boundary by indicating some direct relationship." *Jackson v. Amazon.com, Inc.*, 65 F.4th 1093, 1104 (9th Cir. 2023). The Ninth Circuit then found that the allegations in the complaint lacked a direct relationship with the arbitration provision, which read:

> Any dispute or claim, whether based on contract, common law, or statute, arising out of or relating in any way to this Agreement, including termination of this agreement, to your participation in the program or to your performance of services.

*Jackson*, 65 F.4th at 1104-05 (Graber, J., concurring in part and dissenting in part). As the Ninth Circuit observed, Amazon's theory was that its alleged monitoring of drivers' conversations "took place while the drivers were performing deliveries for Amazon under the agreement and

participating in the Flex Program." The Ninth Circuit disagreed, explaining that the "alleged misconduct was not related to agreement" or to the drivers' "participation in the Flex program or the performance of services under that program." *Jackson*, 65 F.4th at 1104. The Ninth Circuit further explained that "controversy in this case is ultimately not about any characteristics or conduct of class members, but whether Amazon is indeed liable for wiretapping and invasion of privacy." *Id.* at 1103. And thus, the Ninth Circuit found that the dispute before it did "not touch on any matters related to the contract that would fall within the arbitration clause." *Id.* The "alleged misconduct" rather "existed independently of the contract and therefore fell outside of the arbitration provision." *Id.* at 1104.

As in *Jackson*, Plaintiffs claim that TaxAct is liable for wiretapping their communications and improperly using and disclosing their confidential tax return information in violation of federal and state law. There is no direct relationship between those claims and TaxAct's "Terms" or "Services," just as there wasn't one in *Jackson*. TaxAct's misconduct and the resulting harms rather exist independently of the "Terms" and "Services" for none of the claims depend on the "Terms" or TaxAct's performance of the "Services." After all, TaxAct's alleged misconduct would be wrongful even if there had been no contract.

**F. The Federal Arbitration Act does not require that this litigation be stayed.**

The FAA does not require that litigation be stayed where one of the parties is not a signatory to an arbitration agreement. *See E. Texas Med. Ctr. Reg. Healthcare Sys. v. Slack*, 916 F.Supp. 2d 719, 722-23 (E.D. Tex. 2013); *see also Congdon v. Uber Techs., Inc.*, 226 F. Supp. 3d 983, 989-90 (N.D. Cal. 2016) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 20 n.23 (1983)); *Mendez v. Puerto Rican Intern. Co., 553* F.3d 709 (3d Cir. 2009) (observing Section 3 of the FAA does not apply "in situations involving a party who has not

committed itself to arbitrate any issues before the court”). Section 3’s mandatory stay therefore does not apply here. The decision to stay these proceedings is consequently one committed to this Court’s discretion. *Moses*, 460 U.S. at 20 n.3.

As a non-signatory, Plaintiff Sessoms is not subject to the FAA for he has not agreed to arbitration. He should therefore be allowed to proceed with this litigation as there is “no justification” for delay, particularly considering that while his claims may overlap with those of others who may be subject to an arbitration agreement, if there are any such individuals, it was TaxAct who included in its Terms of Service a provision that it contends permits only individual arbitration. Jaeger Decl., ¶ G-4. Plaintiff Sessoms’ claims, as well as those of other putative class members like him, will need to be litigated in court. *See Congdon*, 226 F. Supp. 3d at 991. In short, TaxAct “cannot have its cake and eat it, too.” *See id.* It “cannot, on the one hand, argue that the parties intended individualized adjudication of each plaintiff’s claims, and in the same breath, argue that certain individual’s actions should be impacted by parallel litigation.” *See id.*

TaxAct’s request to stay this litigation should therefore be denied.

## III. Conclusion

For all these reasons, TaxAct's Third Motion to Compel Arbitration and Stay Litigation should be denied.

Respectfully submitted,

COHEN, PLACITELLA & ROTH, P.C.

By: /s/ James P. Goslee

James P. Goslee (#203043)
Michael Coren (#31037)
Eric S. Pasternack (#320127)
Jared M. Placitella (#321333)
2001 Market St., Suite 2900
Philadelphia, PA 19103
(215) 567-3500
jGoslee@cprlaw.com
mcoren@cprlaw.com
epasternack@cprlaw.com
jmplacitella@cprlaw.com

Dated: February 27, 2024