**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JAMES KIRKHAM et al.** | | **CIVIL ACTION** |
| **Plaintiffs,** | | |
| **v.** | | |
| **TAXACT, INC.,** | | **NO. 23-3303** |
| **Defendant.** | | |

## OPINION

Plaintiffs James Kirkham and Matthew Sessoms have sued the tax preparer company TaxAct, Inc. ("TaxAct"), alleging, on behalf of two classes of similarly situated customers, that the company shared their confidential personal information with Meta and Google, in violation of federal tax law, 26 U.S.C. §§ 6103, 7431(a)(2), and Pennsylvania's Wiretapping and Electronic Surveillance Control Act, 18 Pa. C.S. § 5701 *et seq.* Relying on the Federal Arbitration Act ("FAA"), 9 U.S.C. § 2 *et seq.*, TaxAct moves to compel individual arbitration and/or stay this case in reliance on its Terms of Service and License Agreement, which requires disputes "arising out of or related to these Terms or our Services" to be resolved in arbitration.

## I.    BACKGROUND

### A.  Plaintiffs' Interactions with TaxAct's Website

Plaintiffs allege, relying in part on reports prepared by the Federal Trade Commission and several members of Congress, that TaxAct used "'pixels'—a piece of code that can be installed on websites and which can send massive amounts of user data to technology companies—to intercept and disclose tax return information to Meta and Google." The pixels, in turn, are used to "allow[] advertisers to measure the performance of their websites and advertising campaigns and build an audience base for future targeted advertising." According to the Amended Complaint, TaxAct confirmed to Congress that it has been using Meta's pixel since

2018 and Google's equivalent tool since approximately 2014.

Kirkham alleges that he used TaxAct to prepare his 2020 tax-year tax returns. Although he recalls clicking a checkbox on one screen—which, per a screenshot produced by TaxAct, says: "I agree to the TaxAct Terms of Service & Terms of Use"—Kirkham "did not understand" accepting the Terms of Service "to be the function of the checkbox. At no time did TaxAct's website present TaxAct's terms and conditions to me. Nor did it explain . . . that I was agreeing to the terms and conditions or arbitration, let alone the significance of the arbitration agreement." TaxAct has produced evidence that Kirkham in fact checked a box indicating his acceptance of the Terms of Service twice during that tax year: once when he created an account, and again before he filed.

Sessoms, on the other hand, says that he never used TaxAct himself. He says that his wife Krysta created an account on TaxAct's website and used it to file his tax return for the 2020 tax year. Although he "gave Krysta permission to prepare my tax returns, I did not grant her authority to enter into any agreements on my behalf or to waive my right to a jury trial or to participate in a class action." Sessoms insists that he has never logged onto TaxAct's website and that he has never used the website to prepare tax returns. Thus, he "ha[s] never seen TaxAct's terms and conditions or any other document that may contain an arbitration provision," let alone agreed to them. TaxAct has produced evidence showing that Sessoms's tax returns were filed through its website for the 2020 and 2021 tax years; the Sessoms family filed a joint return via TaxAct in 2022.

TaxAct's account creation page, as of 2020, required customers to provide an email address, cell phone number, username, and password, and included a checkbox towards the bottom of the screen, in the same-size font as was used to tell users where to enter their

identifying information, indicating that they "agree to the TaxAct Terms of Service & Terms of Use, and have read and acknowledge the Privacy Statement."  Both "TaxAct Terms of Service & Terms of Use" and "Privacy Statement" are written in blue, as opposed to black, and function as hyperlinks to the respective documents.  Similarly, before submitting one's return, a customer must enter certain identifying information and indicate, by checking a box, that they "agree to the terms and conditions."  Thus, someone accessing a TaxAct account would have agreed to the Terms of Service multiple times: once when it was created, and again for each subsequent tax filing.  "[T]erms and conditions" is presented in the same small font as the other headings on the page but is in blue and is underlined.  It, too, is a hyperlink to the Terms of Service.

### B.  The 2020 Terms of Service

The iteration of TaxAct's Terms of Service that were in effect when the Kirkham and Sessoms tax returns were filed through the website (the "2020 Terms of Service") provided that customers "may not use the Services until you have read and agreed to this Agreement.  By using the Services, you indicate your unconditional acceptance of this Agreement.  If you do not accept this Agreement, you must terminate your use of the Services."  Acceptance gives a user "a limited, nonexclusive, nontransferable, non-sublicensable, revocable license to access and use the Services for your personal purposes."

Among the conditions laid out in the Terms of Service is an arbitration provision, which customers are advised, in bold, to "read . . . carefully because it requires you to arbitrate certain disputes and claims with TaxAct and limits the manner in which you can seek relief from us."  The arbitration provision requires that, "[e]xcept for small claims disputes in which you or TaxAct seek to bring an individual action in small claims court . . . or disputes in which you or TaxAct seeks injunctive or other equitable relief for the alleged unlawful use of intellectual property," customers agree to have "all disputes arising out of or relating to these Terms or our

Services . . . be resolved through confidential binding arbitration . . . in accordance with the Streamlined Arbitration Rules and Procedures . . . of the Judicial Arbitration and Mediation Services ("JAMS"), which are . . . *hereby incorporated by reference*." The JAMS rules, in turn, require the arbitrator to: (1) "resolve disputes about the interpretation and applicability of these Rules and conduct of the Arbitration Hearing;" and, (2) adjudicate "[j]urisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought. . . . The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter." Moreover, the arbitration provision requires customers to "agree that any [such] dispute . . . is personal to you and TaxAct and that any dispute will be resolved solely through individual arbitration and will not be brought as a class arbitration, class action or any other type of representative proceeding." The "validity and performance of" the 2020 Terms of Service is "governed by Texas law (without reference to choice of law principles) and applicable federal law."

Customers were advised that they could "opt out of binding arbitration within thirty (30) days of the date you first accepted the terms of this Section by sending an email to [TaxAct]. In order to be effective, the opt-out notice must include your full name and clearly indicate your intent to opt out of binding arbitration." It is undisputed that neither Kirkham nor Sessoms did this.

The Terms of Service also noted that TaxAct "reserves the right, at any time, to change the terms of this Agreement" but promised to "provide . . . notice of such changes, such as by sending an email, posting a notice on the Services or updating the date at the top of this Agreement." Such changes "will not amend or modify the terms for any prior tax year unless the terms expressly indicate prior year terms are also amended or modified." Continuing to use

TaxAct's website, the Terms of Service warn, will "confirm . . . acceptance of the[ir] then-current version."  Finally, the Terms of Service also include an integration clause, providing that they "set forth TaxAct's . . . entire liability and your exclusive remedy with respect to the Services, comprise a complete statement of the agreement between you and TaxAct regarding the subject matter thereof, and supersede any prior understandings with regards to such subject matter."

## II.    LEGAL STANDARD

The Federal Arbitration Act provides that "[a] written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity . . . ."  9 U.S.C. § 2.  "A party aggrieved by the alleged failure . . . of another to arbitrate . . . may petition any United States district court which, save for such agreement, would have jurisdiction . . . for an order directing that such arbitration proceed in the manner provided for in such agreement."  *Id.* § 4.

The FAA "reflects an 'emphatic federal policy in favor of arbitral dispute resolution.'"  *KPMG LLP v. Cocchi*, 565 U.S. 18, 21 (2011) (per curiam) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985)); *accord Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983) (acknowledging the "liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary").  Pursuant to that "liberal" policy, "courts must place arbitration agreements on an equal footing with other contracts . . . and enforce them according to their terms."  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (citations omitted).

That principle reaches even delegation clauses—agreements to arbitrate "'gateway'

questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy," *Rent-A-Ctr. W., Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010) (citations omitted)—so long as "there is clea[r] and unmistakabl[e] evidence that they did so," *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (quoting *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986)).  That is because "[a]n agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other."  *Rent-A-Ctr.*, 561 U.S. at 69.

"Deciding whether arbitration is required is a two-step process: in the first step, the court determines whether 'there is an agreement to arbitrate,' and then in the second step, the court decides whether 'the dispute at issue falls within the scope of that agreement.'" *Jaludi v. Citigroup*, 933 F.3d 246, 254 (3d Cir. 2019) (quoting *Century Indem. Co. v. Certain Underwriters at Lloyds, London*, 584 F.3d 512, 523 (3d Cir. 2009)).  The first step is a question of state contract law.  *Id.* (citation omitted).

When evaluating a motion to compel arbitration, the appropriate evidentiary standard that is to be applied depends on the pleadings.  "[W]hen it is apparent, based on the face of a complaint, and documents relied upon in the complaint, that certain of a party's claims are subject to an enforceable arbitration clause, a motion to compel arbitration should be considered under a Rule 12(b)(6) standard without discovery's delay."  *Guidotti v. Legal Helpers Debt Resol., L.L.C.*, 716 F.3d 764, 776 (3d Cir. 2013) (internal quotation marks and citation omitted). On the other hand, if either: (1) "the motion to compel arbitration does not have as its predicate a complaint with the requisite clarity to establish on its face that the parties agreed to arbitrate;" or, (2) "the opposing party has come forth with reliable evidence that is more than a naked

assertion . . . that it did not intend to be bound by the arbitration agreement, even though on the face of the pleadings it appears that it did," the summary judgment standard found in Federal Rule of Civil Procedure 56 applies, and limited discovery should be allowed. *Id.* at 774 (internal quotation marks and citations omitted). In other words, where a "district court's order compelling arbitration is in effect a summary disposition of the issue of whether or not there had been a meeting of the minds on the agreement to arbitrate," the summary judgment standard is appropriate. *White v. Sunoco, Inc.*, 870 F.3d 257, 262 (3d Cir. 2017) (quoting *Flintkote Co. v. Aviva PLC*, 769 F.3d 215, 219 (3d Cir. 2014)).

Here, Kirkham and Sessoms argue, among other things, that there had been no meeting of the minds regarding arbitrability because of how TaxAct presented its terms of service to them. Thus, per *White* and *Guidotti*, Rule 56's summary judgment standard is appropriate.[1] *Id.* Considering the above, the Court will grant TaxAct's motion only if it shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "A genuine issue is present when a reasonable trier of fact, viewing all record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." *Doe v. Abington Friends Sch.*, 389 F.3d 252, 256 (3d Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-26 (1986)). "Material facts are those that could affect the outcome of the proceeding." *Roth v. Norfalco*

---

[1] Both parties submitted several exhibits in support of their briefs on TaxAct's Motion to Compel Arbitration, and the Court both provided notice to the parties that Rule 56 would apply and gave them an opportunity to file any additional exhibits, *Guidotti*, 716 F.3d at 775 n.6.

*LLC*, 651 F.3d 367, 373 (3d Cir. 2011).  In making these determinations, the court must view the facts and draw all reasonable inferences in the light most favorable to the non-moving party.  *See Anderson*, 477 U.S. at 255.

### III.   DISCUSSION

Both Kirkham and Sessoms argue that, notwithstanding the FAA's strong presumption in favor of arbitrability, TaxAct's motion should be denied because neither of them ever formed a valid contract with the company.

### A.  The Court's Review Is Limited by the Delegation Clause.

Because the arbitration provision incorporates the JAMS rules in full, it includes those rules' delegation clause whereby the arbitrator must adjudicate "[j]urisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought."  This provision considerably narrows, but does not eliminate, the Court's review of Plaintiffs' arguments.

The FAA requires that, "*before* referring a dispute to an arbitrator, the court determine[] whether a valid arbitration agreement exists."  *Henry Schein, Inc. v. Archer and White Sales, Inc.*, 139 S. Ct. 524, 530 (2019) (emphasis added); *see* 9 U.S.C. § 4 (requiring district courts to compel arbitration only "upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue").  At the same time, the FAA also instructs courts to enforce the terms that private parties have agreed to.  *Concepcion*, 563 U.S. at 339.  The Supreme Court has held that this rule applies with equal force to delegation clauses even if, like the one at issue here, they provide that an arbitrator is to decide the validity or formation of an arbitration agreement.  *Rent-A-Ctr.*, 561 U.S. at 68-72.

The Third Circuit resolved the obvious tension between these two principles in *MZM Construction Company, Inc. v. New Jersey Building Laborers Statewide Benefit Funds*, 974 F.3d

386 (3d Cir. 2020).  There, a construction company and a labor union had agreed to a simple, one-page agreement to govern hiring for a project.  *Id.* at 392.  The agreement incorporated by reference a preexisting collective bargaining agreement, which required employers to make financial contributions to the appellee funds.  *Id.* at 392-93.  The collective bargaining agreement also included an arbitration agreement, which in turn included a delegation clause providing that "[t]he Arbitrator shall have the authority to decide whether an Agreement exists, where that is in dispute."  *Id.* at 393.  A disagreement arose over whether the construction company was complying with its payment obligations, and the funds unilaterally scheduled arbitration.  *Id.* When the construction company sued to enjoin the arbitration, it argued that there was fraud in the execution of the employment agreement that incorporated by reference the collective bargaining agreement, so the arbitration agreement contained therein (including the delegation clause) did not bind the company.  *Id.*

The district court sided with the construction company and enjoined arbitration, *id.* at 394, and the Third Circuit affirmed, holding that, "unless the parties clearly and unmistakably agreed to arbitrate questions of contract formation in a contract *whose formation is not in issue*, those gateway questions are for the courts to decide," *id.* at 402 (emphasis added).  There, the formation of an agreement to delegate arbitrability to an arbitrator was at issue because "[l]ack of assent to the container contract"—the employment agreement—"necessarily implicates the status of the arbitration agreement" and "the container contract and the arbitration provision depend on the same act"—formation of the employment agreement—"for their legal effect."  *Id.* at 400 (citation omitted).  "That is no less true when the container contract includes or incorporates a delegation provision."  *Id.* (citation omitted).

Plaintiffs raise the same sort of arguments attacking the 2020 Terms of Service here.

Both Kirkham and Sessoms contend that they never formed an agreement to arbitrate with

TaxAct because they never validly agreed to the 2020 Terms of Service.  Moreover, the

arguments that they raise—that the arbitration agreement is illusory for lack of consideration,

and that they never assented to its terms—attack both their agreement to the container contract

(the 2020 Terms of Service) and the arbitration delegation clause contained therein.  The

agreements "depend on the same act[s]" for their validity.  *Id.* (citation omitted).  Because they

have placed "in issue" the "formation" of an agreement to delegate the issue of arbitrability to an

arbitrator, *id.* at 402, whether Plaintiffs and TaxAct formed an agreement to arbitrate is properly

before the Court.[2]

### B.  TaxAct Has Not Waived its Arbitrability Argument

Kirkham and Sessoms contend that positions taken by TaxAct in *Smith-Washington v.*

*TaxAct, Inc.*, No. 23-cv-830 (N.D. Cal. filed Feb. 23, 2023), a similar putative class action filed

in the Northern District of California, foreclose its efforts to arbitrate here.  Specifically, in

*Smith-Washington*, TaxAct has preliminarily agreed to a class action settlement.  Plaintiffs view

is that, in doing so, TaxAct has "relinquished any right that it may have to arbitration" not only

against the putative nationwide class at issue there, but also the putative Pennsylvania class at

issue here.

But TaxAct's conduct, both here and in California, belies that view.  The Supreme Court

---

[2] On the other hand, Plaintiffs' additional arguments that they have raised previously regarding the enforceability of the arbitration agreement, *e.g.*, that the arbitration agreement as a whole is procedurally and substantively unconscionable, do not specifically challenge the validity of the delegation provision and thus fall within the province of the arbitrator.  *Rent-A-Ctr.*, 561 U.S. at 68-72.  Unlike their arguments attacking the existence of an agreement to arbitrate, these arguments do not go to the formation of the agreement to arbitrate and, in turn, the delegation provision.  *See generally Bowles v. OneMain Fin. Grp.*, L.L.C., 954 F.3d 722, 725 (5th Cir. 2020) (treating a "procedural unconscionability objection" as going "to the enforceability of the Arbitration Agreement and not its formation"); Restatement (Second) of Contracts § 208 (Am. L. Inst. 1981) (describing unconscionability as a reason for "a court [to] refuse to enforce the contract," not a reason to hold that no contract was formed).

has held that, as in other contexts, waiver rules for arbitration agreements are the same as for any other contract.  *Morgan v. Sundance, Inc.*, 596 U.S. 411, 417 (2022).  Thus, in arbitration as elsewhere, "[w]aiver . . . 'is the intentional relinquishment or abandonment of a known right.'"  *Id.* (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)).  "In analyzing whether waiver has occurred, a 'court focuses on the actions of the p[arty] who held the right' and is informed by the 'circumstances and context of *each case*.'"  *White v. Samsung Elecs. of Am., Inc.*, 61 F.4th 334, 339 (3d Cir. 2023) (emphasis added) (footnote omitted) (first quoting *Morgan*, 596 U.S. at 417; and then quoting *Gray Holdco, Inc. v. Cassady*, 654 F.3d 444, 451 (3d Cir. 2011)).

In *White*, the Third Circuit held that Samsung had "evince[d] a preference for litigation over arbitration" when it "clearly sought to have this case dismissed by a court on the merits. Only after it was apparent that further litigation would be required, and it could not get the case fully dismissed before discovery, did Samsung attempt to arbitrate the remaining claim."  *Id.* at 340.  TaxAct's conduct in this case looks little like Samsung's in *White*.  True, TaxAct moved to stay the case arguing that Kirkham and Sessoms are members of the *Smith-Washington* nationwide class (ECF No. 64 at 4), but the company has not pursued the same merits-based resolution of the case that the Third Circuit relied on to find waiver in *White*.  Instead, TaxAct consistently has maintained that Plaintiffs' claims are subject to arbitration.  It asserted in the parties' discovery plan that it "believe[d] that Plaintiff agreed to arbitrate any claims on an individual basis" (ECF No. 14 at 2).  And, since then, TaxAct has filed three motions to compel arbitration (ECF Nos. 21, 30, 55), and never moved to dismiss the case on the merits.

Moreover, although the Third Circuit's directive to focus on the particularities of "each" case implies an individual analysis that can be understood to limit the effect of TaxAct's conduct in the *Smith-Washington* litigation in the waiver inquiry here, *White*, 61 F.4th at 339 (citation

11

omitted); *accord Chun Ping Turng v. Guaranteed Rate, Inc.*, 371 F. Supp.3d 610, 620 (N.D. Cal. 2019) (quoting *Bischoff v. DirecTV, Inc.*, 180 F. Supp.2d 1097, 1113 (C.D. Cal. 2002)) ("[T]o hold that defendant can no longer assert its right to compel arbitration simply because it did not assert that right in another case is absurd."), to the extent that TaxAct's conduct in the California case is relevant, for the reasons set forth below, it does not support a finding of waiver either. There, TaxAct moved to stay proceedings pending arbitration just days after the case was removed to federal court.  Motion to Stay Proceedings Pending Arbitration at 1, *Smith-Washington v. TaxAct, Inc.*, No. 23-cv-830 (N.D. Cal. Mar. 2, 2023) (ECF No. 12).  Indeed, the arbitration question has not been addressed in *Smith-Washington*, as all deadlines have been stayed as settlement negotiations proceed.  Order Granting Stipulation for Stay Pending Preliminary Approval Submission, *Smith-Washington* (N.D. Cal. Jan. 10, 2024) (ECF No. 107). Thus, TaxAct has not waived its argument that Kirkham and Sessoms must pursue their claims in arbitration.

### C.  The Arbitration Agreement is Supported by Adequate Consideration

Kirkham's and Sessoms's first contract-based argument is that the 2020 Terms of Service is unenforceable for lack of consideration.

Under Texas law,[3] a contract (including, of course, an agreement to arbitrate) is formed by: "(1) an offer; (2) an acceptance in strict compliance with the terms of the offer; (3) a meeting of the minds; (4) each party's consent to the terms; and (5) execution and delivery of the contract with the intent that it be mutual and binding."  *Franco v. Ysleta Indep. Sch. Dist.*, 346 S.W.3d 605, 608 (Tex. App. 2009) (citation omitted).  Moreover, "[a]n agreement to arbitrate, like other

---

[3] In reliance on the arbitration agreement's statement that its "validity and performance . . . shall be governed by Texas Law (without reference to choice of law principles), and applicable federal law," the arbitration agreement is to be interpreted according to that state's law (*see* ECF No. 52 at 1).

contracts, must also be supported by consideration." *Lizalde v. Vista Quality Markets*, 746 F.3d 222, 225 (5th Cir. 2014) (quoting *Mendivil v. Zanios Foods, Inc.*, 357 S.W.3d 827, 31 (Tex. App. 2012)).  "As it relates specifically to arbitration agreements," the general rule is that '[m]utual agreement to arbitrate claims provides sufficient consideration to support an arbitration agreement,'" with some exceptions not applicable here.  *Id.* (quoting *In re 24R, Inc.*, 324 S.W.3d 564, 566 (Tex. 2010) (per curiam)).  A different rule applies, however, "when an arbitration clause is part of an underlying contract."  *In re AdvancePCS Health L.P.*, 172 S.W.3d 603, 607 (Tex. 2005) (per curiam).  There, "the rest of the parties' agreement provides the consideration." *Id.*; *accord Sam Houston Elec. Coop., Inc. v. Berry*, 582 S.W.3d 282, 292 (Tex. App. 2017); *In re Lyon Fin. Servs., Inc.* 257 S.W.3d 228, 233 (Tex. 2008) (citation omitted).

Here, the arbitration provision is not a standalone contract between Plaintiffs and TaxAct. The 2020 Terms of Service, which contains many provisions setting forth the contractual terms between TaxAct and its users as well as the arbitration provision at issue, is supported by mutual obligations and forbearances.  *In re AdvancePCS Health*, 172 S.W.3d at 607.  Specifically, pursuant to the 2020 Terms of Service, users receive access to TaxAct's services in exchange for their being bound by the conditions contained therein, changes to which they must accept in order to continue to avail themselves of those services.  In that the arbitration provision was "but one part of a larger underlying contract," *Berry*, 582 S.W.3d at 292—because users needed to check only one box to assent to the entirety of the agreement's terms—the rest of the 2020 Terms of Service provide the necessary consideration for the arbitration provision.  Therefore, the Court will not deny TaxAct's Motion to Compel Arbitration on this ground.[4]

---

[4] Kirkham and Sessoms cite *Nelson v. Watch House International, L.L.C.*, 815 F.3d 190 (5th Cir. 2016), for the proposition that, even where an arbitration agreement is part of a larger contract, it can still be void if one party can amend it unilaterally.  But "state courts are the ultimate expositors of state law."  *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975) (citations omitted).  And the Texas Supreme Court has not carved out this exception.  *In re AdvancePCS*

### D.  Only Kirkham Assented to the Arbitration Agreement.

Having concluded that the arbitration agreement is supported by adequate consideration, the next question is whether Kirkham and Sessoms assented to the 2020 Terms of Service, and in turn, the delegation clause and arbitration provision contained therein.  It is not in genuine dispute that Kirkham checked the box agreeing to these terms.  The question instead is whether, under these circumstances, that action was sufficient to bind him to the 2020 Terms of Service.

#### i. Principles Governing Assent on the Internet

The proper standard against which to evaluate Plaintiffs' interactions with TaxAct's website flows from whether the 2020 Terms of Service are characterized as a "clickwrap" or "browsewrap" agreement.  A "clickwrap" agreement is one whereby "a website presents users with specified contractual terms on a pop-up screen and users must check a box explicitly stating 'I agree' in order to proceed." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022) (citing *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175-76 (9th Cir. 2014)); *accord StubHub, Inc. v. Ball*, 676 S.W.3d 193, 200 (Tex. App. 2023); *In re Online Travel Co. (OTC) Hotel Booking Antitrust Litig.*, 953 F. Supp.2d 713, 719 (N.D. Tex. 2013) ("*In re OTC*"). That process makes sure that customers "click on an acceptance *after* being presented with terms and conditions." *James v. Glob. TelLink Corp.*, 852 F.3d 262, 267 (3d Cir. 2017) (emphasis added).  "Structured properly, a clickwrap agreement would conclusively demonstrate notice and acceptance of the agreement's terms.  And a customer on notice of contract terms available on the internet website is bound by those terms." *Ball*, 676 S.W.3d at 200 (citation omitted); *see also Berman*, 30 F.4th at 856 (citing *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017)).

---

*Health*, 172 S.W.3d at 607.  Therefore, to the extent that *Nelson*, persuasive authority, holds otherwise, the Court will defer to the rule expounded in Texas's highest court.

On the other hand, browsewrap agreements, "in which a website offers terms that are disclosed only through a hyperlink and the user supposedly manifests assent to those terms simply by continuing to use the website," are more suspect "because consumers are frequently left unaware that contractual terms were even offered, much less that continued use of the website will be deemed to manifest acceptance of those terms." *Berman*, 30 F.4th at 856 (citation omitted); *Ball*, 676 S.W.3d at 200-01; *see also Fteja v. Facebook, Inc.*, 841 F. Supp.2d 829, 837 (S.D.N.Y. 2012) (treating Facebook's terms of use as neither "a true browsewrap license" nor "a pure-form clickwrap agreement").

In line with this distinction, website owners generally have two options to show that a user assented to their terms of service: (1) they can show that the user "ha[d] actual knowledge of the agreement;" or, (2) they can show the user was on "inquiry notice" to the terms by "provid[ing] reasonably conspicuous notice of the terms to which the consumer will be bound" and getting "unambiguous[] . . . assent to those terms" through "some action, such as clicking a button or checking a box." *Berman*, 30 F.4th at 856 (citations omitted).

"Whether a user has inquiry notice of a browsewrap agreement, in turn, depends on the design and content of the website and the agreement's webpage." *Nguyen*, 763 F.3d at 1177 (citation omitted). Thus, consumers have been held to not be on notice to "terms . . . located in text that would have become visible to [them] only if they had scrolled down to the next screen." *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 23 (2d Cir. 2002). Notice "printed in a tiny gray font considerably smaller than the font used in the surrounding website elements, and indeed in a font so small that it is barely legible to the naked eye" will not suffice either. *Berman*, 30 F.4th at 856-57. "On the other hand, 'where the website contains an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound, courts have

been more amenable to enforcing browsewrap agreements.'" *James*, 852 F.3d at 267 (quoting *Nguyen*, 763 F.3d at 1177).

### ii. How to Characterize the 2020 Terms of Service

Here, TaxAct's website contains some hallmarks of both browsewrap and clickwrap agreements.  On the one hand, to create an account, a user must click a checkbox indicating: "I agree to the TaxAct Terms of Service & Terms of Use [hyperlinked], and have read and acknowledge the Privacy Statement [hyperlinked]."  A user must check a similar box to file tax returns.  Traditional browsewrap agreements do not elicit this assent from users.  *Berman*, 30 F.4th at 856; *Ball*, 676 S.W.3d at 200-01.  On the other hand, the terms themselves never appear via pop-up and must be accessed by affirmatively clicking the hyperlink to them.  "Structured properly, a clickwrap agreement," *Ball*, 676 S.W.3d at 200, would "present[]" potential users "with the terms and conditions" before they assent, *James*, 852 F.3d at 267.

### iii. Kirkham Assented to the 2020 Terms of Service

The Court need not decide now how to characterize the 2020 Terms of Service, however, because even if analyzed as a browsewrap agreement, TaxAct's 2020 Terms of Service are enforceable against Kirkham.  If they are treated as a browsewrap agreement, to be bound by the 2020 Terms of Service, Kirkham: (1) must have received "reasonably conspicuous notice of the terms;" and, (2) must have taken "some action, such as clicking a button or checking a box, that unambiguously manifest[ed] his or her assent to those terms."  *Berman*, 30 F.4th at 856.  Because it is undisputed that Kirkham checked the box on TaxAct's website agreeing to the Terms of Service, only the first element is at issue here.  *Id.*

TaxAct provided Kirkham with sufficiently conspicuous notice of its Terms of Service for him to be bound.  To review, to create an account, Kirkham had to check a box indicating: "I agree to the TaxAct Terms of Service & Terms of Use, and have read and acknowledge the

Privacy Statement." The Terms of Service are marked in blue as typically indicates a hyperlink. The text is small but legible, is in the center of an uncluttered screen, and clearly indicates that checking the box constitutes assent to its terms.

This design is consistent with browsewrap agreements that have been enforced previously. "[I]t is permissible to disclose terms and conditions through a hyperlink" when "the fact that a hyperlink is present [is] readily apparent." *Id.* at 857. Although it is a best practice to underline or capitalize the linked text, highlighting in blue the hyperlink to the Terms in Service can help do that. *Id.*; *accord Meyer*, 868 F.3d at 78-79. Indeed, the notice provided here bears little in common with those found insufficient in *Berman* and *Nguyen*. TaxAct did not link to the Terms of Service "in a tiny gray font considerably smaller than the font used in the surrounding website elements." *Berman*, 30 F.4th at 846; *see also Checchia v. SoLo Funds*, 2023 WL 3868369, at *9 (E.D. Pa. June 7, 2023) ("Significantly, 'Terms & Conditions' is *not* hyperlinked to the Terms, nor does it appear in any special color, font, or format."). Nor did it dangle a hyperlink to the Terms of Service before its users without requiring that they click a button manifesting their assent to the conditions contained therein. *Nguyen*, 763 F.3d at 1178-79.

Pointing to *Berman*, a case primarily based on interpretations of California and New York law, Plaintiffs argue that "only if the user is explicitly advised that the act of clicking will constitute assent" can they be bound. 30 F.4th at 857. For one thing, it is doubtful that dispositive legal weight should be placed on this distinction given the increasing ubiquity of hyperlinks like the ones TaxAct included on its account formation screen. *See Fteja*, 841 F. Supp.2d at 839 (noting that "it is not too much to expect" regular internet users to "understand that the hyperlinked phrase 'Terms of Use' is really a sign that says 'Click Here for Terms of Use'"). Moreover, where, as here, TaxAct's services cannot be accessed without checking the

17

box indicating one's agreement to the 2020 Terms of Service, that is a distinction without a difference. *HealthPlanCRM, LLC v. AvMed, Inc.*, 458 F. Supp.3d 308, 333-34 (W.D. Pa. 2020) (collecting cases); *see also In re OTC*, 953 F. Supp.2d at 718-19 (treating a clickwrap agreement contained in a hyperlink as enforceable where "it was impossible to complete a transaction . . . in the absence of affirmative assent to the User Agreement"). TaxAct's website thus bears little resemblance to the one at issue in *Berman*. Finally, Kirkham's reliance on *Checchia*'s concern that a customer could be misled into thinking that the "Terms of Service" to which he had to agree there was something other than the terms and conditions containing the arbitration provision is misplaced here because in that case, "the 'Terms of Service' hyperlink had no identifier . . . and was not even the only 'Terms of Service' that appeared on the page." 2023 WL 3868369, at *9. Thus, Kirkham received reasonable notice of the 2020 Terms of Service, and he assented to the arbitration agreement contained therein.

### iv. *Sessoms Is Not Bound by His Wife's Assent to the 2020 Terms of Service*

Whether Sessoms formed a contract with TaxAct presents separate questions because he says that only his wife Krysta used the website. TaxAct argues that: (1) that is not the case because he personally assented to TaxAct's 2020 Terms of Service just like Kirkham did; and, (2) even if he never used TaxAct's website, Sessoms nonetheless is bound to arbitrate his claims based on two contract law doctrines (equitable estoppel and third-party beneficiary) as well as agency law.

With respect to the first argument, this cannot be grounds for compelling arbitration here in that Sessoms has submitted a declaration maintaining that he never used TaxAct's software and never granted his wife the authority to enter into an agreement to waive his right to a jury trial or proceed via a class action. TaxAct seeks to undermine the veracity of that declaration by

18

providing back-end records showing that the person creating Sessoms's account agreed to the

2020 Terms of Service when it was created and when individual tax returns were filed through

that account.  Sessoms does not dispute that but says it was his wife, Krysta—not him—who

handled the account.  *See* Tex. Bus. & Com. Code § 322.009(a) ("An electronic record or

electronic signature is attributable to a person *if it was the act of the person*." (emphasis added)).

His "non-conclusory affidavit . . . based on personal knowledge and directed at a material issue,

is sufficient to defeat" TaxAct's argument when analyzed in accordance with Rule 56 of the

Federal Rules of Civil Procedure.  *Lupyan v. Corinthian Colls. Inc.*, 761 F.3d 314, 320 (3d Cir.

2014) (citing *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161-63 (3d Cir.

2009)); *see Guidotti*, 716 F.3d at 776.

### a.  Equitable Estoppel

Turning to TaxAct's equitable estoppel argument: "Federal and Texas state courts have

recognized . . . that '[i]t does not follow . . . that under the [FAA] an obligation to arbitrate

attaches only to one who has personally signed the written arbitration provision'; instead, under

certain circumstances, principles of contract law and agency may bind a non-signatory to an

arbitration agreement."  *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 738 (Tex. 2005)

(citations omitted) (quoting *Fisser v. Int'l Bank*, 282 F.2d 231, 233 (2d Cir. 1960)); *see also R.J.*

*Griffin & Co. v. Beach Club II Homeowners Ass'n*, 384 F.3d 157, 160-61 (4th Cir. 2004).  Thus,

the equitable estoppel doctrine—sometimes referred to as "direct benefits estoppel"—is that "a

non-signatory plaintiff seeking the benefits of a contract is estopped from simultaneously

attempting to avoid the contract's burdens, such as the obligation to arbitrate disputes."  *In re*

*Kellogg Brown & Root*, 166 S.W.3d at 739 (citations omitted).  Texas courts, however, have

construed this limitation narrowly.  As relevant here, while "a non-signatory plaintiff may be

compelled to arbitrate if it seeks . . . through the claim, to derive a direct benefit from the

contract containing the arbitration provision," where "a non-signatory's claims can stand independently of the underlying contract, then arbitration generally should not be compelled under this theory." *Id.* at 739-41.

This case presents exactly that scenario, so equitable estoppel does not bar Sessoms's claim. The Amended Complaint at its core alleges that TaxAct compromised Plaintiffs' privacy by allowing Google and Meta access to their personal data. Plaintiffs' claims are brought under a state wiretapping law and federal tax laws, not claims for breach of contract or breach of warranty. These claims "arise[] from general obligations imposed by state law, including statutes, torts and other common law duties," *In re Morgan Stanley & Co., Inc.*, 293 S.W.3d 182, 184 n.2 (Tex. 2009) (citations omitted)—here, an analogue to the tort of invasion of privacy, *see Huber v. Simon's Agency, Inc.*, 84 F.4th 132, 153 (3d Cir. 2023)—and thus Sessoms cannot be compelled to arbitrate them based on equitable estoppel principles.

### b. Third-Party Beneficiary

TaxAct also argues that Sessoms, as a third-party beneficiary of his wife's agreement with the company, is bound by her assent to the arbitration provision. The third-party beneficiary doctrine provides that, "[l]ike other contracts, arbitration agreements may also be enforced by third-party beneficiaries, so long as 'the parties to the contract intended to secure a benefit to that third party and entered into the contract directly for the third party's benefit.'" *Jody James Farms, JV v. Altman Grp., Inc.*, 547 S.W.3d 624, 635 (Tex. 2018) (citation omitted) (quoting *In re Palm Harbor Homes, Inc.*, 195 S.W.3d 672, 677 (Tex. 2006)). The doctrine can be applied to compel third-party beneficiaries to arbitrate as well. *Carr v. Main Carr Dev., LLC*, 337 S.W.3d 489, 494-95 (Tex. App. 2011); *see also E.I. DuPont de Nemours and Co. v. Rhone Poulenc Fiber and Resin Intermediates, S.A.S.*, 269 F.3d 187, 195 (3d Cir. 2001).

The presumption is that "noncontracting parties are not third-party beneficiaries,"

*Newman v. Plains All Am. Pipeline, L.P.*, 23 F.4th 393, 401 (5th Cir. 2022) (citing *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 420 (Tex. 2011)).   Two conditions must be satisfied for that presumption to be overcome: (1) "the benefit must be more than incidental;" and, (2) the contracting parties must have "clearly and fully spelled out" their intent to benefit that party.  *Jody James*, 547 S.W.3d at 635 (quotation omitted).  "A court will not create a third-party beneficiary contract by implication."  *MCI Telecomm. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 651 (Tex. 1999) (citation omitted).  "Whether the third party intended or expected to benefit from the contract is irrelevant, because only the intention of the contracting parties in this respect is of controlling importance."  *Jody James*, 547 S.W.3d at 635 (internal quotation marks and citation omitted); *accord Union Pac. R.R. Co. v. Novus Int'l, Inc.*, 113 S.W.3d 418, 422 (Tex. App. 2003) ("The intention to confer a direct benefit on a third party must be clearly and fully spelled out in the four corners of the contract . . . .").

Thus, in *City of Houston v. Williams*, the court held that firefighters who were not mentioned in contracts between their union and the city nonetheless were third-party beneficiaries because the contracts: (1) "ma[d]e [their] purpose" to benefit the firefighters "plain in their preambles;" and, (2) "directly guarantee[d] benefits to the Firefighters" that were "not offered to the world at large."  353 S.W.3d 128, 146 (Tex. 2011).  On the other hand, in *Jody James*, an agent who sold a crop insurance company's policy to a farm could not claim third-party beneficiary status based on a federal statute's statement that the government "must 'encourage the sale of Federal crop insurance through licensed private insurance agents [who] shall be reasonably compensated from premiums paid by the insured.'"  547 S.W.3d at 635-36 (quotation omitted).  And in *Newman*, a pipeline owner was not a third-party beneficiary of an arbitration agreement between a staffing company and the contractor that it hired to inspect its

pipelines because none of the relevant contracts "clearly and fully spell[ed] out that [the pipeline owner] could take legal action" in case of a breach and the employment relationship with the contractor was controlled exclusively by the staffing company.  23 F.4th at 397, 402-03.  "Whatever [the pipeline owner's] expectations were, they are 'irrelevant.'"  *Id.* at 402 (quoting *Jody James*, 547 S.W.3d at 635).

These cases illustrate that Texas courts have set a high bar for overcoming the presumption against third-party beneficiary status.  Express reference to the parties' intent to benefit the third party is highly probative.  *Williams*, 353 S.W.3d at 146.  Reference to a generalized, aspirational intent to benefit a set of third parties as a class, *Jody James*, 547 S.W.3d at 635-36, as opposed to a specified third party or group of third parties, *Williams*, 353 S.W.3d at 146, is not enough to accord third-party beneficiary status.  And there are plenty of instances in which contracting parties surely understood that a third party would benefit from their agreement where the presumption against finding that status nonetheless survived.  *E.g.*, *Newman*, 23 F.4th at 402-03

Based on these principles, Sessoms was not a third-party beneficiary of the 2020 Terms of Service.  Two contractual provisions arguably serve as a hook for conferring that status on Sessoms, but both fall short.  First, the agreement accords a signatory "a limited, nonexclusive, nontransferable, non-sublicensable, revocable license to access and user the Services for [their] personal purposes . . . to prepare one valid and complete tax return . . . ."  Because TaxAct offers customers the opportunity to file a joint tax return—an offer that Krysta Sessoms availed herself of—her husband arguably would be a beneficiary of that single return.  Second, it makes clear that users must "acknowledge and agree that [they] are solely responsible for all content, data, and information submitted by your user identification . . . including, without limitation, content,

data, and information relating to third parties." TaxAct argues that this reference to "third parties" standing alone is enough to bind Sessoms. Texas law demands more. In *Williams*, the contracts at issue unambiguously identified the third-party beneficiary firefighters. 353 S.W.3d at 146. No similarly unmistakable manifestation of the parties' intent is present on the face of the 2020 Terms of Service. It is not enough that, as TaxAct phrases it, "Krysta obviously intended to benefit Matthew when she created an account under his name and filed his returns, both individually *on his behalf* . . . and then jointly." Once more, the intent to benefit a third party must be found within the four corners of the contract. *Union Pac. R.R. Co.*, 113 S.W.3d at 422. Here, it is not, so Sessoms cannot be bound to the 2020 Terms of Service as a third-party beneficiary of his wife's contract with TaxAct.[5]

### c.   Agency

Nor, at this juncture, on the arguments offered up by TaxAct, can agency law bind Sessoms. Like contract law, "agency may bind a non-signatory to an arbitration agreement." *In re Kellogg Brown & Root*, 166 S.W.3d at 738 (citations omitted). "Texas law does not presume agency, and the party who alleges it has the burden of proving it." *IRA Res., Inc. v. Griego*, 221 S.W.3d 592, 597 (Tex. 2007) (citation omitted).

"Authority to act on the principal's behalf and control are the two essential elements of agency." *Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 589 (Tex. 2017) (citations omitted).

---

[5] None of the cases that TaxAct cites illustrates a contrary principle, either because the extent of the third-party beneficiary doctrine was not analyzed or because the type of contractual relationship at issue shares little in common with this case. In *Nationwide of Bryan, Inc. v. Dyer*, the plaintiff-appellees conceded that the non-signatory spouse was a third-party beneficiary, so the parties' intent to benefit her was not decided by the court. 969 S.W.2d 518, 520 (Tex. App. 1998). In *Southwest Health Plan, Inc. v. Sparkman*, the plaintiff-appellee had purchased "health insurance coverage for himself and his son," a contractual relationship that, unlike the one between TaxAct and Krysta Sessoms, would unambiguously contemplate a benefit to a third party on the face of the insurance agreement. 921 S.W.2d 355, 356 (Tex. App. 1996). And in *In re Rangel*, the court held, without discussion or explanation of the contract's terms, that Juanita Rangel was bound to her husband Leon's agreement with Orkin Exterminating Company and the arbitration agreement contained therein because she was a third party beneficiary of the contract. 45 S.W.3d 783, 785, 787 (Tex. App. 2001). Reliance on this authority is, accordingly, a thin reed on which to hang a significant change in Texas law.

The agent thus "cannot bind a principal absent either actual or apparent authority." *Sanders v. Total Heat & Air, Inc.*, 248 S.W.3d 907, 913 (Tex. App. 2008). "Actual authority denotes that authority which the principal intentionally confers upon the agent, or intentionally allows the agent to believe he has, or by want of ordinary care allows the agent to believe himself to possess." *Lifshutz v. Lifshutz*, 199 S.W.3d 9, 22 (Tex. App. 2006) (citations omitted). The scope of an agent's actual authority comes from the "the principal's words and conduct relative to the agent." *Sanders Oil & Gas GP, LLC v. Ridgeway Elec.*, 479 S.W.3d 293, 302 (Tex. App. 2015) (citation omitted). On the other hand, "[a]pparent authority arises through acts of participation, knowledge, or acquiescence by the principal that clothe the agent with the indicia of apparent authority." *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 672 (Tex. 1998) (citations omitted). "Only the conduct of the principal may be considered; representations made by the agent of his authority have no effect." *Lifshutz*, 199 S.W.3d at 22-23 (citations omitted). Although generally a question of fact, *Undavia v. Avant Med. Grp., P.A.*, 468 S.W.3d 629, 634 (Tex. App. 2015), where "the facts are uncontroverted or otherwise established, the existence of an agency relationship is a pure question of law," *Harding Co. v. Sendero Res., Inc.*, 365 S.W.3d 732, 742 n.24 (Tex. App. 2012) (citations omitted).

Here, the facts necessary to determine whether there is an agency relationship are in genuine dispute. First, whether Krysta Sessoms had actual authority to bind her husband to the 2020 Terms of Service is in genuine dispute. To be sure, Matthew Sessoms gave his wife permission to "prepare" his tax returns on his behalf. But the scope of the "permission" he "intentionally confer[red]" on her is hotly contested. *Lifshutz*, 199 S.W.3d at 22 (citation omitted). He is emphatic in his declaration that he "did not grant her authority to enter into any agreements on [his] behalf or to waive [his] right to a jury trial or to participate in a class action."

While Sessoms's "permission" that Krysta "prepare [his] tax returns" could implicitly grant her actual authority to assent to the 2020 Terms of Service on his behalf, a rational factfinder could conclude otherwise, so TaxAct, the party alleging the existence of an agency relationship, has not carried its burden. *Griego*, 221 S.W.3d at 597.  Second, the scope of Krysta Sessoms's apparent authority is in genuine dispute as well.  Beyond the fact that Krysta created an account on its website in her husband's name, TaxAct has not pointed the Court to any sufficiently clear "acts of participation, knowledge, or acquiescence by" her husband to carry its burden of proving her apparent authority to bind her husband to the 2020 Terms of Service. *Morris*, 981 S.W.2d at 672.  The Court thus declines to hold that Sessoms assented to the arbitration agreement based on principles of agency law.

In sum, because his assent to the 2020 Terms of Service is subject to multiple disputes of material fact, the Court will deny TaxAct's Motion to Compel Arbitration as applied to Matthew Sessoms.

### E.  This Case Will Be Stayed in Part

Thus, at this stage, only Kirkham's claims must be arbitrated—per the 2020 Terms of Service, in Dallas County, Texas.  The Third Circuit recently reaffirmed, however, "that 9 U.S.C. § 4 does not permit a district court to enter an order compelling arbitration outside the district where it sits." *Henry ex rel. BSC Ventures Holdings, Inc. Emp. Stock Ownership Plan v. Wilmington Tr. NA*, 72 F.4th 499, 504 n.5 (3d Cir. 2023), *cert denied sub nom. Wilmington Trust, N.A. v. Marlow*, No. 23-122 (U.S. Oct. 16, 2023).  Thus, an Eastern District of Pennsylvania judge cannot order arbitration in Dallas County, Texas.  At the same time, federal law unambiguously provides that, once the Court is "satisfied that the issue involved . . . is referable to arbitration under such an agreement," it "shall on application of one of the parties stay the trial of the action until such arbitration has been had . . . ."  9 U.S.C. § 3.  Based on this

clear directive, the Court will stay Kirkham's claims but will deny TaxAct's Motion to Compel Arbitration.

While Sessoms's claims are not, on the record before the Court, subject to arbitration, there is an open question as to whether they should be stayed pending any arbitration of Kirkham's claims. Where, as here, some, but not all, parties are subject to an agreement ordering arbitration, the FAA does not require that the case be stayed. *Mendez v. Puerto Rican Int'l Cos., Inc.*, 553 F.3d 709, 712 (3d Cir. 2009) ("While Section 3 can reasonably be read to speak to situations in which the 'suit or proceeding' involves a non-arbitrable 'issue' between the parties as well as the arbitrable 'one,' we do not believe it can reasonably be read to resolve issues presented in situations involving a party who has not committed itself to arbitrate any issue before the court."). Instead, the scope of the stay is "within the discretion of the court." *Id.*; *Moses H. Cone*, 460 U.S. at 20 n.23. Courts applying *Mendez* have assessed:

> (1) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party; (2) whether denial of the stay would create a clear case of hardship or inequity for the moving party; (3) whether a stay would simplify the issues and the trial of the case; and (4) whether discovery is complete and whether a trial date has been set.

*Clouser v. Golden Gate Nat'l Senior Care, LLC*, 2016 WL 4254268, at *2 (W.D. Pa. Aug. 10, 2016) (citing *Akishev v. Kapustin*, 23 F. Supp.3d 440, 446 (D.N.J. 2014)); *see also Congdon v. Uber Techs., Inc.*, 226 F. Supp.3d 983, 990 (N.D. Cal. 2016) (similar). TaxAct bears the burden of showing that a stay is proper. *Landis v. N. Am. Co.*, 299 U.S. 248, 255 (1936) ("[T]he suppliant for a stay must make out a clear case of hardship or inequity in being required to go forward . . . ."); *CTF Hotel Holdings, Inc. v. Marriott Int'l, Inc.*, 381 F.3d 131, 139 (3d Cir. 2004) ("The opposing party must state a clear countervailing interest to abridge a party's right to litigate.").

Here, those factors counsel against staying Sessoms's case.  Because the arbitration agreement waives class arbitration, federal court might be the only forum in which Sessoms can proceed via representative litigation.  Staying the case thus would "present a clear tactical disadvantage" to Sessoms.  *Clouser*, 2016 WL 4254268, at *2 (citation omitted).  Moreover, depending on the issues reached in its ruling, the arbitrator's resolution of Kirkham's case might not necessarily be given preclusive effect in federal court, so a stay would not necessarily "simplify the issues" in Sessoms's case.  *Clouser*, 2016 WL 4254268, at *2; *see CTF Hotel Holdings*, 381 F.3d at 139 (cautioning that, although there is "the potential for judicial efficiency . . . in possible collateral estoppel because the arbitrator could make determinations relevant to [the party not obligated to arbitrate its claims]'s federal claims . . . staying litigation for that reason effectively denies [that party] its contracted for day in court"); Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 4475.1 (3d ed. Apr. 2023 Update) (noting that "the freedom an arbitrator may feel to develop judicially recognized legal principles and . . . the brevity or lack of an arbitral opinion . . . provide excellent reasons for reticence in recognizing issue preclusion").  Because these factors weigh in favor of allowing the case to proceed, Sessoms's claims will not be stayed, and they will proceed on this Court's docket.

An appropriate order follows.

**BY THE COURT:**

/s/Wendy Beetlestone, J.

_____

**WENDY BEETLESTONE, J.**

27